Mark Mahon
movieman1000@live.com
Mariners Rest,
Mariners View Avenue,
Passage West,
Cork,
Ireland
Tel: + 353 87 742 4444

*Plaintiff Pro Se*

FILED

OCT 27 2026

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

MARK MAHON, AN INDIVIDUAL,

Plaintiff,

v.

YOUTUBE LLC; GOOGLE LLC; MAINSAIL, LLC; SHORELINE ENTERTAINMENT, INC.; APPLE INC.; ENTERTAINMENT ONE UK LIMITED; DOE 1; AND DOES 2 - 10,

Defendants.

CASE NO. C 26 12575 PCP

**COMPLAINT FOR:**

1. COPYRIGHT INFRINGEMENT;
2. CONTRIBUTORY AND VICARIOUS INFRINGEMENT;
3. CONVERSION;
4. DECLARATORY RELIEF;
5. DECLARATORY RELIEF;
6. DECLARATORY RELIEF;
7. UNJUST ENRICHMENT

**DEMAND FOR JURY TRIAL**

BY FAX

Plaintiff, Mark Mahon, alleges as follows:

## PRELIMINARY STATEMENT

Plaintiff Mark Mahon brings this action in his individual capacity to protect and enforce his asserted rights in *Strength & Honour*, an original screenplay and motion picture registered with the United States Copyright Office, which he wrote, produced, and directed. Plaintiff asserts that the rights he previously conveyed to Maron Pictures Limited ("Maron Pictures") pursuant to three coordinated agreements dated September 25, 2006 reverted to him following the failure to pay the agreed consideration and his October 1, 2015 written revocation. His asserted individual reversion arose under those agreements and is distinct from Maron Pictures' separate contractual relationship with Mainsail LLC under the April 2009 Sales Agency Agreement.

This action concerns specifically identified later conduct and presently disputed Film-related rights, including the public availability of substantially the complete motion picture through a YouTube posting discovered on September 24, 2026; the dissemination of a Film copy displaying an altered opening presentation; the nonreturn and unresolved custody or disposition of the two original clean LipSync NTSC DVD-R screeners delivered to Shoreline Entertainment in California on July 30, 2009; and the existence, scope, duration, and present legal effect of rights asserted or administered through the historical Mainsail–Entertainment One distribution chain. Plaintiff seeks relief against each Defendant according to that Defendant's own actionable conduct, legally operative interests, and resulting injury.

The asserted Film-authorization chain originated in a written Sales Agency Agreement that *expressly excluded North America and Ireland.* Plaintiff maintains that no binding amendment expanded those territorial rights, and Mainsail's principals subsequently verified under oath in March 2025 that the "Sales Agency Agreement was not amended." Plaintiff further contests the authenticity of a purported January 20, 2016 declaration attributed to him, which he expressly repudiated under oath, and disputes the completeness of contractual materials authenticated and submitted in the prior federal proceedings. Those matters remain the subject of Plaintiff's pending direct challenges to the earlier judgments and are alleged here where relevant to ownership, authorization, knowledge, evidentiary provenance, and the parties' present legal

relationships.

Plaintiff does not concede the correctness, completeness, authenticity, or ultimate legal effect of the disputed evidentiary record, nor does he waive or abandon any pending appellate or post-judgment right. The detailed factual and procedural allegations herein are necessary to distinguish the particular conduct, contractual rights, evidentiary developments, and continuing legal controversies involving the respective Defendants, and to identify the independent factual and legal grounds supporting each Claim for Relief. The central authorization dispute is whether Mainsail possessed any legally effective copying authority or other legally effective authority to license copying or other exploitation of the Film within North America or Ireland and, if so, the source, scope, and limits of any such authority asserted by downstream Defendants. Plaintiff brings this action to preserve and vindicate his individually enforceable rights in the Film against the independently alleged conduct and continuing adverse claims identified herein, while maintaining his separate challenges to the disputed evidentiary submissions and representations that he alleges have materially prejudiced the recognition and enforcement of those rights.

## I. PARTIES AND RELEVANT NONPARTY ENTITIES

1. Plaintiff Mark Mahon ("Plaintiff" or "Mahon") is an individual residing in County Cork, Ireland. Plaintiff wrote, produced, and directed the original motion picture *Strength and Honour* (the "Film") and authored its underlying screenplay. For the avoidance of doubt, the titles *Strength and Honour* and *Strength & Honour* refer to the same motion picture, and the use of the ampersand does not identify a separate or different copyrighted work. Plaintiff brings this action in his individual capacity and asserts legal ownership of the exclusive Film rights at issue following the contractual revocation and reversion alleged below. In the alternative, as further alleged in ¶64, Plaintiff asserts beneficial ownership of particular exclusive copyright rights based upon the royalty interests personally reserved under his September 25, 2006 agreements with Maron Pictures Limited. Plaintiff bases his standing upon rights and interests held by him personally, rather than merely upon his ownership of shares in Maron Pictures Limited.

2. Defendant YouTube LLC ("YouTube") is a Delaware limited liability company and a wholly owned subsidiary of Google. YouTube maintains its principal business operations in San

Bruno, California and operates the YouTube audiovisual platform. Google and YouTube are separate legal entities, and Plaintiff alleges liability against each on the basis of that entity's own conduct, knowledge, control, contractual role, or legally attributable acts.

3. Defendant Google LLC ("Google") is a Delaware limited liability company with its principal place of business in Mountain View, California. Google Inc., which converted into Google LLC in September 2017, entered into Film-related content-hosting and distribution arrangements involving Entertainment One U.S. LP. Google has historically asserted Film authority derived through the downstream licensing chain described below.

4. Defendant Mainsail, LLC ("Mainsail") is a Nevada limited liability company. In the prior Northern District litigation, Mainsail admitted that its principal place of business was in Los Angeles County, California. Mainsail entered into the April 2009 Sales Agency Agreement ("SAA") concerning the Film and participated in Film-related licensing, distribution, and rights administration from or through California.

5. Defendant Shoreline Entertainment, Inc. ("Shoreline") is, on information and belief, a California corporation engaged in motion-picture licensing, sales, and distribution. Shoreline received Film materials in California, including the two clean LipSync DVD-R screeners described below, and participated in the Film-related distribution and presentation activities alleged herein.

6. At relevant times, Mainsail and Shoreline operated through overlapping ownership, management, personnel, offices, equipment, and Film-related business activities involving, among others, Sam Eigen ("Eigen") and Morris Ruskin ("Ruskin"). Although Mainsail was the named sales agent under the SAA, Shoreline separately received Film materials in California and participated in their handling, duplication, labeling, storage, and distribution. In his declaration filed on October 31, 2023, Eigen identified himself as an executive of both Mainsail LLC and Shoreline Entertainment, Inc., described them as affiliated companies referred to collectively as "Mainsail/Shoreline," and stated that he directly supervised their Film-marketing staff and reviewed Film-related records maintained in their electronic data storage. Plaintiff alleges each entity's direct responsibility for its own Film-related activities and for conduct undertaken

through its direction, authorization, agency, or ratification. Plaintiff further asserts alter-ego liability in the alternative, based upon their common ownership and integrated operations, including the undifferentiated attribution of Film-material custody. Plaintiff attributes the receipt and handling of the original masters to Shoreline and the copying directions and later custody representations to Mainsail and Eigen, as specified in ¶¶102 and 106–112.

7. Defendant Apple Inc. ("Apple") is a California corporation with its principal executive offices in Cupertino, California. Apple entered into downstream audiovisual-distribution arrangements involving Entertainment One entities and has historically asserted that its authority concerning the Film derived through the Mainsail–Entertainment One–Apple licensing chain.

8. Defendant Entertainment One UK Limited ("eOne UK") is a private limited company organized under the laws of England and Wales, company number 02989602, with a registered office in London, England. In May 2009, eOne UK entered into a Film-specific distribution arrangement with Mainsail and thereafter participated in Film licensing, delivery, accounting, rights administration, and downstream digital-platform arrangements.

9. Defendant Doe 1 is the presently unidentified person or entity that, on information and belief, selected and caused substantially the complete Film to be uploaded through the YouTube account publicly identified as "Rt3-Ireland," associated with video identification number M90fFPm3klw. Plaintiff did not authorize that upload. Doe 1's true name, domicile, address, and legal capacity are presently unknown to Plaintiff, and Plaintiff seeks appropriately limited discovery to identify that Defendant and the Film-specific conduct attributable to that person or entity.

10. Plaintiff presently does not know the true names, identities, legal capacities, or locations of certain additional persons or entities whose own conduct may be shown through discovery to have participated in one or more of the specifically pleaded later Film-related transactions. Plaintiff therefore designates such presently unidentified persons or entities as DOES 2 through 10. Those Does may include, to the extent supported by the evidence, persons or entities responsible for supplying the source copy used in the current YouTube posting; asserting or administering a Film-specific Content ID, provider, monetization, or other rights-management

interest; receiving or administering Film-specific revenue; administering or succeeding to a Film-specific account or obligation; or possessing, transferring, disposing of, or otherwise exercising dominion over the specifically identified tangible Film property alleged below.

11. The identities and precise roles of Doe 1 and DOES 2 through 10 are not presently reasonably available to Plaintiff because the relevant account-registration records, content-delivery records, source-file and platform metadata, rights-management records, payment and accounting records, succession records, communications, and physical-property custody records are principally within the possession, custody, or control of Defendants or other identified record holders. Plaintiff will seek leave to amend to substitute the true names and particularized allegations concerning any Doe Defendant if and when discovery supplies a legally sufficient basis to do so.

12. Plaintiff alleges each Defendant's actionable conduct, knowledge, control, participation, and legally attributable responsibility separately. Where supported by the particular facts alleged herein, Plaintiff further relies upon direct participation, agency, direction, authorization, ratification, material contribution, coordinated conduct, or another legally recognized basis of responsibility concerning an identified Film-related transaction or injury. These allegations apply to named and Doe Defendants alike.

**Relevant nonparty entities and corporate succession**

13. Entertainment One U.S. LP ("eOne US") is a Delaware limited partnership that historically acted as a United States contracting entity for certain Entertainment One distribution arrangements. The prior record identifies eOne US as a contracting or assignee entity in Film-related arrangements involving Apple and Google. eOne US is not presently named as a Defendant, but its agreements, assignments, records, and contractual role remain material to the source and scope of rights asserted by the named Defendants.

14. Hasbro, Inc. ("Hasbro") formerly owned or controlled entities within the Entertainment One group. In a declaration dated March 10, 2023, Hasbro's Managing Attorney for Global Litigation and Privacy, Robert Turner, stated that Hasbro had previously owned Entertainment One U.S. LP and had "subsumed certain of its contractual obligations." In the

accompanying filing, Hasbro represented that it had assumed obligations associated with the Apple/iTunes distribution arrangement. Plaintiff does not presently name Hasbro as a Defendant but alleges this evidence because it bears upon identifying the entities responsible for Film-related agreements, contractual obligations, records, accounts, and rights administration.

15. On December 27, 2023, Hasbro completed the disposition of its Entertainment One film-and-television business, identifying eOne UK as a transferred company and encompassing broadly defined categories of film-and-television assets, contracts, exploitation rights, accounts, records, and related business materials. Plaintiff has received no Film-specific transaction schedule, assignment, account-transfer instruction, or other record establishing whether the rights, materials, receivables, liabilities, or administration associated with *Strength & Honour* were retained, transferred, reassigned, terminated, or otherwise affected by that transaction. Plaintiff alleges the transaction insofar as it bears upon the identity and obligations of any present rights holder, contractual successor, account administrator, or custodian of Film-specific materials, without assuming that any particular Film asset or obligation transferred merely because it fell within a broadly described class of assets.

## II. SUBJECT-MATTER JURISDICTION, PERSONAL JURISDICTION, AND VENUE

### A. Subject-Matter Jurisdiction

16. This action includes claims for copyright infringement under the Copyright Act of 1976, 17 U.S.C. §§101 *et seq.*, including infringement of exclusive rights under 17 U.S.C. §§106 and 501 as alleged in Claims One and Two. This Court has original federal-question jurisdiction over those claims pursuant to 28 U.S.C. §1331 and original and exclusive jurisdiction pursuant to 28 U.S.C. §1338(a).

17. Plaintiff also seeks declaratory relief under 28 U.S.C. §§2201 and 2202 concerning actual, present controversies over Film-related rights and legal relationships, to the extent those controversies fall within this Court's original federal jurisdiction or its properly established supplemental jurisdiction.

18. Plaintiff invokes supplemental jurisdiction under 28 U.S.C. §1367(a) over Claim

Three. The California receipt, duplication, custody, labeling, and disputed disposition of the identified Film-source materials overlap with the source-copy and alteration issues concerning the later YouTube posting. The common records include the LipSync deliveries, Visual Data copying and shipments, Shoreline-branded discs, and disputed opening presentation alleged in Sections VI–VIII and X. Plaintiff alleges that these overlapping operative facts form part of the same Article III case or controversy. He invokes supplemental jurisdiction over the related contractual and financial issues only where their operative facts form part of that same controversy, as specified in the corresponding Claims.

**B. Personal Jurisdiction**

19. This Court may exercise personal jurisdiction to the extent permitted by California Code of Civil Procedure §410.10, the Due Process Clause of the United States Constitution, Federal Rule of Civil Procedure 4(k)(1)(A), and, where its requirements are independently satisfied as to a federal claim and a foreign defendant, Federal Rule of Civil Procedure 4(k)(2). Plaintiff alleges personal jurisdiction as to each Defendant based upon that Defendant's own California contacts and activities, together with any additional forum-directed conduct legally attributable to that Defendant through agency, direction, authorization, ratification, alter-ego relationships, or other applicable principles of law, as established by the Defendant-specific allegations and supporting evidence herein.

20. Apple Inc. is incorporated in California and maintains its principal executive offices in Cupertino, California. Google LLC maintains its principal place of business in Mountain View, California, and YouTube LLC maintains its principal place of business in San Bruno, California. Plaintiff alleges that each is at home in California and subject to this Court's general personal jurisdiction. The claims against each Defendant additionally concern that Defendant's own Film-specific contractual, platform, or rights-administration activities alleged herein.

21. Mainsail has admitted that its principal place of business is in Los Angeles County, California, and Shoreline has admitted that it is a California corporation with its principal place of business in Los Angeles County. Claim Three concerns each Defendant's own California

receipt, handling, custody, control, or disposition of the specifically identified tangible Film materials, as alleged in Section VII and Claim Three.

22. Plaintiff asserts specific personal jurisdiction over eOne UK for Claims Five and Seven based on its own Film-related dealings: the May 16, 2009 distribution agreement with California-based Mainsail, selection of California governing law, and March 31, 2011 assignment within the United States platform arrangements alleged in ¶¶123–135. The present claims concern the scope and duration of authority, succession, and financial administration under those dealings. Plaintiff alleges that these claim-related contacts connect eOne UK with California. Prior jurisdictional dismissals include the January 29, 2026 ruling in Case No. 4:25-cv-01083-YGR, challenged in Appeal No. 26-1092. Plaintiff preserves that direct challenge and seeks adjudication of the jurisdictional basis for the particular present claims.

23. In the alternative, for any independently cognizable claim against eOne UK arising under federal law, Plaintiff invokes Federal Rule of Civil Procedure 4(k)(2). Plaintiff relies upon eOne UK's own Film-specific United States-directed contractual dealings and rights-administration activities, including its participation in the assignment and downstream platform arrangements involving Entertainment One U.S. LP, insofar as attributable to eOne UK and relevant to the particular claim asserted. Plaintiff invokes Rule 4(k)(2) where eOne UK is not subject to personal jurisdiction in the courts of any State and where the exercise of jurisdiction based upon its aggregate claim-related United States contacts satisfies due process.

24. Plaintiff presently does not know the true identity, domicile, residence, or forum contacts of Doe 1 or the other unidentified Doe Defendants. Plaintiff seeks appropriately limited early discovery of the account, upload, source-copy, communications, payment, and other transaction-specific records necessary to identify the responsible persons or entities, determine the facts relevant to personal jurisdiction and venue, and effect service through the procedures authorized by law.

**C. Venue**

25. Venue for claims arising under the Copyright Act is governed by 28 U.S.C. §1400(a), which permits such an action to be brought in a judicial district in which the defendant

or its agent resides or may be found. The Ninth Circuit has held that a defendant may be found within a district for purposes of §1400(a) when that defendant would be subject to personal jurisdiction if the district were treated as a separate State. *Columbia Pictures Television v. Krypton Broadcasting of Birmingham, Inc.*, 106 F.3d 284, 289 (9th Cir. 1997), reversed on other grounds by *Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340 (1998).

26. Venue is proper in this District as to Google and YouTube because their principal business operations relevant to the present Film-related platform claims are located in Mountain View and San Bruno, respectively, within this District, and the claims concern Film-specific platform activity, rights administration, hosting, transmission, public performance, and records maintained or administered through their Northern California operations.

27. Venue is proper in this District as to Apple because Apple is headquartered in Cupertino, California, within this District, and the present declaratory controversy concerns Apple's own Film-related contractual and rights-administration position arising from agreements and platform conduct connected with its Northern California operations.

28. To the extent eOne UK is treated as a defendant not resident in the United States, Plaintiff relies upon 28 U.S.C. §1391(c)(3) as applicable to venue for claims governed by the general venue statute, subject to the separate jurisdictional requirements alleged above.

29. Venue is additionally proper under 28 U.S.C. §1391(b)(2) for claims governed by the general venue statute insofar as a substantial part of the events or omissions giving rise to those claims occurred within this District. Such events include Apple's Film-specific contractual and rights-administration activities in Cupertino and Google's and YouTube's Film-related contracting, platform processing, rights administration, hosting, transmission, and distribution activities connected with their Mountain View and San Bruno operations. The relevant events and their relationship to the particular claims are alleged in the corresponding factual sections.

30. Venue is independently proper under 28 U.S.C. §1391(b)(1) for claims governed by the general venue statute, based upon the residence of the presently identified domestic Defendants in California. Apple Inc. is incorporated in California and headquartered in Cupertino; Google LLC maintains its principal place of business in Mountain View; YouTube

LLC maintains its principal place of business in San Bruno; Mainsail LLC has admitted that its principal place of business is in Los Angeles County; and Shoreline Entertainment, Inc. is a California corporation with its principal place of business in Los Angeles County. Apple, Google, and YouTube reside within the Northern District of California for venue purposes, and the identified domestic Defendants are residents of California. This residence-based venue ground encompasses Plaintiff's California-law conversion claim against Mainsail and Shoreline, concerning those Defendants' own California Film-material activities. Plaintiff does not infer the domicile or residence of Doe 1 or any other unidentified Defendant merely from the availability of the challenged YouTube posting in California.

## III. CALIFORNIA AND UNITED STATES NEXUS; DOMESTIC ACTS AND INJURY

31. The California and United States connections alleged in this action arise from identifiable Film-specific transactions, contractual relationships, physical-property activities, digital-platform operations, and later acts of exploitation. Those connections include Plaintiff's California residence and financing of Film materials; the California receipt, handling, copying, inventorying, and shipment of Film elements; the Mainsail–Shoreline distribution and materials chain; agreements involving Apple, Google, and Entertainment One entities; documented United States platform operations concerning the Film; and the later public availability and playback of substantially the complete Film through YouTube from within California.

32. From approximately 2008 through 2010, during the Film's post-production, branding and early exploitation period, Plaintiff resided in California, including in Los Feliz, Hermosa Beach, and Marina del Rey, conducted Film-related business from California, and maintained a Bank of America account in California. On February 17, 2010, Plaintiff personally paid US$3,282.24 (£2,000) from that account toward LipSync's Film-specific post-production and master-material invoice and was not reimbursed by Maron Pictures or another person.

33. Film materials were maintained, accessed, copied, inventoried, and shipped through Visual Data Media Services ("Visual Data") in California. Mainsail acknowledged in 2023 directing Visual Data to reproduce Film copies and supply Film materials to distributors. Visual Data's records identify two DVD items associated with *Strength & Honour,* bearing

barcode numbers 263626 and 263627, which were included in a May 31, 2017 shipment addressed to Shoreline Entertainment at the Mainsail/Shoreline business location in Beverly Hills, California. The corresponding shipping records, companion delivery documentation, and sworn evidence from Visual Data corroborate the California shipment and receipt of those materials. The identity and provenance of the inventoried DVD items, including their relationship to the two original clean LipSync screeners, are addressed separately below.

34. Independently, contemporaneous records of LipSync Post Ltd. ("LipSync") establish that, following completion of the relevant post-production work in late July 2009, LipSync produced two clean, full-length NTSC DVD-R screeners of *Strength & Honour* and dispatched them directly to Shoreline Entertainment in California. Delivery to Shoreline was recorded on July 30, 2009. Plaintiff personally contributed to financing the relevant Film-specific post-production and master-material work and asserts ownership of, and a present right to possess, those two identifiable items of tangible Film property, independently of his copyright interests in the audiovisual work embodied on them.

35. Separate California and United States connections arose through the Film's downstream digital-distribution arrangements. Apple's later discovery production included a March 31, 2011 assignment of certain Entertainment One UK contractual interests to Entertainment One US LP, consented to by the relevant iTunes entity, and a July 29, 2011 Digital Video Distribution Agreement between Apple Inc. and Entertainment One US LP. Google's discovery production included an April 18, 2011 Content Hosting Services Agreement, a June 5, 2012 Transactional Content Agreement, and Amendment No. 1, involving Entertainment One US LP and Google entities. The accompanying Film-specific records connected *Strength & Honour* to those agreements and the digital-platform arrangements involving Apple in Cupertino and Google in Mountain View, California. YouTube maintains its principal business operations in San Bruno, California, and its particular contractual and platform responsibilities are alleged separately below. These agreements and associated records establish identifiable United States and California contractual connections to the Film's historical distribution chain, while the nature and location of the separate technical acts concerning the current YouTube posting are addressed

below.

36. On September 24, 2026, Plaintiff discovered that substantially the complete Film was publicly available through YouTube at https://www.youtube.com/watch?v=M90fFPm3klw, under the title "Strength & Honour full Irish movie" and the account name "Rt3-Ireland." On October 19, 2026, Kenneth T. Smith, a registered California process server physically present in Santa Clara County, California, accessed the specifically identified YouTube posting using an ordinary California internet connection without a VPN, proxy, or location-spoofing service. Smith personally selected and played portions of the Film through YouTube, observing moving audiovisual images and audible Film sound, including portions near the beginning and end of the approximately 1-hour-and-32-minute posting. His declaration executed on October 19, 2026, together with six accompanying screenshots, documents the actual California playback, the Film's displayed title, the identified uploading account, and representative content from the motion picture. On October 22, 2026, Roberto Antonio Rivera, a California licensed private investigator identified in his signed declaration as Licence No. 20124, independently accessed the same YouTube posting while physically present in Santa Clara, Santa Clara County, California, using his normal internet connection without a VPN, proxy, or location-spoofing service. Rivera personally observed moving images and accompanying Film audio and made an approximately 9-minute-and-53-second audiovisual recording using a Samsung Galaxy S25+ mobile phone. His declaration executed under penalty of perjury identifies the unedited source recording as 20261022_162900.mp4 and confirms that it fairly and accurately depicts the YouTube page and the portions of the Film he observed and recorded. These independent observations document actual Film playback in California on two separate dates. Based upon that evidence and the previously disclosed operation of Google and YouTube's United States infrastructure, Plaintiff further alleges on information and belief that technical processes associated with the current posting occurred through United States systems. The precise server locations, processing and transmission paths, uploader identity, and respective participation of Google, YouTube, and other persons remain matters for Film-specific discovery.

37. The two original clean LipSync screeners were delivered to Shoreline

Entertainment in California on July 30, 2009. Mainsail subsequently presented photographs of Shoreline-branded discs in cases bearing Visual Data barcode numbers 263626 and 263627, which Mainsail represented as the corresponding Film-source items, but those photographs do not establish that the photographed discs were the same physical items produced and dispatched by LipSync. Plaintiff has neither recovered the original screeners nor received a complete account of their subsequent location, custody, condition, transfer, or disposition. On September 30, 2026, Plaintiff formally demanded their unaltered return, if retained, or information identifying their whereabouts and disposition. The October 9, 2026 response deadline expired without reply, and no response had been received as of October 11, 2026. Plaintiff alleges these circumstances as a separate California tangible-property controversy, addressed more fully below.

38. The Film-specific discovery record separately identified historical technical activity involving United States infrastructure. Apple identified only United States-based server locations associated with *Strength & Honour* and disclosed Film-related copying, processing, transmission, performance, distribution, and related technical functions undertaken through United States systems. Google and YouTube's March 17, 2023 discovery responses and associated records likewise identified United States hosting, storage, routing, transmission, reproduction, public performance, distribution, and related processing involving the Film. Plaintiff relies upon these disclosures as evidence of the historical distribution chain's domestic technical operations. The particular systems, processes, and respective participation of Google and YouTube concerning video M90fFPm3klw remain matters for posting-specific discovery.

39. Plaintiff asserts present ownership of the Film and underlying screenplay rights asserted herein through his authorship, the September 25, 2006 agreements, and the contractual reversion following his October 1, 2015 revocation. The relevant United States Copyright Registration Nos. include PA 1-642-297, PA 1-398-376, and TXu1-289-556. Plaintiff asserts that unauthorized domestic exploitation of the Film, including the later public availability of substantially the complete Film through YouTube, impairs his asserted United States copyright interests, the exclusivity and commercial licensing value of those interests, and his ability to authorize and negotiate legitimate domestic exploitation. Plaintiff separately alleges interference

with his claimed ownership and possessory interests in tangible Film materials delivered to California.

40. Plaintiff alleges the historical California laboratory, physical-property, contractual, and platform records as evidence of Film-material provenance, the source and territorial scope of asserted authorization, and the conduct and identities of the relevant participants. The separately identified September–October 2026 YouTube and tangible-property developments bear upon the present conduct, injuries, and accrual allegations addressed in the corresponding claims for relief.

## IV. PRIOR PROCEEDINGS, PENDING APPEALS, AND SCOPE OF THIS ACTION

41. Plaintiff previously brought Film-related actions in this District, including Case No. 4:20-cv-01523-YGR against Mainsail LLC and related defendants; Case No. 4:20-cv-01525-YGR against Google LLC and YouTube LLC; Case No. 4:20-cv-01527-YGR against Entertainment One US LP, Entertainment One UK Limited, and related entities; Case No. 4:20-cv-01534-YGR against Apple Inc. and related defendants; and Case No. 4:20-cv-01530-YGR against Alphabet Inc. and Google LLC. Subsequent Film-related actions included Case Nos. 4:21-cv-08562-YGR and 4:22-cv-07397-YGR. The action commenced in 2025 is identified separately below. Plaintiff identifies these proceedings so that the relationship between the earlier pleadings, adjudications, and present Claims may be assessed according to the particular parties, conduct, rights, and issues involved.

42. On May 8, 2024, the District Court granted the defendants' motions for summary judgment in the Mainsail, Apple, and Google/YouTube actions. The resulting judgments were entered on June 4, 2024. The summary-judgment record included a purported January 20, 2016 declaration attributed to Plaintiff, which he had expressly repudiated under oath, and SAA packages submitted by Mainsail, Apple, and Google that Plaintiff asserts omitted material portions of the executed Laboratory Access documentation, as detailed below. Plaintiff appealed in Ninth Circuit Appeal Nos. 24-3570 (Google/YouTube), 24-3571 (Apple), and 24-3589 (Mainsail). On February 24, 2026, the Ninth Circuit issued memorandum dispositions affirming the respective judgments. Plaintiff continues to challenge the evidentiary foundation and legal consequences of those judgments through the separate judgment-relief proceedings and resulting

appeals identified below.

43. Plaintiff has consistently disputed the authenticity, completeness, and legal effect of material portions of the evidentiary record relied upon in the prior proceedings. In particular, Plaintiff disputes the purported declaration dated January 20, 2016, which attributed to him the assertion that "Maron Pictures owns the rights" to the Film, notwithstanding his earlier October 1, 2015 contractual revocation of rights previously conveyed to Maron Pictures. Plaintiff first encountered that purported declaration when Mainsail filed it on April 10, 2020, repudiated it under oath on April 12, 2020, and again expressly denied preparing, signing, authorizing, or adopting it during his April 27, 2023 deposition. Nevertheless, the district court subsequently cited the ownership assertion attributed to Plaintiff in its judicial-estoppel analysis. Plaintiff maintains his challenges to the authenticity and evidentiary effect of that instrument in the pending direct proceedings.

44. On October 31, 2023, Mainsail, Apple, and Google submitted SAA exhibits authenticated by Sam Eigen as true and correct copies and relied upon those submissions in asserting the Film's historical authorization and licensing chain. Mainsail's submitted package omitted the Laboratory Access Letter page bearing the laboratory's executed signature and included an unmarked Materials Schedule. The packages submitted in the Apple and Google actions contained a Laboratory Access form without the laboratory's executed signature and likewise included an unmarked Materials Schedule. Those materials differed from the completed Laboratory Access Letter and marked Materials Schedule bearing handwritten deletions and strike-throughs concerning identified Film Items and Video Items. Plaintiff separately submitted the executed Laboratory Access materials on October 31, 2023 in support of his challenge to Mainsail's asserted authority to direct Visual Data's California copying of Film materials.

45. Plaintiff first obtained the records revealing the relevant Visual Data copying activities through communications and documents received in December 2019. In its August 7, 2020 Omnibus Order, Case No. 4:20-cv-01523-YGR, Dkt. No. 44, at 9, the district court recognized the separate-accrual rule for copyright infringements and concluded, at the pleading stage, that Plaintiff could pursue the Visual Data-related infringement allegations under the

discovery rule because he alleged that Visual Data had withheld the relevant information before 2019.

46. Plaintiff submitted the executed Laboratory Access Letter and marked Materials Schedule on October 31, 2023 to challenge Mainsail's asserted authority for Visual Data's California copying of Film materials. During preparation of his Ninth Circuit briefs, Plaintiff subsequently compared those executed materials with the contractual packages authenticated and submitted by Defendants and identified the omissions and material differences alleged herein. On June 5, 2025, Plaintiff submitted the complete integrated SAA in Case No. 4:25-cv-01083-YGR, Dkt. No. 66-3. He subsequently presented the complete agreement and related evidence with the January 30, 2026 motions for relief from judgment. Plaintiff relies upon this chronology to distinguish the earlier submission of particular executed materials from the later comparative presentation of the complete contractual record.

47. On March 6, 2025, Morris Ruskin executed a verification under penalty of perjury adopting the April 2023 discovery responses. On March 7, 2025, Sam Eigen executed a corresponding verification individually and on behalf of Mainsail LLC and Shoreline Entertainment, Inc. Those verifications expressly adopted responses including the statement that the SAA "was not amended." Although that response had previously been served, the March 2025 verifications constituted subsequent sworn adoption by the identified individuals and entities after the May 8, 2024 summary-judgment rulings and June 4, 2024 judgments. Plaintiff relies upon those verifications as later-developed evidence concerning Mainsail's documented amendment position, contractual scope, and asserted Film authorization, with their legal effect upon the prior judgments reserved for the pending direct proceedings.

48. On January 30, 2026, Plaintiff filed motions under Federal Rule of Civil Procedure 60(d)(3), with alternative requests under Rule 62.1, in the Mainsail, Apple, and Google/YouTube actions. The motions presented the complete integrated SAA and Laboratory Access materials, Plaintiff's sworn repudiation and deposition testimony concerning the purported January 20, 2016 declaration, the March 2025 executed verifications, and related evidence concerning the integrity and completeness of the summary-judgment record. On March 23, 2026, the district court denied

those motions. Plaintiff separately appealed that denial in Ninth Circuit Appeal Nos. 26-2134 (Apple), 26-2299 (Google/YouTube), and 26-2533 (Mainsail). Those appeals challenge the denial of relief from the earlier judgments and the Court's treatment of the evidence and grounds presented in the motions.

49. Plaintiff commenced Case No. 4:25-cv-01083-YGR on February 3, 2025 and filed the First Amended Complaint on February 5, 2025. On January 29, 2026, the District Court entered Dkt. No. 76, dismissing the action without leave to amend. The Court dismissed the claims against Entertainment One UK Limited and Simon Osborn for lack of personal jurisdiction, including its determination that the previously litigated jurisdictional issue concerning eOne UK could not be relitigated on the showing made. The Court dismissed the claims against Apple, Google, YouTube, and Alphabet on claim-preclusion grounds and rejected Plaintiff's requests for relief from earlier judgments based upon the alleged evidentiary misconduct. Plaintiff disputes those determinations and challenges the January 29, 2026 ruling in Ninth Circuit Appeal No. 26-1092.

50. Plaintiff expressly preserves all arguments, objections, and requests for relief properly presented in the pending appeals and direct judgment-relief proceedings. Nothing in this Complaint constitutes a concession concerning the authenticity of the purported declaration, the completeness of the SAA materials previously submitted by any Defendant, the SAA's territorial exclusions, its amendment history, the domestic-conduct evidence, or the validity or ultimate preclusive effect of any judgment presently subject to direct challenge. The present Complaint is pleaded without assuming that the relief sought in those proceedings has already been granted.

51. Plaintiff relies upon historical agreements, prior filings, declarations, discovery responses, laboratory and platform records, accounting records, sworn statements, and litigation positions as evidence concerning the source and scope of asserted Film rights, authorization, notice, knowledge, intent, Film-material provenance and custody, financial administration, diligence, discovery, accrual, and causation. Those materials are relevant to connecting the later conduct and present legal controversies alleged herein with the responsible Defendants, asserted authority, identifiable transactions, and resulting injuries. Plaintiff seeks relief for the substantive

wrongs, individually enforceable rights, and present legal controversies specifically alleged in the corresponding Claims.

52. Plaintiff distinguishes the particular conduct and legal interests asserted in each present Claim from the historical transactions described as background. Claims One and Two concern the specifically identified full-length YouTube posting discovered on September 24, 2026 and the actionable conduct attributable to each responsible Defendant in connection with that posting. Plaintiff relies upon independently accrued claims according to their operative facts and dates, including the principle that federal claim preclusion does not bar claims accruing after the filing of the relevant operative complaint in an earlier action. *Howard v. City of Coos Bay*, 871 F.3d 1032, 1040–41 (9th Cir. 2017). The particular Defendant, conduct, asserted right, accrual facts, and resulting injury are identified in the corresponding Claim.

53. The circumstances relevant to the present Claims include Plaintiff's September 24, 2026 discovery of posting M90fFPm3klw; the October 19 and 22, 2026 California playback documented by Kenneth T. Smith and Roberto Antonio Rivera in ¶36; the October 22 notifications described in ¶¶187–189; Plaintiff's September 30, 2026 demand for the original LipSync screeners and the unanswered October 9 deadline; and the original eOne UK expiration timetable in Section XII, including March 31, 2025 for the distribution Term and September 30, 2025 for the physical-inventory sell-off period. Plaintiff also relies upon the identified 2026 rights positions and retail observations, according to each event's actual date, participants, and relationship to the conduct, obligation, or injury asserted in the corresponding Claim.

54. Plaintiff seeks adjudication of the substantive rights, actionable conduct, and present legal controversies identified in Claims One through Seven on the factual and legal grounds alleged for each Claim. Relief directed to setting aside the earlier judgments is pursued through the separate appellate and judgment-relief proceedings identified in this Section.

55. Ninth Circuit Appeal Nos. 26-1092, 26-2134, 26-2299, and 26-2533 concern prior rulings material to the Film rights, evidentiary record, and legal relationships alleged herein. Plaintiff intends to seek, by separate motion, an appropriate discretionary stay of this action or, alternatively, of the particular claims or issues materially affected by those appeals. Any

requested stay will identify its proposed scope and duration and provide for appropriate status reporting and reconsideration. Plaintiff will request that any stay preserve the Court's ability to authorize appropriately limited measures concerning identification of responsible parties, jurisdictional facts, preservation of Film-specific evidence and tangible property, and necessary interim relief concerning continuing unauthorized exploitation. Plaintiff brings this action upon the facts, documents, and evidence presently available following reasonable investigation, including matters expressly alleged on information and belief. To the extent discovery, identification of unknown participants, appellate decisions, or subsequent events supply a legally sufficient basis for additional or revised allegations, claims, parties, or remedies, Plaintiff intends to seek leave, where required, to amend or supplement this Complaint under Federal Rule of Civil Procedure 15, the applicable orders of this Court, and any applicable appellate mandates.

## V. PLAINTIFF'S CREATION, OWNERSHIP, CONTRACTUAL REVERSION, BENEFICIAL INTEREST, AND STANDING

56. Plaintiff Mark Mahon wrote the screenplay for *Strength and Honour* and served as the Film's producer and director. Plaintiff developed the Film as an independent Irish motion picture and personally participated in its financing, production, post-production, master materials, and authorized branding.

57. The Film was completed in or about 2008 and subsequently received substantial international recognition. Its underlying screenplay is registered with the United States Copyright Office under Registration No. TXu1-289-556. The motion picture is the subject of basic Registration No. PA 1-642-297, effective August 6, 2009, and supplementary Registration No. PA 1-398-376, effective May 3, 2017, which identifies that basic registration and records corrections and amplifications concerning Plaintiff's authorship and asserted ownership. Plaintiff relies upon the registration record together with the contractual grants, reserved interests, revocation, and reversion alleged herein to establish the particular rights he asserts.

58. Maron Pictures Limited, Irish company registration number 423090, was incorporated on July 4, 2006. Plaintiff has held one hundred percent of its issued shares since incorporation, and that ownership has remained unchanged. Those facts are corroborated by

Moore's December 6, 2022 ownership-confirmation letter, authenticated as Exhibit 1 to Trevor Leacy's declaration executed on May 24, 2023.

59. Plaintiff's ownership of Maron Pictures is relevant background but is not the source of the individual rights asserted here. Plaintiff bases his standing upon rights and interests held by him personally, including his authorship, contractual rights, asserted legal ownership following reversion, continuing percentage interests, beneficial ownership where applicable, and his separately asserted ownership and possessory interests in tangible Film property.

60. On September 25, 2006, Plaintiff entered into three coordinated written agreements with Maron Pictures: the Agreement to Acquire Literary Material, identifying Plaintiff as Owner; the Agreement to Acquire Authorship Rights, identifying Plaintiff as Author; and the Agreement for Producer and Director Services, identifying Plaintiff as Supplier. The agreements addressed the rights and services provided by Plaintiff in those respective capacities and contained express provisions governing consideration, royalties, and revocation. Each agreement selects Irish law. Plaintiff gives notice pursuant to Federal Rule of Civil Procedure 44.1 that he relies upon Irish law concerning the construction and operation of the September 25, 2006 agreements, including their rights grants, reserved royalties, revocation, and reversion provisions.

61. The three agreements formed a coordinated consideration structure. Collectively, they provided for payment to Plaintiff of €300,000, rather than three separate €300,000 payments, and also reserved to Plaintiff continuing percentage interests in the surplus distributable under clause 13(1)(b) of the related Production, Finance and Distribution agreement.

62. Clause 5(b) of the Literary Material agreement provided Plaintiff with further script royalties of forty percent; clause 4(b) of the Authorship agreement provided further authorship royalties of fifty percent; and clause 4(b) of the Producer and Director Services agreement provided further Producer and Director royalties of ten percent. Each percentage was tied to the surplus arising for distribution under clause 13(1)(b) of the related Production, Finance and Distribution ("PFD") agreement. The percentages collectively represented one hundred percent of that contractually defined distributable surplus.

63. The €300,000 consideration and the royalties identified above were promised directly to Plaintiff under agreements entered into with him as Owner, Author, and Supplier. His entitlement to amounts accruing under those provisions arose from the rights and services he provided and was independent of his ownership of shares in Maron Pictures. Plaintiff relies upon those contractual interests, together with his asserted reversion and any legally operative succession rights, to identify the personal financial interests affected by the conduct alleged in Claim Seven.

64. In the alternative, if the Court were to determine, contrary to Plaintiff's primary assertion of contractual revocation and reversion, that legal title to any particular exclusive copyright right remained with Maron Pictures Limited during the infringement challenged in Claims One or Two, Plaintiff asserts that he held beneficial ownership of that right under 17 U.S.C. §501(b) at the time of the challenged infringement. Plaintiff alleges that he originally held and conveyed the corresponding literary-material and authorship rights under the September 25, 2006 agreements in exchange for consideration that included the reserved script and authorship royalties identified in ¶62. He relies upon the corresponding royalty interest for the period in which it remained operative and the particular exclusive right infringed. This alternative rests upon Plaintiff's personal interest as an author who conveyed rights for royalty consideration, independently of his ownership of shares in Maron Pictures.

65. Clause 5(a) of the Literary Material agreement, clause 4(a) of the Authorship agreement, and clause 4(a) of the Producer and Director Services agreement required the stated €300,000 consideration to be paid in full no later than September 30, 2015 and expressly permitted Plaintiff, in his sole discretion, to revoke the corresponding rights if that consideration was not paid.

66. The required €300,000 consideration was not paid by September 30, 2015. Plaintiff did not waive the contractual payment requirement or agree that the rights transferred under the coordinated agreements could remain permanently vested in Maron Pictures notwithstanding the failure of consideration.

67. By written Notice of Contract Revocation dated October 1, 2015, Plaintiff

exercised the expressly reserved contractual remedy for nonpayment of the required €300,000 consideration by September 30, 2015, revoking the rights, licences, privileges, and property rights previously granted to Maron Pictures under the September 25, 2006 agreements. Niall Byrne, then a director of Maron Pictures, subsequently confirmed under oath that he received that notice in his capacity as a director on or about October 2, 2015. See Case No. 4:20-cv-01523-YGR, Dkt. No. 83-6, ¶4. The filed copy of the notice also bears a receipt stamp dated October 2, 2015.

68. Clause 10 of the Authorship agreement provided that, following written notice exercising the reserved revocation right, all rights granted and assigned would automatically revert if no agreement had been reached within thirty days after receipt of the notice. That clause expressly connected the Authorship agreement with the Literary Material and Producer and Director Services agreements and provided that a single notice would cover all three agreements, with the rights granted and assigned under them reverting in the same manner.

69. No agreement resolving the payment default was reached within thirty days after Maron Pictures received Plaintiff's Notice of Contract Revocation. Plaintiff maintains that his October 1, 2015 exercise of the expressly reserved contractual remedy effected the revocation and reversion of the rights previously conveyed under the three agreements. Independently and in the alternative, Plaintiff alleges that their automatic-reversion provisions became operative upon expiration of the contractual thirty-day period following receipt of the notice without an agreement resolving the default. Plaintiff therefore asserts ownership of the reverted rights before the later conduct challenged in the present copyright Claims.

70. On October 5, 2015, Plaintiff wrote to Trevor Leacy concerning the related Production, Finance and Distribution agreement and Share Purchase agreement, stating that he was treating those two agreements as void consequent upon his October 1, 2015 revocation of the rights previously assigned to Maron Pictures. The letters reiterated the nonpayment of the €300,000 consideration and identified the three September 25, 2006 rights agreements. Plaintiff relies upon that correspondence as part of the contemporaneous record of his exercise of contractual revocation and the resulting treatment of the related financial arrangements.

71. From the effective contractual reversion date, Plaintiff asserts that legal title to the

exclusive rights previously conveyed by him under the coordinated September 25, 2006 agreements vested again in him. Plaintiff asserts that Maron Pictures thereafter lacked authority to make any new grant, extension, amendment, renewal, or authorization inconsistent with the rights that had reverted to Plaintiff. Plaintiff has executed no subsequent written conveyance transferring those reverted rights to Mainsail, eOne UK, Apple, Google, YouTube, Doe 1, or any other Defendant.

72. Every licence, sublicense, distribution agreement, assignment, or other authorization derived from the rights originally transferred by Plaintiff remained subject to the substantive rights, territory, duration, conditions, and other limitations of the legally operative instruments. Plaintiff alleges that neither the asserted contractual reversion nor any survival, assignment, or sublicensing provision independently enlarged the rights previously and lawfully conveyed. The continued legal effect of any pre-existing licence must be determined according to its governing terms, the actual source and scope of the original authority, and applicable law. Plaintiff distinguishes such pre-existing arrangements from any new authorization purportedly granted after the rights had reverted to him.

73. Ownership of the copyright embodied in the Film and ownership of particular physical Film materials are separate property interests. Plaintiff independently asserts ownership of, and an immediate right to possess, the two original clean LipSync screeners produced and delivered to Shoreline Entertainment in July 2009. Plaintiff relies upon the Film-specific commissioning, financing, payment, production, delivery, and subsequent custody evidence alleged herein, including his personally funded post-production and master-material expenditure and the absence of reimbursement. Plaintiff asserts his tangible-property rights independently of his copyright interests and does not assert that ownership or possession of a physical carrier, standing alone, transferred or established ownership of the copyrighted audiovisual work embodied upon it.

74. Plaintiff asserts the particular personal interest supporting each Claim: legal ownership of the exclusive copyright rights he alleges reverted to him; alternatively, beneficial ownership of the particular rights and for the relevant periods described in ¶64; his personal

contractual or restitutionary interests in amounts legally payable or restorable to him; and his separately alleged ownership and immediate possessory rights in the identified tangible Film materials. Each Claim identifies the corresponding right, responsible Defendant, conduct, and resulting injury.

## VI. THE SAA, TERRITORIAL RESTRICTIONS, AMENDMENT REQUIREMENT, AND LIMITS ON ALTERATION

75. In April 2009, Mainsail and Maron Pictures executed a written Sales Agency Agreement concerning *Strength and Honour*. Mainsail executed the agreement on April 20, 2009, and Maron Pictures executed it on April 27, 2009. The SAA provided that its Deal Terms, Standard Terms, Delivery Schedule, Laboratory Access Letter, and Short Form Agreement were to be interpreted together as an integrated agreement.

76. The Deal Terms expressly defined Mainsail's contractual "Territory" as "the entire world, excluding North America and Ireland." California and the United States fell within the excluded North American territory, while Ireland was separately and expressly excluded.

77. Section 1.1 of the SAA granted Mainsail the sole and exclusive right to license distribution of the Film, as agent for and on behalf of Maron Pictures, only "throughout the Territory." The specified distribution media included theatrical exhibition, home video, television, video on demand, the Internet, and wide-area computer networks. Section 8 likewise required Mainsail to use commercially reasonable efforts to license the Film "throughout the Territory" and contemplated distribution licenses executed by Mainsail as "Agent of Licensor." Accordingly, the SAA's written territorial grant did not itself authorize Mainsail to license copying, distribution or other exploitation of the Film as an audiovisual work within North America, the United States, California, or Ireland.

78. The Short Form Distribution Agreement was expressly subordinate to the complete SAA and provided that the complete agreement would control in the event of inconsistency. Section 7.14 further restricted supplemental documentation from enlarging Maron Pictures' obligations without its express consent. A supplemental or delivery document therefore did not, merely by its existence, expand the territory or rights defined in the integrated SAA.

79. Section 19.3 expressly provided that the SAA could not be changed or terminated orally and that no amendment, modification, or assignment would bind either party until accepted by a duly authorized agent or officer of the other party. The provision further recognized facsimile signatures as valid for the SAA and amendments thereto. No accepted written amendment or modification expanding Mainsail's contractual Film-distribution Territory to include North America, the United States, California, or Ireland has been produced to Plaintiff or identified in the contractual record. Plaintiff asserts that the SAA's express territorial exclusion remained unchanged and that the written agreement conferred no authority upon Mainsail to license Film distribution within those excluded territories.

80. Mainsail's April 2023 discovery responses expressly stated that the SAA "was not amended." On March 6, 2025, Morris Ruskin verified those responses under penalty of perjury in his individual capacity. On March 7, 2025, Samuel Eigen verified them under penalty of perjury individually and on behalf of Mainsail LLC and Shoreline Entertainment, Inc. Those verifications, executed after the May 8, 2024 summary-judgment rulings, constituted subsequent sworn adoption by Mainsail's principals of the earlier non-amendment position and are material to the actual amendment history and written territorial scope of the SAA.

81. Mainsail's own earlier description of the agreement was consistent with its written territorial limitation. On October 31, 2023, Sam Eigen declared that Mainsail's agency under the SAA was limited to foreign distribution and that the agreement expressly excluded the United States and Ireland. Eigen further represented that he was personally familiar with the SAA and authenticated the SAA package submitted as Exhibit B as a "true and correct copy" of the agreement.

82. The SAA package authenticated by Eigen and filed by Mainsail as Exhibit B, Dkt. No. 118-3 in Case No. 4:20-cv-01523-YGR, was materially incomplete when compared with the executed, integrated contractual record. It omitted the Laboratory Access Letter page bearing the laboratory's execution and included an unmarked Materials Schedule instead of the materially marked schedule associated with the completed Letter. Eigen also authenticated SAA exhibits submitted in the Apple and Google actions on October 31, 2023. Those submissions included an

incomplete Laboratory Access form without the laboratory's executed signature and likewise contained the unmarked Materials Schedule. The executed Laboratory Access Letter and marked Materials Schedule contain handwritten deletions and restrictions material to identifying the Film elements covered by the laboratory-access arrangement.

83. Plaintiff's October 31, 2023 submissions in the Mainsail, Apple, and Google proceedings included the executed Laboratory Access Letter and marked Materials Schedule to challenge Mainsail's asserted authority for Visual Data copying. The later comparison with Defendants' authenticated packages and the complete-SAA submissions are described in ¶46. Plaintiff alleges that the differences are material to the accuracy of the authorization record and Mainsail's asserted authority to obtain, access, or direct copying of particular Film elements.

84. Section 6 of the SAA expressly governed changes to the Film. It authorized specified alterations, including dubbing, subtitling, foreign-language titles, and cuts or edits necessary to satisfy legal, broadcast, or other distribution requirements. It further provided that "[n]o other cuts or re-arrangements shall be made without prior written approval by the Licensor," with such approval not to be unreasonably withheld. Plaintiff alleges that the removal or replacement of the Film's original Maron Pictures opening presentation card was not an alteration permitted by those specified exceptions, and that neither Plaintiff nor Maron Pictures granted prior written approval for that particular change.

85. The SAA separately addressed the exploitation of artwork and promotional materials. Section 7.3 concerned Mainsail's right, during the contractual term, to distribute and otherwise exploit the Key Art and Stills supplied pursuant to the Delivery Schedule. That provision did not expressly authorize Mainsail to disregard applicable credit obligations, replace or alter presentation elements incorporated into the completed Film or Key Art, or depart from restrictions governing the use, placement, and prominence of names, likenesses, logos, and required credits. The Delivery Schedule expressly required a complete statement of screen and advertising credit obligations, the prescribed order and layout of names in the billing block, and copies of contractual provisions defining the form and nature of required credits and restrictions governing the use of names, likenesses, and logos. Plaintiff asserts that the materially altered

cover artwork and promotional presentations challenged herein departed from the materials supplied and the specific restrictions communicated to Mainsail, without Plaintiff's or Maron Pictures' approval.

86. Maron Pictures supplied Mainsail with completed branded Key Art and an authorized release trailer. On February 4, 2010, Plaintiff issued a Screen and Advertising Statement of Restrictions identifying the Film's required cast-credit presentation, Plaintiff's writing, producing, and directing credit, the Maron Pictures logo requirements, and the direction that *Strength and Honour* "shall be referred to, as an Irish film." A fuller version of that statement preserved in Mainsail's produced records additionally specified the Film's awards and Irish Film Academy nominations. Mainsail's contemporaneous correspondence further establishes that these restrictions were communicated downstream.

87. Plaintiff asserts that neither he nor Maron Pictures gave approval for the materially different cover artwork subsequently used in connection with the Film, the challenged altered trailer, changes to the required billing and actor presentation, the unauthorized alteration or substitution of existing Film presentation elements, or the characterization of the award-winning Irish Film as a "Brit flick." These departures were inconsistent with the authorized presentation of *Strength and Honour* and the specific screen, advertising, credit, and national-identity restrictions communicated to Mainsail and relevant downstream participants. Plaintiff further alleges that the disputed materials were created, supplied, approved, distributed, displayed, or continued in use notwithstanding the applicable restrictions and the objections and notices identified herein. The particular conduct, notice, participation, and subsequent exploitation attributable to each Defendant are alleged in the corresponding Defendant-specific factual sections.

88. The April 2009 correspondence expressly distinguished permission to add a separate Shoreline distributor logo from authorization to remove, replace, or alter the Film's existing presentation cards, which Plaintiff did not grant.

89. During September and October 2010, Maron Pictures objected in writing to the disputed Shoreline opening presentation. The full-length Film copy presently disseminated through the identified YouTube posting omits the original Maron Pictures opening presentation

and displays an animated Shoreline Entertainment presentation instead. Plaintiff alleges that the April 2009 negotiations described in paragraph 88, the 2010 written objections, and the comparison of the authorized and later Film versions support his allegations concerning the disputed alteration, the limits of the permission granted, lack of consent to removal or replacement of the original presentation, notice to Mainsail and Shoreline, and the provenance of the altered Film copy.

90. The complete integrated SAA includes the Laboratory Access Letter executed by the laboratory, Mainsail, and Maron Pictures, together with an associated Materials Schedule bearing material handwritten modifications. The executed schedule crosses out all listed Video Items and several identified Film Items, while leaving certain 35mm Film Items unstruck. Those handwritten modifications are absent from the unmarked Materials Schedule contained in the October 31, 2023 SAA packages submitted by Defendants. Plaintiff asserts that the marked schedule forms part of the operative laboratory-access documentation and is material to determining the particular Film elements covered by that arrangement.

91. The executed Laboratory Access Letter and marked Materials Schedule are relevant to the nature and scope of any asserted authority to obtain, access, reproduce, or direct copying of particular Film elements. Those materials did not constitute an amendment of the SAA's defined Territory or confer Film-distribution rights within North America or Ireland. Section 19.3 independently governed amendments to the SAA, including any proposed enlargement of its original territorial grant.

92. Physical access to, delivery of, or possession of a Film element likewise did not by itself transfer ownership of the physical carrier or confer an unrestricted copyright license. The Laboratory Access Letter remained a derivative of, and subject to, the purposes and limitations of the underlying agreement.

93. The SAA's written territorial exclusions, contractual limitations, and amendment requirements governed the Film rights Mainsail possessed and could convey or administer as sales agent for Maron Pictures. Rights derived through Mainsail remained confined to the authority Mainsail lawfully held under the governing instruments. In its November 15, 2023

opposition to Plaintiff's motion for summary judgment, Mainsail represented that the SAA had been formally terminated in October 2015 while invoking Section 2.5 concerning Existing Deals. Separately, Plaintiff alleges that the rights he previously conveyed to Maron Pictures reverted following the September 30, 2015 payment default and his October 1, 2015 Notice of Contract Revocation, as detailed in Section V. Plaintiff alleges that neither Section 2.5 nor the existence of downstream licensing arrangements enlarged the original SAA Territory, authorized new grants of rights that had reverted to Plaintiff, or conferred unrestricted continuing authority over the Film or its source materials.

## VII. PLAINTIFF'S TANGIBLE FILM MATERIALS, LIPSYNC SCREENERS, AND CALIFORNIA CUSTODY CHAIN

94. Plaintiff personally commissioned and contributed his own funds toward creation and completion of tangible Film master materials at LipSync Post Ltd. in London. LipSync Invoice No. 11909, dated September 30, 2009, identifies *Strength And Honour*, names "Mark Mahon / Maron Pictures" as client and "MARK MAHON" in the purchase-order field, and records a £12,000 final installment for Film-specific post-production work. Plaintiff's personal $3,282.24 (£2,000) payment toward that work is identified in ¶95. The commissioning, production, payment, and limited-purpose delivery support his asserted ownership and immediate right to possess the two original screeners.

95. On February 17, 2010, while maintaining a residence and personal bank account in California, Plaintiff transferred $3,282.24—then equivalent to £2,000—from his Bank of America account to LipSync in connection with *Strength & Honour*. The transfer carried a February 18, 2010 value date, identified the Film, and reflected Plaintiff's Los Angeles, California address. The beneficiary account information corresponded to the remittance account identified on LipSync Invoice No. 11909. The payment was made from Plaintiff's personal funds, and neither Maron Pictures nor any other person or entity reimbursed Plaintiff for that expenditure.

96. Plaintiff asserts personal ownership of and a present, immediate right to possession of the tangible Film materials he commissioned and financed, including the two original clean NTSC DVD-R master screeners produced by LipSync and delivered to Shoreline Entertainment

in California on July 30, 2009. Those original physical screeners were delivered for the limited Film-related purposes associated with screening and sales presentation, not through any sale, gift, assignment, abandonment, or other transfer of ownership of the physical items. Plaintiff did not convey title to those screeners to Mainsail, Shoreline, Visual Data, or any downstream distributor, and neither original has been returned to him. Plaintiff alleges those ownership and possessory interests independently of his copyright ownership and exclusive rights in the audiovisual work embodied on the screeners.

97. In late July 2009, LipSync completed post-production work necessary to produce two clean, full-length NTSC DVD-R screeners of the Film. The relevant audio conform and layback work was not completed until approximately July 28, 2009, and the two completed master screeners could not have existed in their finished form before that work was completed.

98. LipSync then dispatched those two clean NTSC DVD-R screeners directly to Shoreline Entertainment in California. LipSync's contemporaneous records reflect delivery to Shoreline on July 30, 2009.

99. The two clean NTSC DVD-R screeners produced and dispatched by LipSync were prepared in accordance with LipSync's established labeling practices. As confirmed by Daniel Pagan, LipSync's former Director of New Business, the screeners bore white LipSync-branded face labels identifying the Film as *Strength & Honour*, the nature of the deliverable, and the relevant creation date. The screeners were not produced or dispatched by LipSync bearing a "SHORELINE" logo or the altered title "STRENGTH & HONOR" (with "HONOR" spelled without the "U" in "HONOUR").

100. Visual Data Media Services maintained separate California laboratory records identifying two Strength & Honour DVD-R screener items under barcode numbers 263626 and 263627. Its records classified those items as source materials rather than deliverables created by Visual Data. In her January 26, 2022 sworn declaration, Visual Data's Director of Client Services, Mia Jones, further confirmed that the two items were logged under Maron Pictures. Those records establish the documented Film-source provenance and inventory history of the two specifically identified barcode items.

101. The documentary record identifies two material custody transactions concerning Film screeners: LipSync's direct delivery of two clean NTSC DVD-R screeners to Shoreline in July 2009, and Visual Data's subsequent shipment of the two source DVD-R items associated with barcodes 263626 and 263627 to Shoreline in May 2017. Plaintiff alleges that the identity and provenance of the physical discs involved must be determined from their production records, distinguishing physical characteristics, shipment documentation, and subsequent custody history.

102. In his October 31, 2023 declaration, Sam Eigen acknowledged that Mainsail/Shoreline instructed Visual Data to copy Film elements and provide them to distributors during 2009, 2010, and August 2011. Mia Jones separately confirmed under penalty of perjury that Mainsail requested Film-material copying and shipment and that Visual Data did not undertake those activities without a client request. Those statements identify Mainsail's operational involvement in the California copying and distribution chain.

103. Plaintiff disputes that the SAA or Laboratory Access Letter supplied unrestricted authority for those California copying activities. As alleged above, the SAA contained express territorial and materials limitations and did not itself transfer ownership of tangible Film masters merely because Mainsail or a laboratory obtained access to them.

104. At the time the Visual Data copying occurred, Plaintiff did not know that additional Film materials were being reproduced in California at Mainsail's direction. Plaintiff understood that existing physical materials were being shipped directly to distributors and repeatedly sought information concerning their whereabouts and movement.

105. Those efforts included inquiries beginning in 2010 and a detailed written request dated March 20, 2012 seeking identification of the countries and recipients to which *Strength & Honour* materials had been shipped. Plaintiff first obtained records revealing the nature and extent of Visual Data's California copying activity through communications and documents received between December 12 and December 16, 2019.

106. On May 31, 2017, Visual Data prepared an outgoing Shipping/Receiving Authorization, Receipt No. 514844, identifying DVD-R source items bearing barcode numbers 263626 and 263627 as *Strength & Honour* NTSC screeners. The shipment was addressed to

Shoreline Entertainment, attention Jennifer Ishikata, at 400 South Beverly Drive, Suite 210, Beverly Hills, California 90212, the same location associated with Mainsail's customer account. The corresponding shipment documentation and signed receiving records establish the California delivery transaction. In her January 26, 2022 sworn declaration, Mia Jones expressly confirmed that a signed shipper established Mainsail's receipt of the two identified source masters at Shoreline's Beverly Hills offices on May 31, 2017.

107. Mia Jones further confirmed under oath that Visual Data did not receive either source item, barcode 263626 or 263627, back into its inventory following the May 31, 2017 shipment. Plaintiff subsequently recovered all other Film master materials maintained by Visual Data, but neither of those specifically identified source items was returned to Plaintiff. Separately, Plaintiff has never received the two original clean NTSC DVD-R screeners that LipSync produced and delivered directly to Shoreline in July 2009.

108. On October 31, 2023, Sam Eigen executed a declaration representing that Mainsail/Shoreline possessed two discs associated with Visual Data barcode numbers 263626 and 263627. Eigen stated that those discs had been manufactured in-house on Mainsail/Shoreline's duplicating equipment on May 22, 2009, and that their Shoreline-branded face labels had been prepared and affixed in-house. Eigen further represented that the discs contained a full-length version of the Film bearing a persistent Shoreline Entertainment identification and that he had located them in a storage box maintained at Mainsail/Shoreline's offices during the litigation. Mainsail submitted photographs and related materials in support of those representations.

109. On September 30, 2026, Daniel Pagan, LipSync's former Director of New Business and a person involved in the production and dispatch of the two clean LipSync screeners, executed a declaration after reviewing Mainsail's photographs. Based upon his personal involvement, contemporaneous LipSync records, and LipSync's labeling practices, Pagan stated that the photographed Shoreline-branded discs are not depicted in the form or condition in which LipSync produced and dispatched the two clean screeners in July 2009. He further stated that the photographs, standing alone, do not establish that the photographed discs are the same physical DVD-Rs dispatched by LipSync.

110. The physical characteristics and manufacturing chronology attributed to the Shoreline-branded discs materially differ from those of the two original LipSync screeners. Eigen identified May 22, 2009 as the date on which the Shoreline-branded discs were manufactured in-house, whereas LipSync's contemporaneous production records and Pagan's sworn declaration establish that the two original clean screeners were produced only after the relevant audio conform and layback work was completed in approximately late July 2009. The photographed discs also bear Shoreline branding and the title "STRENGTH & HONOR," rather than the original white LipSync labels identifying the Film as "Strength & Honour." Plaintiff alleges that these differences are material to identifying the photographed discs and establishing whether they account for the original physical screeners delivered to Shoreline on July 30, 2009.

111. Pagan further explained that the clear plastic DVD cases depicted in Mainsail's photographs were containers that LipSync used during the relevant period and that a disc could be removed and replaced without altering the case or a barcode affixed to it. Accordingly, the appearance of the case or barcode does not, standing alone, establish the identity, origin, contents, or provenance of the disc subsequently placed inside it.

112. Shoreline was the documented recipient of the two original clean LipSync screeners in California on July 30, 2009. Mainsail separately directed Film-material handling and laboratory activities and, through Sam Eigen, subsequently made representations concerning the possession, manufacture, and provenance of the Shoreline-branded discs identified during the litigation. Neither Mainsail nor Shoreline has provided Plaintiff with a complete chain-of-custody record identifying the subsequent storage, movement, handling, alteration, transfer, return, loss, destruction, or other disposition of the two original LipSync screeners following their delivery to Shoreline. Neither Defendant has identified their present location or custodian or returned those originals to Plaintiff. Plaintiff alleges that the original screeners remain unaccounted for and that records and information within the possession, custody, or control of the responsible Film-material participants are material to determining their subsequent disposition and identifying any wrongful detention, transfer, or other interference with Plaintiff's property rights.

113. On September 30, 2026, Plaintiff transmitted a written demand to counsel for

Mainsail and Shoreline identifying the two clean LipSync screeners, asserting Plaintiff's ownership and present right to possession, and requesting their unaltered return if they remained within either Defendant's possession, custody, or control. The demand alternatively requested information sufficient to identify their present location, custodian, transfer history, or disposition. Plaintiff requested a substantive response by October 9, 2026.

114. The demand further requested preservation of the relevant physical items and records concerning their receipt, storage, handling, copying, labeling, transfer, shipment, return, loss, destruction, disposal, or other disposition, including records capable of distinguishing the two clean LipSync screeners from the separately photographed Shoreline-branded discs.

115. On October 9, 2026, the deadline specified in Plaintiff's September 30, 2026 written demand expired without any response from Mainsail, Shoreline, or their counsel. As of October 11, 2026, Plaintiff has received no acknowledgment, substantive response, or explanation concerning the whereabouts, custody, condition, or disposition of the two clean LipSync NTSC DVD-R screeners. Neither Defendant has returned either screener, identified its present custodian or location, or provided the requested information concerning its subsequent handling, transfer, or disposition. Plaintiff continues to assert his ownership of and immediate right to possession of the two original physical screeners delivered to Shoreline in California on July 30, 2009.

116. Plaintiff never relinquished his asserted ownership of or right to possession of the two original clean LipSync screeners. Those specifically identifiable Film materials were delivered to Shoreline in California, have never been returned to Plaintiff, and remain unaccounted for despite Plaintiff's September 30, 2026 written demand and the expiration of the October 9, 2026 response deadline. Plaintiff alleges a continuing deprivation of possession of his tangible Film property and seeks its unaltered return, together with appropriate relief for any established wrongful detention, transfer, disposal, destruction, or other exercise of dominion inconsistent with his ownership and possessory rights.

117. These tangible-property allegations concern the physical chattels themselves and are independent of the exclusive copyright rights embodied in the Film. Possession of a master, DVD, digital file, or other physical or electronic copy did not, by itself, convey ownership of

copyright or authority to reproduce, distribute, publicly perform, alter, or sublicense the Film. The historical custody and copying evidence is also relevant to provenance, source-copy identification, California conduct, knowledge, notice, and the origin of Film materials appearing in later exploitation.

## VIII. THE MAINSAIL–eONE AUTHORIZATION CHAIN, TERRITORIAL LIMITS, AND UNITED STATES PLATFORM DELIVERY

118. Entertainment One UK Limited, formerly known as E1 Entertainment UK Limited, did not obtain any rights in *Strength & Honour* directly from Plaintiff. The Film rights asserted by eOne UK originated through Mainsail and therefore depended upon the nature and scope of whatever authority Mainsail lawfully possessed.

119. In verified jurisdictional discovery responses dated October 8, 2020, eOne described an agreement entered into on or about May 1, 2009 between eOne UK and Mainsail, acting for and on behalf of Maron Pictures, as the "eOne-Maron License." According to eOne, that license covered the United Kingdom of Great Britain, Eire, the Channel Islands, Isle of Man, Malta, Gibraltar, and the Armed Forces of those territories, and did not cover the United States or any other part of North America.

120. In the same verified responses, eOne separately identified a Distribution License Agreement dated on or about May 16, 2009 between eOne UK and Mainsail (the "eOne-Mainsail Agreement"). eOne stated that the agreement was for a fifteen-year term, identified the same defined European territories, expressly excluded the United States and North America, and permitted eOne UK to sublicense or sub-distribute only rights held under that agreement and only within the defined territories during its term.

121. Whatever rights eOne UK received through either transaction remained derivative of the rights lawfully held by Mainsail. As alleged above, the SAA defined Mainsail's Territory as excluding North America and Ireland, required accepted formal changes for amendments or modifications, and was later verified by Mainsail to have "not been amended." A downstream agreement could not, merely by its execution, enlarge the upstream Film rights from which it purported to derive.

122. The territories identified in eOne UK's asserted licensing arrangements expressly included Eire, notwithstanding the SAA's exclusion of Ireland from Mainsail's contractual Territory. Section 19.3 governed amendments and modifications to the SAA, and Mainsail's contracting-side principals subsequently verified under penalty of perjury on March 6 and 7, 2025, that the SAA "was not amended." Plaintiff alleges that the inclusion of Ireland within eOne UK's downstream licensing arrangements did not enlarge Mainsail's original contractual grant or confer Film-distribution rights that the written SAA expressly excluded.

123. eOne UK thereafter participated in a Film-distribution structure involving related eOne entities and digital-platform agreements with United States companies. In its October 2020 responses, eOne acknowledged that in or around 2010 or 2011 eOne UK entered into a Memorandum of Understanding with Entertainment One US LP, Seville Pictures Inc., and Entertainment One Films Canada Inc. concerning coordinated administration of their respective iTunes distribution arrangements through an umbrella structure.

124. According to eOne, the MOU parties coordinated their iTunes arrangements under a single umbrella agreement while continuing to deliver content through vendors designated by iTunes. Thus, Entertainment One US LP occupied a role in the contractual administration of the digital-platform structure even though particular Film files could be transmitted by vendors located outside the United States.

125. eOne further stated that, on or about February 3, 2010, eOne UK used Vode Ltd. in England to transmit an electronic copy of *Strength & Honour* to iTunes S.à.r.l. over the Internet. eOne stated that the Film was supplied pursuant to an umbrella agreement between Entertainment One US LP and iTunes S.à.r.l.

126. eOne also stated that in or around 2012 eOne UK used Vode and/or Refine Media in the United Kingdom to transmit an electronic copy of the Film to Google Inc. and/or Google Ireland Limited. According to eOne, that delivery occurred pursuant to an agreement among Entertainment One US LP, Google Inc., and Google Ireland Limited.

127. eOne further represented that the Google arrangement applied generally to video content and that distribution of particular content was restricted through associated metadata. As

to *Strength & Honour*, eOne stated that the Film-specific metadata limited distribution, at most, to the United Kingdom, Eire, Channel Islands, Isle of Man, Malta, Gibraltar, and the Armed Forces of those territories.

128. The October 2020 responses therefore acknowledged Entertainment One US LP's participation in the contractual administration of the Film's digital-platform distribution arrangements, while identifying electronic deliveries through United Kingdom vendors and asserting Film-specific restrictions on the territories available for distribution. The responding eOne entities nevertheless separately denied particular Film-related delivery and licensing activities within California, as reflected in their jurisdictional interrogatory responses identified below.

129. In response to Jurisdictional Interrogatory No. 1, eOne represented, after what it described as a reasonably diligent investigation, that none of the eOne defendants—including Entertainment One US LP, Entertainment One Ltd., and Entertainment One UK Ltd.—provided copies of the Film to Apple, Google, or YouTube in the Northern District of California or in any other federal judicial district in California.

130. In response to Jurisdictional Interrogatory No. 2, eOne further represented that none of the eOne defendants engaged in licensing activity concerning the Film in the Northern District of California or in any other federal judicial district in California.

131. In response to Jurisdictional Interrogatory No. 4, eOne represented, again after what it described as a reasonably diligent investigation, that Entertainment One US LP neither provided nor acted as an agent of any parent company in providing the Film to Apple, Google, or YouTube.

132. Simon Osborn verified those discovery responses on behalf of eOne UK. Osborn stated that he was eOne UK's Head of Legal and Business Affairs, Distribution, that he had read the responses and knew their contents, and that the matters stated therein were true based upon his information and belief. He executed the verification under penalty of perjury under the laws of the United States.

133. Between October and December 2020, eOne produced contractual documents

concerning the Film and its digital-platform distribution chain, including an intercompany iTunes Memorandum of Understanding, an Apple/iTunes agreement, and a financially redacted Google Transactional Content Agreement. That production did not include the executed March 31, 2011 assignment from Entertainment One UK to Entertainment One US LP and related iTunes consent, the subsequent Apple Inc.–Entertainment One US LP United States/Canada distribution agreement, Google's April 18, 2011 Content Hosting Services Agreement, or the June 5, 2012 amendment linking that hosting agreement to the transactional arrangement. Plaintiff subsequently obtained the additional instruments through discovery from Apple and Google in 2023. Those documents supplied material contractual details concerning Entertainment One US LP's United States platform role and the Film-specific authorization and distribution chain.

134. Apple's subsequent discovery production identified an executed March 31, 2011 assignment of the relevant iTunes agreements from Entertainment One UK to Entertainment One US LP, with the consent of the applicable iTunes entity. Apple's production further identified a July 29, 2011 Digital Video Distribution Agreement between Apple Inc. and Entertainment One US LP governing distribution in the United States and Canada and selecting California law and the Northern District of California. In discovery responses served March 31, 2023 and verified April 12, 2023, Apple identified the contractual chain governing *Strength and Honour* and confirmed Film-related platform functions authorized under those agreements involving California and United States servers. Plaintiff asserts that these subsequently produced instruments and Film-specific responses establish material United States and California contractual and technical connections absent from the complete transactional picture presented by eOne in 2020.

135. Google's subsequent discovery production identified the April 18, 2011 Content Hosting Services Agreement between Entertainment One US LP and Google Inc., together with Amendment No. 1, effective June 5, 2012, linking that hosting arrangement to the separate Transactional Content Agreement. Although eOne had produced a financially redacted version of the Transactional Content Agreement in December 2020, it had not produced the Content Hosting Services Agreement or the amendment. Google's March 2023 discovery responses and

subsequent evidentiary submissions connected *Strength and Honour* to the Entertainment One/Google contractual structure and identified Film-related hosting, processing, storage, transmission, and distribution functions conducted under the applicable platform arrangements. Plaintiff alleges that these additional executed instruments and Film-specific disclosures established material features of the United States contractual and technical chain that had not been disclosed through eOne's earlier production.

136. Plaintiff disputes the completeness and accuracy of the October 8, 2020 verified California licensing-and-delivery account in ¶¶129–132 in light of the additional executed instruments and Film-specific disclosures identified in ¶¶133–135. Although eOne had disclosed certain intercompany and digital-platform arrangements, the later production supplied additional evidence of the assignments, participating entities, asserted rights, and United States licensing platform administration. Plaintiff asserts that those discrepancies are material to each entity's conduct, the source and territorial scope of authorization, the California contractual nexus, and the foundation of the earlier jurisdictional representations.

137. The internal assignments, platform agreements, delivery instructions, Film-specific metadata, content-provider records, server and transmission records, accounting records, and intercompany communications necessary to reconstruct the complete Film-specific chain were principally maintained by eOne, Apple, Google, and their related entities. Plaintiff could not independently reconstruct that internal transactional chain from public information alone.

138. The April 8, 2021 personal-jurisdiction ruling in Case No. 4:20-cv-01527-YGR, Dkt. No. 77, considered eOne's October 2020 account of Entertainment One US LP's administrative role and United Kingdom vendor deliveries and found the then-disclosed agreements insufficient to establish the required California connection. Plaintiff asserts that the additional agreements and Film-specific technical disclosures identified in ¶¶133–135 materially supplemented that documentary account concerning the actual participants, rights administration, delivery, and platform operations. His direct challenges to the jurisdictional determinations remain identified in Section IV.

139. Plaintiff's 2020 action against the Entertainment One defendants included a civil

claim for trafficking in counterfeit labels or packaging under 18 U.S.C. §2318. In its August 7, 2020 Omnibus Order (Case No. 4:20-cv-01527-YGR, Dkt. No. 52, at 13–16, 23–24), the District Court recognized Plaintiff's standing to pursue that claim and determined, at the pleading stage, that Plaintiff had adequately alleged timely trafficking by Entertainment One in counterfeit Film labels or packaging in the United States, including the alleged distribution of the Film with unauthorized cover artwork in December 2019. The Court further recognized that counterfeit packaging may violate §2318 even when associated with genuine copies of a copyrighted motion picture. Following Entertainment One's October 8, 2020 jurisdictional responses, verified under penalty of perjury by Simon Osborn and described in ¶¶129–132, the Court dismissed the Entertainment One action on April 8, 2021 for lack of personal jurisdiction (Case No. 4:20-cv-01527-YGR, Dkt. No. 77), without adjudicating the substantive merits of the previously recognized counterfeit-label claim. Plaintiff asserts that the additional executed Apple and Google agreements and Film-specific records subsequently obtained in 2023, as described in ¶¶133–136, materially bear upon the completeness and accuracy of the earlier jurisdictional representations and the factual premises upon which the dismissal rested. Plaintiff further relies upon his January 2010 objections and the February 4, 2010 Screen and Advertising Statement of Restrictions, described in ¶¶221–222, as evidence that the challenged cover artwork, promotional presentation, and characterization of his Irish motion picture as a "Brit flick" departed from the authorized Film presentation.

140. Plaintiff alleges that the Film rights asserted or administered by Apple, Google, YouTube, and other downstream platform participants must be traced to the particular grants, assignments, and Film-specific distribution instructions through which those rights purportedly arose. The Entertainment One and platform instruments did not, merely by their execution or administration, enlarge the authority originally conveyed to Mainsail under the SAA, whose defined Territory excluded North America and Ireland and which Mainsail's principals subsequently verified "was not amended." Plaintiff disputes any asserted Film authorization exceeding the territorial or substantive rights lawfully conveyed through the operative contractual chain. The particular platform transactions, conduct, and present rights positions attributable to

Apple, Google, and YouTube are alleged separately below.

## IX. APPLE'S FILM-SPECIFIC CALIFORNIA AGREEMENTS, PLATFORM CONDUCT, NOTICE, AND PRESENT RIGHTS POSITION

141. Apple Inc. maintains its principal place of business in Cupertino, California and operates the Apple and iTunes systems through which audiovisual content is received, processed, stored, copied, transmitted, offered, and distributed. Plaintiff never entered into a license agreement directly with Apple granting Apple rights to reproduce, distribute, publicly perform, transmit, store, or otherwise exploit *Strength and Honour*. Apple's asserted Film authority instead derived through a downstream chain involving Entertainment One entities and, ultimately, the Mainsail SAA alleged above.

142. The Apple transactional chain later produced in discovery included a fully executed March 31, 2011 instrument assigning certain Entertainment One UK rights, obligations, or contractual interests to Entertainment One U.S. LP, with the relevant iTunes entity consenting to that transaction. The produced chain also included a fully executed July 29, 2011 Digital Video Distribution Agreement between Apple Inc. and Entertainment One U.S. LP concerning digital delivery and distribution through Apple's platform.

143. The July 29, 2011 agreement involved Apple Inc. in California, selected California law, and provided for litigation or dispute resolution in the United States District Court for the Northern District of California. The 2023 Apple discovery record further identified the Entertainment One chain as governing *Strength and Honour* and supplied Film-specific links between that contractual structure and Apple's handling of the Film.

144. Whatever rights were conveyed through the March 2011 assignment or July 2011 Apple agreement remained dependent upon the lawful scope of the upstream rights from which they derived. As alleged above, the SAA excluded North America and Ireland; Section 19.3 required an accepted formal amendment or modification for a binding change; and Mainsail later verified that the SAA "was not amended."

**Apple's domestic technical conduct**

145. Apple's Film-specific discovery responses and supporting technical records

identified United States-based server locations and technical activity involving *Strength and Honour* through Apple's infrastructure, including copying, processing, storage, transmission, public performance, distribution, and associated platform functions. The disclosed operations included California-connected activity and establish material domestic connections to the Film's historical exploitation through Apple's systems. Plaintiff asserts that these Film-specific operations are relevant to the territorial scope and actual exercise of the authorization Apple claimed under the Mainsail–Entertainment One–Apple licensing chain, whose upstream Sales Agency Agreement expressly excluded North America and Ireland.

146. On November 14, 2023, Apple expressly asserted in its opposition to Plaintiff's motion for summary judgment that Plaintiff had granted Apple an implied license "to copy" *Strength and Honour* within the United States. Apple thus affirmatively claimed a right to reproduce the Film domestically through an asserted authorization originating from the Film's earlier distribution arrangements. Plaintiff disputes that he granted Apple such authorization or that the written SAA's excluded territories were enlarged by any subsequent amendment.

**Notice and continuing platform functionality**

147. Plaintiff notified Apple of his ownership, copyright, and Film-authorization objections in December 2019. His communications included correspondence with Apple's representatives on December 23, 2019, followed by further communication to Apple's Copyright Team on December 27, 2019. Plaintiff disputed the authority under which the Film and its associated materials were being exploited and sought action concerning that disputed exploitation. Apple therefore received direct notice of Plaintiff's ownership and authorization objections before the commencement of the prior Apple action in March 2020.

148. On January 2, 2020, Apple informed Plaintiff that the Film was "no longer available for sale." That statement addressed new retail availability but did not establish that all Film-specific copies, customer entitlements, re-download functionality, metadata, artwork, catalogue records, or other platform functions had ceased.

149. On January 7, 2022, notwithstanding Apple's prior notice of Plaintiff's copyright and authorization objections and the pending federal action, D. Barrie Graham, an existing Apple

customer who had previously purchased *Strength and Honour*, accessed the Film through his Apple iTunes player, downloaded and watched it, and observed the disputed cover artwork, the description "Brit flick," and the attribution "Studio: eOne." Graham subsequently confirmed those facts under oath in a declaration filed on November 14, 2023, accompanied by supporting screenshots. The January 2022 event occurred more than two years after Plaintiff notified Apple of the dispute and after Apple represented that the Film was no longer available for new retail sales. Plaintiff alleges that the event establishes the continued operation of Apple's Film-specific customer-access and re-download functionality in 2022, together with the continued presentation of the challenged promotional materials.

**Plaintiff's repudiation of the purported declaration and Apple's later adoption**

150. On April 12, 2020, Plaintiff repudiated under oath the purported January 20, 2016 declaration attributed to him concerning ownership of the Film. During his deposition on April 27, 2023, Plaintiff again expressly denied preparing, signing, authorizing, or adopting that declaration. Apple's counsel, including David R. Eberhart, Katie Gosewehr, and Renia Zervos, appeared on behalf of Apple at that deposition. Accordingly, Apple's representatives had direct notice of Plaintiff's sworn repudiation before Apple filed its October 31, 2023 summary-judgment motion and submitted the disputed declaration as part of its evidentiary record.

151. Nevertheless, on October 31, 2023, Apple moved for summary judgment and represented to the district court that Plaintiff had signed a declaration stating that "Maron Pictures owns the rights to the Film." Apple filed the disputed declaration as Exhibit 11 in its October 31, 2023 summary-judgment materials and relied upon the ownership assertion attributed to Plaintiff, notwithstanding its counsel's prior attendance at Plaintiff's April 27, 2023 deposition and his express sworn repudiation of that instrument.

152. Apple's October 31, 2023 submission also relied upon Sam Eigen's authentication of an SAA package as a true and correct copy of the agreement. The package submitted in the Apple action contained an incomplete Laboratory Access form without the laboratory's executed signature and included an unmarked Materials Schedule instead of the materially marked schedule associated with the completed, executed Laboratory Access Letter. Plaintiff asserts that

these differences are material to the accuracy and completeness of the contractual record Apple submitted in support of its asserted authorization and licensing positions.

153. Plaintiff's own October 31, 2023 summary-judgment materials separately included the completed Laboratory Access Letter and marked Materials Schedule in connection with his Visual Data copying claims. Plaintiff later discovered while preparing his Ninth Circuit appeals, through comparison of the respective contractual submissions, that Apple's authenticated SAA package did not contain those executed integrated materials.

**Apple's continued rejection of Plaintiff's asserted rights**

154. On March 1, 2024, Apple filed supplemental briefing in which it maintained, among other things, that Plaintiff had not owned the relevant motion-picture copyright, possessed no direct right to the Film royalties at issue, and could not defeat Apple's asserted sublicense through Plaintiff's October 2015 revocation. Apple thereby continued to reject Plaintiff's asserted post-reversion ownership and the effect of his contractual revocation.

155. Apple thereafter continued to defend the asserted Mainsail–Entertainment One–Apple authorization chain through the resulting appellate and post-judgment proceedings. The additional contractual materials, Plaintiff's sworn repudiation of the purported declaration, the March 2025 sworn Mainsail non-amendment verifications, and the Film-specific domestic server evidence did not cause Apple to withdraw its authorization position.

**Apple's present 2026 rights position**

156. As recently as July 17, 2026, in its answering brief in Ninth Circuit Appeal No. 26-2134, Apple continued to maintain that it had possessed a valid license to distribute *Strength and Honour* in Ireland and that its Film-related United States conduct did not constitute actionable infringement. Apple further maintained that Plaintiff's later-developed contractual and evidentiary materials did not undermine the authorization upon which Apple had relied. Plaintiff continues to dispute Apple's asserted licensing chain, the ownership and authorization premises upon which it rests, and its legal effect upon Plaintiff's asserted post-reversion rights.

157. Apple's July 17, 2026 appellate position continued to defend the legal validity of the Film-distribution authority asserted through the Mainsail–Entertainment One–Apple chain.

The January 7, 2022 customer re-download separately establishes that Apple continued implementing Film-specific customer-access functionality after new retail sales had ceased. Plaintiff has not received a Film-specific confirmation from Apple identifying whether any licence, sublicense, customer-redelivery entitlement, catalogue interest, or rights-management authority derived from that chain remains recognized or operative. Plaintiff alleges that the source, duration, territorial scope, and present legal effect of any such surviving entitlement are material to the exclusive Film rights and commercial licensing interests he presently asserts.

158. Plaintiff presently asserts ownership of the exclusive Film rights that reverted to him following the September 30, 2015 contractual default and his October 1, 2015 revocation. Plaintiff seeks to license, enforce, certify, warrant, and commercially exploit those rights. Apple continues to defend the legal validity of the downstream authorization chain through which it exercised Film-distribution rights, while Plaintiff disputes that the chain conferred the authority claimed. Plaintiff asserts that the parties' unresolved disagreement concerning the operative rights conveyed through that chain bears upon the existence and scope of any presently effective Apple Film right inconsistent with Plaintiff's asserted exclusive ownership.

159. Plaintiff alleges that the unresolved scope and present legal effect of the Mainsail–Entertainment One–Apple authorization chain have practical significance for his ability to establish and represent a clear chain of title, warrant exclusive rights to prospective licensees, negotiate further exploitation of the Film, and determine whether any prior Apple authorization or Film-related entitlement continues to burden or qualify the rights he presently asserts.

160. Plaintiff alleges a present controversy concerning whether Apple retains, recognizes, administers, or may exercise any legally operative Film-related licence, sublicense, customer-redelivery entitlement, catalogue interest, or comparable authority derived from the disputed Mainsail–Entertainment One–Apple chain, and, if so, the source, territorial scope, duration, and legal effect of that authority upon Plaintiff's asserted exclusive rights. The particular declaratory relief sought is identified in Claim Four.

161. Plaintiff disputes continuing Apple authority asserted through the implied licence, surviving sublicense, or customer-redelivery and related platform entitlements described in ¶¶146

and 157–160, except to the extent established by its actual legal source, territorial scope, duration, and governing terms.

162. Apple possesses or controls Film-specific contractual, catalogue, metadata, technical, and rights-administration records concerning its receipt, processing, storage, distribution, and customer-redelivery arrangements for *Strength and Honour*. Those records include information concerning the Film's historical availability and customer-access functionality and are relevant to determining the asserted source, scope, duration, and present status of any purported Film-related authority Apple claims, recognizes, or administers.

## X. GOOGLE AND YOUTUBE'S FILM-SPECIFIC CALIFORNIA AGREEMENTS, DOMESTIC PLATFORM CONDUCT, NOTICE, AND CURRENT FULL-FILM POSTING

163. Defendant Google LLC maintains its principal place of business in Mountain View, California and operates substantial technical, contractual, financial, and administrative infrastructure within this District. Defendant YouTube LLC operates the YouTube audiovisual platform and maintains its principal business operations in San Bruno, California.

164. Google LLC and YouTube LLC are separate legal entities with distinct but related contractual and operational roles concerning *Strength and Honour*. Google entered into or succeeded to the agreements with Entertainment One U.S. LP identified below and previously asserted that those agreements encompassed YouTube through its corporate and platform relationship with Google. YouTube operates the audiovisual platform through which the current full-length Film posting is made available. Plaintiff alleges each Defendant's responsibility for its own Film-specific contractual activities, technical operations, rights administration, knowledge, decisions, and participation in the conduct alleged herein.

165. Plaintiff never entered into a direct license agreement with Google or YouTube authorizing either entity to reproduce, host, store, encode, transcode, distribute, publicly perform, transmit, monetize, administer, or otherwise exploit the feature film, *Strength and Honour*. The authority historically asserted in connection with the Film instead depended upon downstream arrangements involving Entertainment One U.S. LP and the licensing chain ultimately originating

with Mainsail.

**California Agreements and Domestic Platform Conduct**

166. The Google-side agreements produced in discovery in 2023 included a Content Hosting Services Agreement dated April 18, 2011, a Transactional Content Agreement dated June 5, 2012, and Amendment No. 1 dated June 5, 2012. Those agreements formed part of the contractual structure under which audiovisual content supplied through Entertainment One U.S. LP was received, hosted, processed, transmitted, distributed, performed, monetized, or otherwise administered through Google-related systems.

167. The Google-side contractual record identified Google Inc., now Google LLC, as a contracting participant located in Mountain View, California. The Transactional Content Agreement and associated agreements established contractual arrangements through which Entertainment One-administered audiovisual content was supplied to Google-related systems. Google's subsequent Film-specific discovery responses connected those contractual arrangements to the receipt, hosting, processing, transmission, and exploitation of *Strength and Honour*, including technical operations within the United States.

168. Neither the Content Hosting Services Agreement, Transactional Content Agreement, Amendment No. 1, nor any other downstream platform agreement could, merely by its execution, create North American, United States, California, or Irish Film rights that the purported upstream grant did not contain. As asserted above, the written SAA expressly excluded North America and Ireland, required an accepted formal amendment or modification for a binding change, and was later sworn by Mainsail to have "not been amended."

169. On March 17, 2023, Google and YouTube served supplemental Film-related discovery responses identifying the contractual arrangements and technical operations associated with *Strength and Honour*. Those disclosures included Google's hosting of the Film on servers owned, leased, or controlled by Google and processing of the Film and/or its associated trailer on servers located within the United States. The discovery record further identified Film-related hosting, storage, routing, transmission, reproduction, performance, distribution, and associated platform-processing functions. Plaintiff asserts that these disclosures concern technical operations

within the United States, independently of the location of any particular foreign consumer, and are material to the domestic operation and territorial scope of the historical Film-distribution arrangements asserted by Defendants.

**Notice and the Purported Declaration**

170. Plaintiff contacted Google and YouTube in or around late 2019 concerning his copyright ownership and objections to the unauthorized exploitation of *Strength and Honour*. Plaintiff was directed to a link that did not provide an effective means of addressing his complaint. Plaintiff subsequently pursued federal litigation against Google and YouTube concerning the Film, the rights asserted through Entertainment One, and the copying, hosting, performance, transmission, and distribution of the Film through their systems.

171. Google and YouTube therefore had notice no later than 2020 that Plaintiff disputed the ownership and authorization asserted for *Strength and Honour*, contended that the SAA excluded North America and Ireland, and denied that the asserted downstream chain conferred unrestricted continuing authority to exploit the Film.

172. On December 29, 2021, Plaintiff documented a Google Play listing for *Strength and Honour* displaying disputed Film artwork, audiovisual promotional material, and descriptive language characterizing the Irish Film as a "Brit flick." Google subsequently maintained that Entertainment One had withdrawn the complete Film from new sale or rental in March 2019 and that the December 2021 evidence concerned remaining artwork or trailer material rather than a new full-Film transaction. Plaintiff asserts the documented listing as evidence of the historical promotional presentation, continuing availability of Film-related material, and the disputed authorization and marketing record, without treating that listing alone as proof of a new full-Film sale or rental.

173. On January 17, 2022, Plaintiff submitted a YouTube copyright-removal request identifying a particular *Strength and Honour* trailer and its video identifier, asserting his copyright ownership and objecting to the identified audiovisual material. Google subsequently represented that the material was removed following that request. Plaintiff alleges those events as evidence of the historical Film-specific copyright dispute, the notice provided concerning that

particular trailer, and the platform's capacity to respond to identified Film material. The 2022 request concerned a different posting and is not pleaded as notice of the separate full-length Rt3-Ireland upload discovered in September 2026.

174. On April 12, 2020, Plaintiff repudiated under oath the purported January 20, 2016 declaration attributed to him concerning ownership of the Film. During his deposition on April 27, 2023, Plaintiff again expressly denied executing, signing, preparing, reading, authorizing, or submitting that declaration. Google's and YouTube's counsel, including Gregory J. Apgar, A. John P. Mancini, and Sara Slavin, appeared at the deposition. Defendants' representatives therefore had direct notice of Plaintiff's sworn repudiation before their October 31, 2023 summary-judgment submissions.

175. On October 31, 2023, Google and YouTube submitted the purported declaration as Exhibit 18 in support of summary judgment. In his supporting declaration, Gregory J. Apgar identified Exhibit 18 as a true and correct copy of Exhibit 32 from Plaintiff's April 27, 2023 deposition and described that document as the "Declaration of Mark Mahon." Exhibit 32 was the instrument that Plaintiff had expressly repudiated under oath during the same deposition. Plaintiff alleges that Google's subsequent presentation and attribution of that document, following the sworn repudiation obtained by its own counsel, were material to the ownership and judicial-estoppel record advanced against him.

176. Google and YouTube relied upon the statement attributed to Plaintiff that "Maron Pictures owns the rights to the Film" in support of ownership, authorization, licensing, waiver, and judicial-estoppel positions.

177. The October 31, 2023 Google/YouTube submission also relied upon an SAA package authenticated by Sam Eigen that contained an incomplete Laboratory Access form without the laboratory's executed signature and included an unmarked Materials Schedule instead of the marked schedule associated with the completed, executed Laboratory Access Letter. The completed materials contained handwritten deletions and restrictions affecting identified Film Items and Video Items. Plaintiff alleges that these differences are material to the completeness of the contractual record presented in support of the asserted authorization and to the scope of

Mainsail's authority concerning Film-source access and copying.

178. On September 2, 2026, in their joint appellate brief in Ninth Circuit Appeal No. 26-2299, Google and YouTube continued to defend the Film-distribution authorization claimed through Entertainment One and the upstream Mainsail licensing arrangements. Defendants maintained that Entertainment One "granted Google a license to distribute the Film via the YouTube platform." Plaintiff disputes the source, territorial scope, documentary foundation, duration, and continuing legal effect of that asserted authorization, including the significance of the repudiated declaration, the incomplete SAA submissions, and the March 2025 sworn verifications confirming that the SAA "was not amended."

**September 2026 Full-Film Posting**

179. On September 24, 2026, Plaintiff observed and documented a publicly accessible YouTube posting containing substantially the complete motion picture *Strength & Honour* at https://www.youtube.com/watch?v=M90fFPm3klw. The posting displayed the title "Strength & Honour full Irish movie" and identified the publishing account as "Rt3-Ireland." Plaintiff observed playback of the Film through the identified posting and preserved contemporaneous evidence identifying the URL, account, Film title, and audiovisual content.

180. On September 24, 2026, the identified YouTube page displayed approximately 4,100 cumulative views and described the video as having been uploaded approximately one year earlier. Plaintiff did not authorize the account identified as Rt3-Ireland, or the person or entity responsible for the upload, to reproduce, distribute, publicly perform, transmit, or otherwise make substantially the complete Film available through YouTube. Plaintiff asserts that the posting made a complete unauthorized substitute for his commercial motion picture publicly available through the platform.

181. The person or entity that selected the substantially complete Film and initiated the current upload is presently unidentified and is alleged as Doe 1 pending discovery of the relevant account-registration, login, upload, IP-address, source-file, payment, rights-management, and communications records.

**Source Copy, Presentation, and Provenance**

182. The copy presently disseminated through the identified YouTube posting contains substantially the complete motion picture but differs materially from Plaintiff's authorized Film at its opening. The authorized Film contains a Maron Pictures animated opening presentation card. Plaintiff is personally familiar with the Film's original presentation and confirms that the two original clean NTSC DVD-R screeners produced by LipSync contained the Maron Pictures animated opening and did not contain the substituted Shoreline Entertainment opening. In the YouTube copy, that original identification is absent and a Shoreline Entertainment animated presentation card appears in the opening position before the Film proceeds into its opening credits. Plaintiff did not authorize the removal or replacement of the original Maron Pictures opening presentation. Plaintiff asserts that this difference is material to the alteration history and provenance of the Film copy presently disseminated through the identified posting.

183. The current copy nevertheless retains other identifying information contained in the Film, including the title *Strength and Honour*, the credit "A Mark Mahon Film," and the end-credit notice "Copyright (C) 2008, Maron Pictures Ltd. All rights reserved." The juxtaposition of the Shoreline opening card with the retained Maron Pictures copyright notice is relevant to the provenance and alteration history of the source copy presently being disseminated.

**Current Platform Processing and Records**

184. The YouTube posting identified above has been made available for playback through the platform's systems for receiving, storing, processing, indexing, and transmitting uploaded audiovisual content. On information and belief, based upon the prior Film-specific technical disclosures and the operation of the Google and YouTube systems, United States-based infrastructure participated in one or more technical processes associated with the identified posting. The particular server locations, ingestion records, copies, processing events, transmissions, territorial availability, and respective operational acts of Google LLC and YouTube LLC are reflected in records maintained by those entities.

185. The Film's documented public availability and playback through the identified YouTube posting in September and October 2026 constitute later Film-specific events separate from the historical Google, Google Play, and YouTube transactions addressed in the prior

proceedings. Plaintiff alleges independently occurring reproduction, public-performance, transmission, and related exploitation activity associated with the identified posting according to the dates, actors, locations, and legally protected rights applicable to those acts. The upload and publication timestamps, subsequent playback and transmission history, and relevant platform decisions are identifiable from the records maintained by YouTube and Google.

186. Plaintiff preserved screenshots and recordings of the identified full-length posting documenting its URL, account, title, view count, YouTube interface, representative Film content, Shoreline opening identifier, and Plaintiff's Film credit. As described in ¶36, Kenneth T. Smith's signed declaration and six screenshots document California playback on October 19, 2026. Roberto Antonio Rivera's October 22, 2026 signed declaration identifies his California location, recording device, duration, and original filename, confirms the recording was unaltered, and attests that it fairly and accurately depicts the observed playback. Plaintiff retains Rivera's recording. These separate observations document California playback of the current posting, independently of the historical United States platform evidence.

**URL-Specific Notice and Post-Notice Conduct**

187. On October 22, 2026, Plaintiff transmitted separate written copyright-infringement notifications concerning the full-length YouTube posting identified as M90fFPm3klw to YouTube Copyright Operations at copyright@youtube.com and Google LLC's designated copyright contact at dmca-agent@google.com. The notifications identified the copyrighted Film, the applicable United States copyright registrations, the precise YouTube URL, the uploading account identified as Rt3-Ireland, Plaintiff's asserted exclusive United States copyright rights, and the absence of his authorization for the identified posting. Plaintiff requested removal or disabling of access through YouTube and separately requested preservation of Film-specific records concerning the upload, account, technical processing, territorial playback, rights administration, licensing, monetization, and subsequent platform actions. Plaintiff retains the transmitted notifications in their original electronic-message format.

188. Plaintiff distinguishes the specific October 22, 2026 notifications concerning video M90fFPm3klw from Defendants' historical knowledge of the broader Film dispute. The earlier

litigation, communications, contractual records, and January 17, 2022 trailer-removal request bear upon Defendants' knowledge of Plaintiff's ownership and authorization position. The October 22, 2026 notifications separately identified the present full-length posting by its precise URL and uploading account and expressly communicated Plaintiff's objection to that particular use.

189. On October 22, 2026, Plaintiff separately transmitted written correspondence concerning the identified posting to counsel representing Google LLC in the prior Film-related proceedings. Plaintiff preserves the original sent correspondence, together with the separate YouTube and Google copyright notifications identified in ¶187.

**Current Rights Administration and Present Controversy**

190. Google and YouTube possess or control posting-specific records identifying the uploader, publication and upload timestamps, account and IP information, source-file characteristics, ingestion and transcoding, server locations, geographical views, watch time, average view duration and percentage, audience retention, advertisements served, monetized playbacks, copyright-management claims, revenue allocations, payment recipients, removal or restoration, and communications. Plaintiff seeks those records through the applicable discovery procedures to identify each participant's conduct and the extent, geography, and financial consequences of the identified posting.

191. Those records are also capable of establishing whether Mainsail, Shoreline, eOne, a successor, or another person or entity supplied the source copy, asserted or administered a Film-related rights claim, directed territorial availability, received Film-related revenue, supplied a monetization instruction, requested continuation or reinstatement, or otherwise claimed authority relevant to the present posting.

192. Google historically asserted Film-distribution authority derived from Entertainment One, and Google and YouTube jointly continued to defend that authorization in their September 2, 2026 appellate submission. Separately, substantially the complete Film was documented as publicly accessible through YouTube in September 2026 under video identification number M90fFPm3klw. Plaintiff disputes the validity, territorial scope, duration, and continuing legal effect of any Film-related license, content-provider entitlement, copyright-

claimant designation, Content ID or comparable rights-management interest, territorial authorization, or monetization instruction presently recognized or administered by either Defendant through the disputed authorization chain. Plaintiff seeks determination of the existence, source, scope, and present legal effect of any such authority according to the respective Defendant's own contractual and platform activities, as further alleged in Claim Six.

193. Plaintiff asserts that the Film rights previously conveyed by him to Maron Pictures reverted following the 2015 contractual default and his October 1, 2015 revocation, that the written SAA never granted North American or Irish territorial rights and was not amended to do so, and that Plaintiff thereafter executed no new written conveyance granting Google or YouTube post-reversion rights in the Film.

**Present Injury and Discovery**

194. Continued public availability of substantially the complete Film without Plaintiff's authorization impairs Plaintiff's control over Film access and exploitation, affects his ability to offer exclusivity to legitimate distributors and platforms, weakens negotiating leverage and market scarcity, and may divert or displace lawful licensing, rental, sale, subscription, advertising, re-release, or other Film exploitation.

## XI. MAINSAIL'S SAA AUTHORIZATION RECORD, TERMINATION POSITIONS, AND MARCH 2025 SWORN NON-AMENDMENT VERIFICATIONS

195. Mainsail LLC was the direct contracting party under the Sales Agency Agreement through which it historically claimed authority to license, distribute, administer, and otherwise represent *Strength and Honour*. Unlike Apple, Google, or YouTube, Mainsail's asserted authority did not arise merely through a downstream sublicense; Mainsail was itself the recipient of certain rights defined by the SAA.

196. The written SAA expressly defined Mainsail's Territory as "the entire world, excluding North America and Ireland." Section 19.3 governed amendments, modifications, and assignments, prohibited oral changes or termination, prescribed acceptance by duly authorized representatives for binding contractual changes, and expressly recognized the validity of facsimile signatures for the SAA and for any amendments made to it. Plaintiff asserts that the SAA was

never amended to include North America, the United States, California, or Ireland within Mainsail's contractual Territory.

**Plaintiff's October 2015 Revocation and Mainsail's Claimed Surviving Rights**

197. Mainsail's SAA-derived authority originated in Film rights conveyed by Plaintiff to Maron Pictures under the September 25, 2006 agreements, which contained express revocation-and-reversion provisions tied to the required €300,000 consideration. Following Maron Pictures' failure to pay that consideration by September 30, 2015, Plaintiff exercised his contractual revocation remedy through his October 1, 2015 Notice of Contract Revocation and asserts the resulting reversion of the underlying rights as alleged in Section V. Separately, on October 7, 2015, Maron Pictures transmitted to Mainsail a written Notice of Termination invoking §18.1 of the SAA. That notice concerned Maron Pictures' distinct contractual relationship with Mainsail as Licensor under the SAA and was separate from Plaintiff's earlier exercise of his individual contractual revocation.

198. In its November 15, 2023 opposition to Plaintiff's motion for summary judgment, Mainsail affirmatively represented that the SAA had been formally terminated in October 2015, while invoking the survival of rights under Existing Deals. See *Mahon v. Mainsail LLC et al.*, Case No. 4:20-cv-01523-YGR, Dkt. No. 122, at 21. Plaintiff asserts that neither §2.5 nor §18.3 preserved an unrestricted sales agency, enlarged the SAA's expressly defined Territory, or independently authorized new licences, extensions, renewals, or other grants exceeding the rights lawfully conveyed under the governing instruments. Any surviving entitlement must be traced to a specifically identifiable Existing Deal and confined to its legally operative rights, territory, duration, and obligations.

**The Purported 2016 Declaration and Mainsail's 2023 SAA Position**

199. The earlier state-court record included a purported declaration dated January 20, 2016 and attributed to Plaintiff, stating that "Maron Pictures owns the rights" to the Film. Mainsail subsequently submitted that instrument as Exhibit J to its April 10, 2020 Request for Judicial Notice in the federal proceedings. Plaintiff alleges that he did not prepare, execute, sign, read, authorize, approve, or submit the declaration. He first encountered the document on April

10, 2020, repudiated it under oath on April 12, 2020, and again expressly denied its execution and authenticity during his April 27, 2023 deposition. The purported declaration postdated Plaintiff's October 1, 2015 revocation and Maron Pictures' separate October 7, 2015 notice invoking §18.1 of the SAA. The October 7 notice was addressed to Sam Eigen and was subsequently submitted by Mainsail as Exhibit JJ to its October 31, 2023 summary-judgment materials. Plaintiff disputes the purported declaration's attribution to him and its use as an acknowledgment of Maron Pictures' continuing ownership following his contractual revocation.

200. On April 27, 2023, Mainsail served discovery responses, including its response to Plaintiff's Request for Admission No. 145, expressly stating that the SAA "was not amended." Those responses were not then accompanied by the personal verifications subsequently executed by Sam Eigen and Morris Ruskin, who adopted the responses under penalty of perjury in March 2025, as alleged below.

201. On October 31, 2023, Mainsail sought summary judgment and maintained that its Film-related licensing, copying, distribution, and materials conduct was authorized. In doing so, Mainsail acknowledged the SAA's written territorial exclusions while asserting that the agreement and related circumstances nevertheless authorized the challenged Film activities.

**Mainsail's October 31, 2023 Evidentiary Submission**

202. On October 31, 2023, Sam Eigen authenticated as a "true and correct copy" the SAA package submitted by Mainsail in support of summary judgment. The missing executed Laboratory Access signatory page and substituted unmarked Materials Schedule are identified in ¶¶82 and 90. Plaintiff separately filed the completed materials that day concerning California laboratory copying, as alleged in ¶46. The differences concern the access and handling authority asserted over identified Film Items and Video Items.

**March 2025 Sworn Non-Amendment Verifications**

203. On March 6, 2025, Morris Ruskin executed a verification under penalty of perjury adopting the April 2023 discovery responses on his own behalf. On March 7, 2025, Sam Eigen executed a materially parallel verification under penalty of perjury adopting those responses for himself, Mainsail LLC, and Shoreline Entertainment, Inc.

204. The responses personally and corporately adopted through those verifications included that the SAA Territory excluded North America and Ireland, that §19.3 governed amendments, modifications, and assignments, and that the identified SAA "was not amended."

205. Sam Eigen signed the original SAA on behalf of Mainsail in 2009 and subsequently verified under penalty of perjury that the agreement "was not amended." His March 7, 2025 sworn verification therefore directly connects Mainsail's original contracting representative with its subsequent confirmation that the written agreement's territorial grant had not been modified.

**Mainsail's 2026 Authorization Position**

206. Mainsail has nevertheless continued in 2026 to defend the validity of the downstream Film-authorization chain. In its August 3, 2026 Answering Brief in Ninth Circuit Appeal No. 26-2533, Mainsail maintained that Plaintiff had given Mainsail the "go ahead" to accept Entertainment One's proposed United Kingdom and Ireland deal and that Entertainment One thereafter sublicensed Film exploitation rights to Apple and YouTube.

207. In the same appellate filing, Mainsail expressly argued that there was "nothing in the SAA requiring Mainsail and Mahon to formally amend the SAA to authorize the E-One License" and continued to rely upon emails and alleged separate authorization notwithstanding the later sworn confirmation that the SAA itself "was not amended."

208. Plaintiff disputes Mainsail's contention that the May 2009 communications concerning the proposed Entertainment One transaction expanded the territorial grant contained in the SAA or conferred broader continuing Film rights upon Mainsail. The executed SAA excluded North America and Ireland, prescribed the contractual requirements for binding amendments and modifications, and was not amended. Plaintiff asserts that the communications concerning the proposed Entertainment One transaction did not themselves convey unrestricted authority to reproduce, license, distribute, or administer the Film within the United States or confer upon Mainsail rights exceeding those lawfully conveyed under the governing instruments.

**Mainsail's Documented Termination Positions**

209. Mainsail's November 15, 2023 termination and Existing Deals position is

described in ¶198. In that filing, Mainsail further represented that it had exercised its Existing Deal completion rights only through 2011. Separately, on April 1, 2012, Sam Eigen represented that Mainsail and Shoreline had ceased representing the Film and no longer maintained a business relationship with Maron Pictures. Nevertheless, in its August 3, 2026 Ninth Circuit Answering Brief, Mainsail continued to defend the authorization of the Entertainment One licensing arrangements and subsequent platform sublicenses. Plaintiff presently asserts ownership of the reverted Film rights and disputes the existence, source, scope, and continuing legal effect of any Film-related licensing, commission, collection, recoupment, or administrative entitlement that Mainsail claims to retain under the SAA or a specifically identifiable Existing Deal. Plaintiff further disputes that any such surviving entitlement enlarged the original SAA Territory or conferred authority beyond the rights lawfully conveyed under the operative agreements.

210. Mainsail's SAA-derived authority originated in the Film rights Plaintiff conveyed to Maron Pictures under the September 25, 2006 agreements, which expressly reserved Plaintiff's contractual right of revocation and reversion upon the stated default. Plaintiff exercised that right through his October 1, 2015 Notice of Contract Revocation, as alleged in Section V. Plaintiff asserts that Mainsail's rights as sales agent remained derivative of the authority lawfully vested in Maron Pictures and were limited by the SAA's express territorial and substantive provisions, including any specifically enforceable surviving contractual rights.

**California Laboratory Activities**

211. Mainsail's California copying and delivery activities discovered in 2019 and the May 31, 2017 shipment of barcode items 263626 and 263627 to Shoreline's Beverly Hills offices are alleged in ¶¶102 and 106. Those records do not by themselves identify the shipped discs as the original July 2009 LipSync screeners, for the reasons in ¶¶101 and 110–111. Plaintiff disputes unrestricted contractual authority for the California materials activities and relies on that evidence for provenance, actual conduct, and territorial scope.

**Present Rights and Commercial Consequences**

212. Plaintiff presently asserts the exclusive Film rights that reverted to him under the September 25, 2006 agreements and seeks to license, administer, enforce, commercially exploit,

and warrant those rights. Any presently operative Mainsail claim derived from the SAA or the historical Entertainment One arrangements that conflicts with Plaintiff's asserted rights affects the determination of chain of title, territorial exclusivity, surviving licensing interests, and the rights Plaintiff may warrant to prospective distributors and licensees.

213. Plaintiff disputes any claimed entitlement inconsistent with his asserted ownership, the SAA's express territorial exclusions, Mainsail's sworn confirmation that the SAA "was not amended," and the contractual reversion alleged herein.

## XII. ENTERTAINMENT ONE UK LIMITED'S FILM-SPECIFIC TERM, POST-TERM RIGHTS, ACCOUNTING, AND SUCCESSION

214. On May 16, 2009, Entertainment One UK Limited, then operating as E1 Entertainment UK Ltd., entered into an International Multiple Rights Distribution License Agreement concerning *Strength and Honour* with Mainsail LLC, identified in the agreement as Licensor "for and on behalf of Maron Pictures LLC." See Case No. 4:20-cv-01534-YGR, Dkt. No. 137-47.

215. The eOne agreement purported to grant Film-distribution rights within the United Kingdom of Great Britain, Eire, the Channel Islands, Isle of Man, Malta, Gibraltar, and the Armed Forces of the Territory. eOne UK later verified that the agreement did not include the United States or any other part of North America and that its sublicensing or subdistribution authority existed only within the Defined Territories and during the contractual term. The Financial Deal Terms further allocated 10% of the stated US$100,000 Guarantee specifically to Eire.

216. The inclusion of Eire within the downstream eOne agreement did not enlarge the territorial rights originally conveyed to Mainsail. The governing SAA expressly excluded North America and Ireland, §19.3 prescribed the requirements for binding amendments and modifications, and Mainsail's contracting-side representatives subsequently verified under penalty of perjury that the SAA "was not amended." Plaintiff alleges that eOne UK's asserted Film rights remained dependent upon the territorial and substantive rights lawfully conveyed through the upstream contractual chain.

**Historical Termination Instructions, Notice, and Disputed Promotional Authority**

217. By late 2009, Maron Pictures had disputed eOne UK's performance under the May 2009 distribution arrangement. After learning that the anticipated United Kingdom theatrical release was not proceeding as represented, Plaintiff instructed Mainsail that the eOne transaction should be terminated for breach.

218. On or about December 21, 2009, Olann Kelleher, acting as Maron Pictures' Irish legal representative and Executive Producer, informed Mainsail that the eOne transaction was to be terminated if the agreed theatrical component was not performed. Kelleher subsequently provided sworn evidence concerning that communication.

219. On December 23, 2009, Plaintiff informed Sam Eigen, copying Kelleher and others, that the instruction was to cancel the transaction for breach of the original agreement.

220. On December 26, 2009, Eigen responded that he would give eOne notice that it would be in breach if it failed to comply with all of the agreement's terms.

221. In January 2010, after the Film was released in the Republic of Ireland using promotional materials Plaintiff had not approved, Plaintiff expressly notified Mainsail and eOne UK of his objections. On January 30, 2010, Plaintiff demanded that distribution cease and that the unauthorized product-cover images and trailer be removed. On January 31, 2010, Plaintiff again asserted contractual breach and demanded that all Film product be removed until the dispute was resolved. Tom Jarvis of eOne UK appeared on the copied-recipient lines of those communications.

222. Plaintiff had also advised that he had not approved the public one-sheet, cover, or trailer being used for the Film. On February 4, 2010, a Screen and Advertising Statement of Restrictions was issued governing cast-credit and advertising presentation and expressly requiring that *Strength and Honour* be referred to as an Irish film. The Film was nevertheless subsequently marketed as a "Brit flick."

**Contractual Term and Post-Term Rights**

223. The May 16, 2009 Entertainment One distribution agreement provided for an original fifteen-year Term measured from the first United Kingdom release, with March 31, 2010

established as the latest date from which that period would run. Under the stated original contractual timetable, and absent any legally operative suspension, extension, or other provision altering that calculation, the fifteen-year Term reached its scheduled expiration no later than March 31, 2025. Plaintiff has received no Film-specific agreement, notice, amendment, or other operative record establishing an extension of that original exploitation period or conferring renewed general distribution authority upon eOne UK. Plaintiff disputes any continuing Film-exploitation authority asserted beyond the lawful duration of the rights actually granted under the governing agreement.

224. The Standard Terms separately provided that, except as otherwise set forth in the agreement, eOne UK, as Distributor, would not "allow or authorize any exploitation of any Picture after the Term."

225. The agreement separately provided a six-month period following expiration of the Term during which eOne UK could sell off its then-existing inventory of Videogrammes. At the conclusion of that period, the agreement required destruction of remaining inventory and delivery of a customary certificate of destruction to the Licensor. This provision concerned existing physical Videogramme inventory and did not itself confer renewed general distribution, digital-platform, or sublicensing authority beyond the original contractual Term.

226. Under the stated contractual timetable, the six-month Videogramme sell-off period reached its outside expiration date no later than September 30, 2025. Plaintiff has received no Film-specific inventory statement, sell-off accounting, stock-disposition report, or certificate of destruction identifying the physical Film inventory held by eOne UK at the end of the Term, the quantities subsequently sold, or the disposition of any remaining inventory.

227. The agreement separately provided that title to Materials delivered to the Distributor remained with the Licensor, subject to the Distributor's contractual rights. Upon termination, and upon receipt of the Licensor's election, eOne UK was required either to return all remaining Materials or to destroy them and provide a customary certificate of destruction.

**Film Materials and Their Disposition**

228. Plaintiff has received no Film-specific record establishing the present location,

custodian, ownership designation, return, destruction, or other disposition of the Film Materials formerly held or controlled by eOne UK. Nor has Plaintiff received any certificate of destruction or Film-specific succession record identifying the entity currently responsible for administering the agreement's material-return, safeguarding, or disposition provisions.

**Plaintiff's Reversion and Paragraph 18(C)**

229. As alleged above, Plaintiff asserts that the Film rights he conveyed to Maron Pictures under the September 25, 2006 agreements reverted following the contractual default and his 2015 revocation. Maron Pictures thereafter separately transmitted its October 7, 2015 notice to Mainsail invoking termination of the SAA. Those events make material the succession mechanism expressly contained in the downstream eOne agreement.

230. Paragraph 18(C) specifically addressed the circumstance in which Mainsail's right, title, and interest in the Film derived from a license agreement with the copyright owner. It provided that the Distributor's exercise of "the rights granted hereunder" would survive termination of the Licensor's Agreement and further required that the Owner "shall on termination of the Licensor's Agreement take an assignment of this Agreement from the Licensor."

231. The survival provision in paragraph 18(C) expressly referred to the exercise of "the rights granted hereunder." Plaintiff alleges that those words confined the provision to the rights actually granted under the eOne agreement, including its defined Territory, Licensed Rights, Term, and other operative restrictions. Paragraph 18(C) did not itself enlarge Mainsail's original territorial grant or confer upon eOne UK rights outside the scope of the contractual authority lawfully conveyed through the upstream chain.

232. Plaintiff has received no executed assignment implementing paragraph 18(C) following Mainsail's asserted October 2015 termination of its upstream agreement, nor any Film-specific record establishing whom eOne UK thereafter recognized as the contractual "Owner," "Licensor," or successor. The records provided to Plaintiff do not identify whether Mainsail assigned the contractual position to Plaintiff, Maron Pictures, or another person or entity, or who thereafter was recognized as entitled to Film-account statements, payments, Materials, and other

contractual performance. Plaintiff alleges that the operation of the contractual succession mechanism and the resulting Film-rights and financial-administration position remain unresolved following his asserted reversion of the underlying Film rights.

**Film-Specific Accounting**

233. The eOne agreement required the Distributor to maintain complete and accurate Film-related financial records, including records of Gross Receipts, Recoupable Distribution Costs, adjustments, collections, credits, contracts, vouchers, receipts, third-party statements, computer records, audit materials, and related correspondence. The agreement also required periodic reporting of receipts, allowable deductions, and other Film-account transactions, followed by annual statements after the earlier reporting periods. Plaintiff alleges that these provisions established a specific documentary framework for the administration and reconciliation of the Film account.

234. The eOne Film-account statement dated January 29, 2020 identified *Strength & Honour*, title number 504890, under Contract No. 000000, designated "Shoreline Entertainment." It reported cumulative collections of £354,664.20 (approximately US$461,489.06), expenses of £1,896.00, distributor fees of £282,851.55, a producer share of £69,916.65, and a guarantee of £62,015.51, resulting in a reported positive balance of £7,901.14—equivalent to approximately $10,280.96 at the January 29, 2020 exchange rate—due under the Film account.

235. The next identified statement, dated February 7, 2021, showed no new current-period collection but introduced a new £155,939.88 entry identified as "Cinema / Other." That entry changed the reported producer share from positive £69,916.65 to negative £86,023.23 and changed the Film account from £7,901.14 ($10,280.96) due to a reported £148,038.74 unrecouped balance.

236. The February 17, 2022 statement carried forward the £155,939.88 Cinema / Other entry and added a further £270,236.47 entry identified as "Home Video / Other," again without showing a new current-period collection. The statement thereby reported cumulative expenses of £428,072.35, a negative producer share of £356,259.70, and a closing unrecouped balance of £418,275.21.

237. The two newly introduced "Other" entries total £426,176.35. That figure is distinct from both the £428,072.35 cumulative-expense figure, which includes the pre-existing £1,896.00 expense, and the £418,275.21 closing deficit reflected on the February 2022 statement.

238. Neither the February 2021 nor the February 2022 Film-account statement identifies the invoices, vendors, services, legal matters, journal entries, payment records, allocation methodology, or contractual basis supporting the newly introduced "Other" charges. Plaintiff has received no underlying ledger or source documentation establishing whether those expenses were incurred, properly attributable to *Strength & Honour*, allowable under the governing agreement, or subsequently adjusted. The reported entries materially altered the Film-account position, converting the previously positive balance into a closing unrecouped balance of £418,275.21.

239. During the February 16, 2024 summary-judgment hearing in the prior federal proceedings, Mainsail's attorney, Richard L. Charnley, represented that eOne had posted expenses incurred in defending litigation brought by Plaintiff against the Film's distribution account. Counsel described the litigation expenses as amounting to hundreds of thousands of dollars and represented that the charges had driven the Film account below break-even. When the Court questioned the contractual authority for charging litigation expenses in that manner, counsel did not identify an authorizing contractual provision. Plaintiff alleges that these statements constitute a documented explanation advanced on behalf of Mainsail concerning the Film-account reversal. Plaintiff has not received the supporting invoices, ledgers, allocation records, or contractual accounting records identifying the amounts actually charged as litigation expenses or their relationship to the two "Other" entries. Counsel further represented that Entertainment One's accounting reflected an earlier guarantee payment to Mainsail, but that Mainsail had not invoiced Entertainment One for the additional reported balance or other subsequent amounts. Counsel stated that an Entertainment One declaration indicated no further payments after approximately June 2015. Plaintiff alleges these representations as further evidence of the disputed Film-account collection, payment, and reconciliation history, including the need to determine the ultimate disposition of the Film-generated receipts and the subsequent

expense allocations.

240. Plaintiff did not receive the 2021 and 2022 statements directly from eOne UK through an ordinary Film-accounting process. He received them from Mainsail on or about May 12, 2023, after the applicable discovery cutoff in the prior Mainsail action.

241. Plaintiff has received no Film-account statement, closing reconciliation, payment record, adjustment ledger, or other Film-specific accounting covering the period after February 17, 2022. Accordingly, Plaintiff has not been provided with a record establishing whether subsequent Film receipts were collected, credited, applied against the asserted deficit, withheld, transferred, reserved, or remitted, or whether either of the disputed "Other" entries was subsequently reversed, reduced, reclassified, or otherwise adjusted.

**Corporate Succession and eOne UK's 2026 Position**

242. On December 27, 2023, Hasbro completed the sale of its Entertainment One film-and-television business to Lionsgate. The transaction included Entertainment One UK Limited within the transferred corporate structure and encompassed broadly defined film-and-television business assets, exploitation rights, contracts, books and records, accounting and collection statements, rights databases, and related business materials. Plaintiff alleges that the resulting corporate succession is material to identifying the present administrator of the Film-specific agreements, account, rights, Materials, records, and outstanding post-term obligations.

243. Plaintiff has received no Film-specific transaction schedule, assignment, rights-database record, account-transfer instruction, closing statement, or other record establishing the treatment of *Strength & Honour* in connection with the December 2023 disposition of the eOne film-and-television business. The records received by Plaintiff do not identify the present administrator or custodian of the Film's contractual rights, financial account, receivables, licensing records, materials, or remaining post-term obligations following that corporate transaction.

244. On July 6, 2026, eOne UK joined the Defendants-Appellees' Answering Brief in Appeal No. 26-1092, DktEntry 39.1. Page 3 advanced the historical chain from Mainsail through Entertainment One to Apple, Google, and YouTube; page 4 characterized Plaintiff's October 2015

revocation as an attempt to revoke SAA rights. Plaintiff disputes that characterization: his October 1 notice concerned the separate 2006 grants to Maron Pictures, not Maron's April 2009 SAA with Mainsail. The filing documents eOne UK's continued adverse position after the scheduled expiration under the original Term described in ¶223. The actual territorial limits, revocation, succession, and operative duration remain disputed.

**Present Rights and Administration**

245. Plaintiff disputes that eOne UK possesses any continuing Film-exploitation authority inconsistent with Plaintiff's asserted ownership, the governing territorial restrictions, or the expiration of the original distribution Term. The parties' unresolved rights-administration dispute concerns the existence and legal effect of any Film-related right or obligation still recognized by eOne UK, the identity of the present contractual Owner or Licensor, the status of any surviving sublicense or materials obligation, and the person or entity presently entitled to administer or receive amounts properly attributable to the Film account.

246. The controversy has practical consequences for Plaintiff's ability to establish and warrant a clean chain of title, identify which downstream Film rights remain operative, determine who is entitled to administer or receive Film-generated revenues, require accurate treatment of the Film account, and determine whether any entity continues to claim an exploitation right originating in the Mainsail–eOne chain after expiration of the governing distribution term.

247. Plaintiff seeks a determination, as between Plaintiff and Entertainment One UK Limited, of the presently operative source, territorial scope, duration, and legal effect of any Film-related right eOne UK retains, asserts, or administers; the operation of paragraph 18(C) and identity of the applicable contractual Owner, Licensor, or successor; and the status of any continuing Film-account, inventory, Materials, and post-term obligations. The requested determination concerns Plaintiff's asserted 2015 reversion, the original distribution Term and subsequent expiration timetable, and the December 2023 corporate succession, as further specified in Claim Five.

## XIII. DISCOVERY, ACCRUAL, CONCEALMENT, AND DEFENDANT-SPECIFIC TIMELINESS

248. Plaintiff pleads timeliness separately according to the particular Defendant, actionable conduct, injury, discovery date, applicable limitations period, and any supported delayed-discovery, concealment, tolling, or estoppel doctrine. No single accrual date governs every Defendant or every Claim.

249. Under 17 U.S.C. §507(b), a civil copyright action must be commenced within three years after the particular claim accrued. Under the Ninth Circuit's discovery rule, a copyright claim accrues when the copyright owner knows or reasonably should know of the particular infringement giving rise to the claim. *Starz Entertainment, LLC v. MGM Domestic Television Distribution LLC*, 39 F.4th 1236, 1242–46 (9th Cir. 2022).

250. Independently actionable reproductions, distributions, transmissions, public performances, and other actionable uses may accrue separately under the separate-accrual rule. *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 671–72 (2014).

251. Plaintiff's declaratory claims concern presently contested Film rights and contractual relationships arising through the Mainsail–Entertainment One distribution chain and associated platform arrangements. The matters bearing upon those disputes include Plaintiff's asserted contractual reversion following the 2015 default, the expiration of the original Entertainment One distribution Term and associated post-term period in 2025, the parties' documented 2026 authorization positions, and the later Film-specific platform activity identified herein. Plaintiff seeks determination of the existence, source, scope, duration, and present legal effect of the disputed rights and obligations as specified in the corresponding declaratory Claims.

**Plaintiff's Continuing Investigation and Diligence**

252. Plaintiff first learned through Visual Data's December 2019 communications and records that previously undisclosed California copying, laboratory processing, and shipment activity had occurred concerning the Film and related master materials.

253. Plaintiff thereafter pursued the Film's California laboratory, distribution, licensing, platform, copying, server, transmission, and accounting records through the federal actions, including written discovery, document requests, requests for admission, interrogatories, depositions, and summary-judgment proceedings.

254. Plaintiff's earlier awareness of Film listings, distribution activity, and territorial-authorization disputes did not disclose the complete Film-specific contractual and operational records subsequently obtained through discovery. In 2023, Apple and Google produced additional executed United States platform agreements, California and United States server information, Film-specific technical disclosures, and related evidence concerning the actual contractual and operational arrangements through which *Strength & Honour* was administered and exploited in the U.S. Plaintiff pursued those records through the federal discovery proceedings described above. Material portions of the underlying transactional and technical information were maintained principally by Defendants and their related entities and were not independently available to Plaintiff through public sources.

255. Plaintiff first saw the purported January 20, 2016 declaration attributed to him when Mainsail filed it on April 10, 2020, and repudiated it under oath on April 12, 2020. During his April 27, 2023 deposition, Plaintiff again expressly denied executing, preparing, signing, or authorizing that declaration. Apple's and Google's counsel attended that deposition, and both Defendants subsequently submitted the disputed instrument in their October 31, 2023 summary-judgment proceedings. Plaintiff alleges those events as evidence of the Defendants' notice, adoption, and continued reliance upon the disputed ownership representation.

256. On October 31, 2023, Mainsail submitted an SAA package authenticated by Sam Eigen that omitted the executed Laboratory Access Letter signatory page and included an unmarked Materials Schedule. The separate SAA packages authenticated and submitted in the Apple and Google proceedings contained incomplete Laboratory Access forms without the laboratory's executed signature and likewise included unmarked Materials Schedules. Plaintiff separately submitted the executed Laboratory Access Letter and marked Materials Schedule in those proceedings concerning the Visual Data copying allegations but did not then present a complete comparison of Defendants' respective authenticated contractual packages. Plaintiff subsequently identified the material differences through examination and comparison of the appellate record. On June 5, 2025, Plaintiff submitted the complete integrated SAA in Case No. 4:25-cv-01083-YGR, including at Dkt. No. 66-3, and thereafter filed the completed agreement in

his January 30, 2026 Rule 60 proceedings. Plaintiff alleges that these documentary differences and subsequent submissions are material to the scope of the authorization asserted and the evidentiary record concerning the Film's ownership and exploitation.

257. Mainsail's March 6–7, 2025 sworn verifications further supplied post-judgment, contracting-side adoption under oath of the response that the SAA "was not amended." Plaintiff pleads those verifications as later-developed evidence concerning the scope of the written authorization chain and as relevant to later and present rights positions.

**Current YouTube Posting, Doe 1, Google, and YouTube**

258. On September 24, 2026, Plaintiff discovered and documented a publicly accessible YouTube posting containing substantially the complete motion picture *Strength & Honour*, identified as video M90fFPm3klw and displayed under the account name "Rt3-Ireland." Plaintiff had not previously identified that particular posting or its availability. He preserved contemporaneous evidence of the URL, displayed account, Film title, public playback, and associated audiovisual content.

259. The identified posting is a distinct Film-specific publication and playback event from the historical transactional distribution addressed in the prior Google and YouTube proceedings. The September 24, 2026 evidence displayed an approximate upload age of one year. The precise publication timestamp, uploader identity, originating source copy, subsequent transmissions, geographic playback records, rights-management history, and monetization records are identifiable through the records maintained by YouTube, Google, and the responsible account holder.

260. Claim One concerns the unauthorized upload of substantially the complete Film by Doe 1 and any additional actionable reproduction, distribution, or other exercise of Plaintiff's exclusive rights attributable to that uploader. Plaintiff first discovered the identified posting on September 24, 2026. The particular upload event and any subsequent acts attributable to Doe 1 are alleged according to their respective dates and the evidence identifying the responsible actor.

261. Claim Two concerns Google LLC's and YouTube LLC's respective alleged supervisory authority and Film-specific financial benefit in connection with the identified full-

length posting, separately from Doe 1's upload and the historical platform distribution. Plaintiff relies upon the California playback, platform controls, October 22, 2026 notices, and work-specific audience activity alleged in Section X and Claim Two, with liability attributed separately to each Defendant.

262. Plaintiff documented actual playback of the Film through the identified YouTube posting on September 24, 2026. Plaintiff alleges that independently actionable reproductions, transmissions, distributions, and public performances associated with that posting are distinct operative events according to the particular acts, dates, and responsible participants established by the Film-specific technical and platform records.

**Mainsail and Shoreline Tangible-Property Accrual**

263. Plaintiff learned of Visual Data's California copying and inventory records in December 2019. The distinct dispute over the original clean LipSync screeners is supported by Eigen's October 31, 2023 custody representations and photographs, the production and delivery records, Pagan's September 30, 2026 declaration, and the unanswered return demand described in ¶¶108–115. Plaintiff relies on those events for their respective discovery, custody, and detention facts. He seeks recovery for wrongful dominion over the original physical items according to when the particular interference occurred and when its factual basis was or reasonably could have been discovered.

264. The September 30, 2026 demand and preservation request are alleged in ¶¶113–114. The October 9 deadline expired unanswered; as of October 11, neither Defendant had acknowledged the demand, returned the original screeners, or supplied their location, custodian, or disposition, as alleged in ¶115.

265. Plaintiff asserts personal ownership of and an immediate right to possession of the two original LipSync screeners. The originals were delivered to Shoreline in California in July 2009, have never been returned, and remain unaccounted for following Plaintiff's September 30, 2026 written demand. Based upon the documented delivery, subsequent Film-material custody evidence, continued nonreturn, and absence of any accounting following demand, Plaintiff alleges on information and belief that the original physical materials have been retained, transferred, or

otherwise subjected to an exercise of dominion inconsistent with his ownership and possessory rights. Plaintiff seeks relief for the wrongful interference alleged in Claim Three.

**eOne UK Discovery, Accounting, and Post-Term Events**

266. On October 8, 2020, the eOne Defendants served jurisdictional interrogatory responses, verified under penalty of perjury by Simon Osborn on behalf of Entertainment One UK Limited, stating that none of the responding eOne entities had engaged in licensing activity concerning *Strength and Honour* in the Northern District of California or in any other federal judicial district in California. In the same verified responses, eOne further represented, following what it described as a "reasonably diligent investigation," that none of the eOne Defendants, including Entertainment One US LP and Entertainment One UK Limited, had provided copies of the Film to Apple, Google, or YouTube in the Northern District of California or any other federal judicial district in California. Osborn, then Head of Legal and Business Affairs, Distribution at eOne UK, verified those representations under penalty of perjury based upon his information and belief.

267. In 2023, Apple and Google produced additional executed agreements and Film-specific discovery concerning the United States distribution chain. Apple's production included the March 31, 2011 assignment and iTunes consent and the subsequent Apple Inc.–Entertainment One US LP United States/Canada distribution agreement. Google's production included the April 18, 2011 Content Hosting Services Agreement and the June 5, 2012 amendment linking that agreement to the Transactional Content Agreement. The later Film-specific disclosures supplied additional evidence concerning Entertainment One US LP's California contractual role, domestic platform administration, and United States technical activities. Plaintiff alleges that these records materially supplemented the account of the Film's contractual and operational chain previously presented through eOne's 2020 jurisdictional discovery.

268. On or about May 12, 2023, Plaintiff received from Mainsail the eOne Film-account statements dated February 7, 2021 and February 17, 2022, identifying previously undisclosed "Other" charges of £155,939.88 and £270,236.47. During the February 16, 2024 summary-judgment hearing, Mainsail's counsel subsequently represented that eOne had posted

litigation-defense expenses against the Film account and that those expenses had driven the account below break-even. Plaintiff has received no underlying Film-specific invoices, payment records, ledger entries, allocation documents, or contractual accounting records establishing the nature and treatment of those charges.

269. Plaintiff has received no later Film statement, reconciliation, remittance, account ledger, or closing accounting after the February 2022 statement.

270. Under the original contractual timetable of the May 16, 2009 Entertainment One distribution agreement, and absent any legally operative extension, suspension, or other provision altering that calculation, the original fifteen-year exploitation Term reached its scheduled expiration no later than March 31, 2025. The separate six-month period governing the sale of then-existing physical Videogramme inventory reached its corresponding outside expiration date no later than September 30, 2025. Those contractual events are material to determining the present duration and legal effect of eOne UK's asserted Film rights, any surviving downstream arrangements, residual Materials and inventory obligations, and the administration of the Film account.

271. Claim Five concerns the present legal effect of eOne UK's Film-related authority and obligations following Plaintiff's asserted reversion, paragraph 18(C)'s contractual succession mechanism, expiration of the original distribution Term, the December 2023 corporate transaction, and the subsequently unresolved status of the Film account and materials. Plaintiff seeks determination of the rights and obligations that eOne UK presently recognizes or administers under the operative contractual chain.

**Present Adverse Rights Positions**

272. Apple continued on July 17, 2026 to defend the validity of the Mainsail–Entertainment One–Apple authorization chain upon which its Film distribution depended. Plaintiff disputes the continuing legal effect of that asserted chain.

273. Mainsail likewise continued in its August 3, 2026 appellate filing to maintain that the downstream Entertainment One licensing and exploitation were authorized notwithstanding Plaintiff's reliance upon the SAA's written territorial limits and the later verified non-amendment

evidence.

274. On September 2, 2026, in Ninth Circuit Appeal No. 26-2299, Google and YouTube jointly continued to defend the historical Film-distribution authority asserted through Entertainment One, including Google's claimed licence to distribute *Strength and Honour* through the YouTube platform. Plaintiff disputes the territorial scope, duration, and continuing legal effect of that asserted authorization. Separately, the full-length Film posting discovered on September 24, 2026 raises the distinct Film-specific matters alleged in Sections X and XIII and in the corresponding Claims.

275. On July 6, 2026, in Ninth Circuit Appeal No. 26-1092, eOne UK joined the Defendants-Appellees' answering brief maintaining the historical licensing chain through which Mainsail granted Film-distribution rights to Entertainment One and Entertainment One subsequently sublicensed distribution through Apple, Google, and YouTube. Plaintiff disputes the lawful territorial scope and continuing effect of that authorization, particularly in light of the original Entertainment One distribution Term's 2025 expiration and the unresolved contractual succession and post-term administration alleged herein.

## XIV. PRESENT INJURY, CLOUD ON TITLE, COMMERCIAL HARM, AND PROSPECTIVE RELIEF

276. Plaintiff presently asserts ownership and the right to control, license, administer, and commercially exploit *Strength and Honour*. The Film is also the subject of unresolved disputes concerning the continuing legal effect of the Mainsail–Entertainment One distribution chain, the Film-related authority asserted by downstream platforms, the September 2026 full-film YouTube posting, the administration of Film-generated revenues, and the disposition of Plaintiff's original tangible Film materials. Plaintiff alleges that these matters presently affect his ability to exercise and commercially exploit the rights he asserts.

277. During 2026, Apple, Google, Mainsail, and eOne UK continued to defend the legal validity of their respective historical Film-authorization arrangements. Separately, substantially the complete Film was documented as publicly accessible through YouTube in September 2026, the original eOne distribution Term had reached its outside expiration date

under the original contractual timetable alleged above, and the Film-account and tangible-property matters described above remained unresolved. Plaintiff alleges that these subsequent events and the respective parties' documented positions materially affect the present scope and commercial administration of his asserted Film rights.

**Plaintiff's Direct Commercial and Property Interests**

278. Plaintiff wrote, produced, and directed *Strength and Honour* and developed the Film as a central part of his professional identity as an Irish filmmaker. The Film's title, authorized presentation, awards history, national identity, credits, source, and chain of title therefore bear directly upon both Plaintiff's professional goodwill and the Film's commercial value.

279. Plaintiff positioned *Strength and Honour* in the market as an award-winning Irish motion picture. The Film received twenty-four awards and over thirty-three nominations, received international publicity, and was commercially distinguished through its awards record, cast, Irish identity, and association with Plaintiff's work.

**The Film's Established Reputation and Commercial Identity**

280. In a recorded interview released on July 4, 2025, Michael Madsen, one of the Film's principal performers, described *Strength and Honour* as "probably the best thing I ever did" and expressly stated that he believed his performance in the Film could have earned him an Academy Award. He praised its father-son boxing story and expressed disappointment at its limited release and exposure. Plaintiff relies upon those remarks as evidence of the Film's professional significance, established creative work and unrealized commercial potential.

281. Plaintiff approved and used the distinctive Irish-tricolor awards cover and authorized Film trailer as part of that commercial identity. Those materials communicated the Film's Irish origin, awards record, cast, quality, and association with Plaintiff and formed part of the goodwill through which Plaintiff sought to license and exploit the Film.

282. Plaintiff developed a substantial public audience around the Film's authorized Irish-tricolor and awards-focused commercial identity. The official *Strength and Honour* Facebook page, established on December 5, 2008, subsequently attracted more than 100,000

followers. As of August 16, 2025, the page displayed approximately 113,000 likes and 111,000 followers, together with Facebook's blue verification badge and Plaintiff's authorized Film imagery. Plaintiff asserts that this longstanding public recognition constitutes evidence of established audience interest and goodwill associated with the Film's authorized presentation.

283. Plaintiff's authorized Irish-tricolor awards cover, original Film trailer, Irish national identity, and original Maron Pictures presentation formed part of the Film's established commercial identity and branding. The subsequent use of materially different cover artwork, audiovisual promotional material, the description "Brit flick," and the replacement of the original Maron Pictures opening presentation card departed from that authorized identity. Plaintiff did not approve those alterations and alleges that their use impaired the consistency and commercial value of the Film's original presentation.

284. On September 24, 2026, Plaintiff documented publicly accessible Amazon.co.uk and Amazon.com retail listings displaying materially altered cover artwork for *Strength and Honour*, differing from the original Irish-tricolor awards cover he had authorized. On October 16, 2026, Plaintiff again documented the Amazon.co.uk listing for the United Kingdom DVD edition, identified by ASIN B002UEX15U and item model E1E51370, showing the challenged artwork, identifying "Entertainment One" as the studio, and continuing to describe Plaintiff's Irish motion picture as a "Brit flick." The listing offered the DVD for sale and continued to display a Film-related promotional video incorporating the disputed cover artwork and advertising the original February 22, 2010 DVD release. Plaintiff additionally possesses physical DVD packaging bearing the express notice "DVD Packaging © E1 Entertainment 2010," associating the challenged physical-release presentation with the Entertainment One-branded distribution chain. Plaintiff alleges that these materials, considered with his January 2010 cease-and-desist demands to Mainsail and Entertainment One and the applicable Screen and Advertising Statement of Restrictions, establish the persistence of the disputed branding and promotional presentation in international retail channels more than sixteen years after he expressly objected to their use. Plaintiff further alleges that the continuing presentation of the Film through artwork, promotional materials, and descriptions he never approved has impaired the consistency, recognition, and

commercial value of the Film's authorized Irish identity and his associated professional goodwill.

**Current YouTube Exploitation and Loss of Exclusivity**

285. The unauthorized complete-Film posting documented on September 24, 2026 and identified in ¶¶179–186 provided viewers with substantially the complete Film without Plaintiff's authorization, interfering with his asserted rights to control reproduction and public exploitation.

286. The documented public availability of substantially the complete Film through the unauthorized YouTube posting provides viewers with access to Plaintiff's copyrighted motion picture without his consent or authorization. Plaintiff alleges that such availability impairs the commercial exclusivity and market scarcity he seeks to offer prospective distributors, digital platforms, broadcasters, territorial licensees, and restoration or re-release partners. It further affects Plaintiff's ability to negotiate lawful streaming, rental, sale, subscription, television, territorial, and other Film-exploitation opportunities, diminishing the value and bargaining leverage associated with granting exclusive rights in the motion picture.

**Present Cloud on Chain of Title and Enforcement**

287. Plaintiff presently asserts that the Film rights previously conveyed to Maron Pictures reverted following the September 30, 2015 contractual default and his subsequent Notice of Contract Revocation. Apple, Google, Mainsail, and eOne UK have continued to defend the historical authorization arrangements derived from the Mainsail–Entertainment One chain. Plaintiff has executed no subsequent written conveyance granting those Defendants additional post-reversion Film rights and continues to dispute the scope and legal effect of the authority asserted through that chain.

288. The competing rights positions and unresolved status of the historical distribution arrangements create a practical cloud upon Plaintiff's asserted chain of title. Plaintiff alleges that this uncertainty affects his ability to certify ownership, warrant exclusive territorial and platform rights, negotiate new Film licenses, make reliable chain-of-title representations to prospective distributors, and determine which historical sublicenses or rights-management interests remain legally operative.

**Film Revenues and Accounting Injury**

289. Plaintiff also remains unable to determine the complete amount and disposition of Film-generated revenues. As alleged above, available records contain incomplete royalty information, unexplained deductions and charges, missing source documentation, unresolved platform revenue information, and no later eOne Film-account statement or reconciliation after February 2022.

290. The eOne Film account reported a positive balance of £7,901.14 ($10,280.96) as of January 29, 2020. The February 7, 2021 statement subsequently introduced a £155,939.88 entry designated "Cinema / Other," resulting in a reported negative balance of £148,038.74. The February 17, 2022 statement added a further £270,236.47 entry designated "Home Video / Other," bringing the reported closing deficit to £418,275.21. Plaintiff has received no underlying invoices, ledger records, payment confirmations, allocation documents, or complete reconciliation establishing the basis and subsequent treatment of those entries.

291. In his July 28, 2023 rebuttal report, Plaintiff's accounting expert identified an apparent unreconciled residual of approximately $29,540.23 when comparing Entertainment One's reported Pay-Per-View/New Media collections for *Strength & Honour* with the Film-related transactions reported through Apple's and Google/YouTube's platforms. The expert identified Google-related Film activity as a potential source of that residual. Plaintiff alleges that the Film-specific financial records produced to date have not reconciled the underlying revenue streams or established how the corresponding receipts were allocated, accounted for, remitted, or retained. The outstanding records include the relevant reporting periods, territories, platform transactions, deductions, exchange rates, upstream remittances, and ultimate recipients necessary to determine the disposition of Film-generated revenues and any amounts payable under the applicable contractual arrangements.

**Tangible Film Materials**

292. Plaintiff's ownership and immediate right to possession of the two clean LipSync screeners constitute a separate tangible-property interest apart from the copyrights embodied in the Film.

293. The two original clean LipSync NTSC DVD-R screeners were Film-specific

physical materials personally commissioned and financed by Plaintiff and delivered directly to Shoreline Entertainment in California on July 30, 2009. Those original items remain unreturned and unaccounted for. Following Plaintiff's September 30, 2026 written demand and the expiration of the October 9, 2026 response deadline, neither original had been returned, and neither Mainsail nor Shoreline had identified its location, custodian, condition, or disposition as of October 11, 2026. Plaintiff remains unable to recover, inspect, preserve, verify the physical identity and condition of, or exercise control over those original Film materials, resulting in the continuing deprivation of the tangible-property interests asserted herein.

**Business Goodwill and Commercial Injury**

294. Plaintiff alleges economic and commercial injury arising from the actionable conduct identified herein, including interference with the exercise of his asserted exclusive Film rights; impairment of licensing, distribution, restoration, and re-release opportunities; diminution of commercial exclusivity and bargaining leverage; loss or diversion of Film-generated consideration to the extent established by the relevant financial records; interference with his ownership and possession of tangible Film property; and injury to the commercial goodwill associated with the Film's authorized identity and Plaintiff's professional work. Plaintiff further alleges that the continued public offering and display of editions using the disputed cover artwork and "Brit flick" characterization, as documented in ¶284, perpetuate a commercial presentation materially inconsistent with the Film's authorized Irish identity, impairing Plaintiff's ability to market a consistent authorized edition and to negotiate or warrant the presentation and exclusivity of the Film rights he personally asserts.

295. Plaintiff's work in developing, producing, financing, and promoting *Strength and Honour* established its commercial identity and his associated professional goodwill. He alleges that the challenged artwork, which he never approved have impaired the established commercial identity of the Film, promotional materials, "Brit flick" description of the Irish Film, substituted opening, unauthorized full-length posting, and the unresolved scope of competing distribution claims, have impaired his ability to control the presentation of his work, preserve its commercial reputation, and his ability to pursue legitimate licensing, restoration, re-release, and related

commercial opportunities.

**Need for Prospective Relief**

296. Monetary compensation alone cannot fully restore Plaintiff's ability to control the prospective exploitation of the Film where substantially the complete work has been made publicly available without his authorization, competing Film-related rights remain unresolved, and original tangible Film materials remain unreturned and unaccounted for. Plaintiff seeks appropriate prospective relief to protect the Film rights and property interests established through the claims alleged herein.

297. Plaintiff seeks declaratory relief concerning the particular present Film-related rights or entitlements asserted, retained, recognized, or administered by Apple, eOne UK, Google, and YouTube, according to the respective controversies pleaded against them. Such relief would determine the legally operative source, territory, duration, scope, and present effect of any authority inconsistent with Plaintiff's asserted exclusive rights.

298. Plaintiff further seeks appropriately tailored injunctive and related prospective relief concerning independently established unauthorized reproduction, distribution, public performance, or other exploitation of the Film, including the complete-Film YouTube posting identified above. Plaintiff also seeks preservation and disclosure, through appropriate procedures, of the Film-specific uploader, source-copy, account, rights-management, monetization, notice, and transmission records necessary to identify the responsible actors and the scope of the conduct alleged.

299. Plaintiff seeks recovery of the two original clean LipSync NTSC DVD-R screeners wrongfully withheld or otherwise subjected to an actionable exercise of dominion, as established through the completed record. The originals were specifically commissioned and completed Film materials and masters, not interchangeable blank DVD-R media. Their value arises from their Film-specific contents, production provenance, original physical form, and role in the completed Film's post-production and delivery history. Plaintiff seeks return of the originals or appropriate compensation for the tangible-property injury proved.

300. Plaintiff further seeks determination and enforcement of any Film-specific

accounting, reporting, payment, or related administrative obligation established under the applicable contracts and substantive claims. Accurate Film-specific financial records are necessary to identify revenues received, deductions imposed, amounts remitted or retained, the disposition of the Film account, and the identity of the person or entity presently entitled to administer or receive the corresponding contractual proceeds.

## CLAIMS FOR RELIEF

### CLAIM ONE
### COPYRIGHT INFRINGEMENT
### 17 U.S.C. §§ 106 AND 501
### AGAINST DOE 1, THE PERSON OR ENTITY THAT SELECTED AND INITIATED THE CURRENT YOUTUBE UPLOAD

301. Plaintiff incorporates by reference ¶¶1, 9, 11–12, 16, 19, 24–26, 36, 38–39, 41–74, 179–186, 248–260, 262, 285–288 and 294–298, concerning his personal rights, Doe 1, the identified posting, domestic conduct, discovery, prior proceedings, and injury, so far as those allegations relate to this Claim.

302. *Strength and Honour* is an original motion picture protected by the Copyright Act and is the subject of basic Registration No. PA 1-642-297 and supplementary Registration No. PA 1-398-376, as described in ¶57. Its underlying screenplay is separately registered under Registration No. TXu1-289-556.

303. Plaintiff asserts that the exclusive rights previously conveyed by him under the September 25, 2006 agreements reverted following the contractual default and written revocation described in Section V, and that he owned the relevant reproduction, distribution, and public-performance rights when the conduct challenged in this Claim occurred. In the alternative, if the Court were to determine, contrary to Plaintiff's primary assertion of contractual revocation and reversion, that legal title to any particular exclusive copyright right remained with Maron Pictures Limited during the infringement challenged in this Claim, Plaintiff asserts that he held beneficial ownership of that right under 17 U.S.C. §501(b) at the time of the challenged infringement, based upon the corresponding reserved royalty interest and applicable period identified in ¶¶62 and 64.

304. Doe 1 is the presently unidentified person or entity that, on information and belief,

selected and intentionally initiated the upload of substantially the complete Film through the YouTube account publicly identified as "Rt3-Ireland," using video identification number M90fFPm3kIw. Plaintiff does not presently know Doe 1's true identity, location, legal capacity, or the identity of any other person or entity that participated in selecting, supplying, or uploading the unauthorized digital copy.

305. On information and belief, Doe 1 obtained or controlled a digital copy of *Strength and Honour*, deliberately selected that copyrighted work for upload, and initiated its publication through YouTube. Doe 1's affirmative selection and initiation of the upload caused the Film to be copied through the platform's upload process and made accessible to viewers. Plaintiff alleges Doe 1's own volitional conduct as the basis of this Claim.

306. Plaintiff did not authorize Doe 1 to reproduce, upload, distribute, publicly perform, publicly display protected images from, or otherwise exercise any exclusive right under 17 U.S.C. §106 in the Film, and Plaintiff has identified no license, consent, or other lawful authority permitting Doe 1 to upload or make substantially the complete Film publicly available.

307. By deliberately selecting and initiating the unauthorized upload of substantially the complete motion picture *Strength and Honour*, Doe 1 caused the Film to be reproduced in digital form and made publicly accessible for audiovisual playback through the identified YouTube posting. Plaintiff alleges that Doe 1's affirmative conduct initiated the reproduction and dissemination of the copyrighted Film and caused its availability for public audiovisual transmission, including to viewers within California as subsequently documented in October 2026. Plaintiff seeks relief for the actionable domestic reproductions, distribution of copies, and public performances that infringed his exclusive rights under 17 U.S.C. §§106(1), 106(3), and 106(4), respectively, insofar as those domestic acts occurred and are legally attributable to Doe 1.

308. On September 24, 2026, Plaintiff personally observed and documented public playback through the identified URL and preserved six contemporaneous screenshots showing the URL, account, Film title, approximately 4,100 cumulative views, approximate one-year upload age, and identifiable Film content, including the credit "A Mark Mahon Film." These records support the posting allegations in ¶¶179–186.

309. Based upon the identified upload, the California accessibility and playback confirmation, and the prior Film-specific United States infrastructure disclosures alleged in ¶¶38 and 184–186, Plaintiff alleges on information and belief that Doe 1's intentional upload caused one or more fixed digital copies of the Film to be created, stored, or processed through United States systems and made the Film available for transmission to the public in California. Plaintiff seeks posting-specific records to establish the particular domestic acts attributable to Doe 1.

310. The copying is literal and substantial. The challenged posting reproduces substantially the complete motion picture, including protected audiovisual expression, dialogue, performances, cinematography, editing, music, titles, and credits, rather than an incidental excerpt, trailer, review, commentary segment, or other limited portion of the work.

311. On information and belief, Doe 1 knew that *Strength and Honour* was a copyrighted commercial motion picture and that Doe 1 lacked authority to upload and disseminate substantially the complete work. The uploaded Film retained identifying information including its title, Plaintiff's authorship credit, and the original end-credit copyright notice. Plaintiff alleges that Doe 1 nevertheless deliberately selected and uploaded the Film without Plaintiff's authorization and seeks a determination of willfulness based upon the evidence of Doe 1's knowledge and conduct.

312. Plaintiff first discovered the identified YouTube posting on September 24, 2026. At that time, the public page displayed an approximate upload age of one year. Plaintiff alleges that the identified upload and any subsequent independently actionable conduct attributable to Doe 1 constitute distinct Film-specific events, with the precise upload date, publication history, subsequent activity, and responsible participants ascertainable from the platform and account records.

313. Doe 1's unauthorized uploading and dissemination of substantially the complete Film interfered with Plaintiff's asserted exclusive rights to control reproduction and public exploitation of his copyrighted work. The posting supplied viewers with access to a complete-Film copy without Plaintiff's authorization, impaired the commercial exclusivity and licensing value of the Film, and adversely affected Plaintiff's ability to negotiate authorized streaming,

distribution, territorial licensing, restoration, and re-release opportunities.

314. Plaintiff seeks actual damages and any profits attributable to Doe 1's infringement under 17 U.S.C. §504(b), or, alternatively, statutory damages under §504(c), including any enhanced award authorized upon proof of willful infringement. The Film's United States copyright registrations predate the identified posting. Plaintiff further seeks the costs and other remedies authorized by the Copyright Act.

315. Plaintiff seeks preliminary and permanent injunctive relief under 17 U.S.C. §502, as authorized by applicable law and supported by the evidence, to restrain further unauthorized reproduction, distribution, public performance, or other actionable exploitation of the Film by Doe 1 and to protect Plaintiff's asserted exclusive copyright rights.

316. Plaintiff seeks leave, where required under Federal Rule of Civil Procedure 26(d)(1), for prompt, narrowly tailored discovery identifying Doe 1 and the factual basis for personal jurisdiction, service, and the nature, duration, geography, and financial consequences of the alleged infringement. The requested records include those identified in ¶¶24, 181 and 190, including upload-time and relevant login IP records, United States storage and playback records, and file hashes. Plaintiff seeks preservation of those records and leave to substitute and serve the identified Defendant.

**CLAIM TWO**
**SECONDARY COPYRIGHT INFRINGEMENT**
**CONTRIBUTORY COPYRIGHT INFRINGEMENT AND, IN THE ALTERNATIVE, VICARIOUS COPYRIGHT INFRINGEMENT**
**17 U.S.C. §§ 106 AND 501**
**AGAINST YOUTUBE LLC AND GOOGLE LLC**

317. Plaintiff incorporates by reference ¶¶1–3, 12–14, 16–20, 25–26, 29–30, 35–36, 38–74, 163–194, 248–262, 274, 285–288, 294–298, and 302–313, concerning his personal rights, Doe 1's alleged infringement, the separate platform Defendants, notice, conduct, discovery, and injury, insofar as those allegations relate to this Claim.

318. As alleged in Claim One, Doe 1 directly infringed Plaintiff's asserted exclusive rights by intentionally selecting and uploading substantially the complete Film through the

YouTube account publicly identified as "Rt3-Ireland" and causing the Film to become publicly accessible through the identified URL without Plaintiff's authorization.

319. Google LLC and YouTube LLC are separate legal entities. The published United States YouTube Terms of Service dated December 15, 2023 identify Google LLC as the service provider. Plaintiff alleges Google's own responsibility through that service-provider role and its legally attributable conduct concerning domestic availability of the identified posting. Plaintiff relies upon their respective Film-specific contractual and platform roles alleged in ¶¶163–169 and attributes liability to each according to its own participation in the decisions and conduct concerning the identified posting.

320. Plaintiff's notices and objections concerning the unauthorized exploitation of Strength & Honour substantially predate the current YouTube posting. Following his December 2019 objections, on March 2, 2020, Plaintiff commenced federal copyright actions in this District against YouTube LLC and Google LLC in Case No. 4:20-cv-01525-YGR, and against Google LLC and related Google entities in Case No. 4:20-cv-01530-YGR. Those proceedings placed Defendants on formal notice that Plaintiff disputed their asserted authority to reproduce, distribute, publicly perform, and otherwise exploit the Film through the Mainsail–Entertainment One licensing chain, including the territorial restrictions excluding North America and Ireland. Their participation in the ensuing litigation and discovery gave notice of his asserted ownership, objections to the Mainsail–Entertainment One authorization chain, and the disputed territorial limits. On January 17, 2022, Plaintiff separately submitted a YouTube copyright-removal request concerning a Film trailer, and as recently as September 2, 2026, Google and YouTube jointly maintained in their appellate proceedings that Entertainment One had granted Google a licence to distribute the Film through the YouTube platform. Plaintiff relies upon this documented history as evidence of Defendants' longstanding knowledge of his asserted copyright ownership, the specific Film, his objections to their claimed authorization, and the disputed source and territorial scope of the rights they continued to defend. Separately, following Plaintiff's September 24, 2026 discovery of the full-length posting identified as M90fFPm3klw, Plaintiff transmitted the specific written notifications described in ¶¶187–189 and 321–322 on October 22, 2026. This Claim

concerns each Defendant's own actionable conduct relating to that separately identified posting.

**A. Contributory Infringement**

321. As alleged in ¶187, on October 22, 2026, Plaintiff transmitted specific written copyright-infringement notifications to YouTube Copyright Operations and Google LLC's designated copyright contact concerning the full-length Film posting identified as M90fFPm3klw. Those notifications supplied the precise URL and video identifier, the Film's applicable United States copyright registrations, Plaintiff's asserted ownership and exclusive rights, and his express contention that the complete-Film posting was unauthorized.

322. The notifications supplied Plaintiff's contact information and electronic signature, together with statements concerning his good-faith belief that the challenged use was unauthorized and the accuracy of the notification and his authority as the asserted owner of an exclusive right, as required by 17 U.S.C. §512(c)(3)(A). The notices requested removal or disabling of the identified posting, appropriate coordination or review, and preservation of the Film-specific records necessary to identify the uploading account, relevant platform actions, asserted rights, and financial administration.

323. YouTube LLC maintains mechanisms to identify, review, restrict, remove, restore, and administer videos, accounts, copyright claims, and monetization. Plaintiff alleges that its exercise of those mechanisms concerning M90fFPm3kIw must be determined from its own records and actions. Google's distinct participation, if any, is to be established through its own Film-specific contractual, technical, operational, or administrative conduct.

324. On October 22, 2026, at approximately 4:38 p.m. Pacific Time, the full-length YouTube posting identified as M90fFPm3klw remained publicly accessible for audiovisual playback in Santa Clara, California. Roberto Antonio Rivera independently documented that accessibility and playback through the recording and sworn declaration described in ¶¶36 and 186. On the same date, at approximately 5:10 p.m. Pacific Time, Plaintiff transmitted the separate copyright-infringement notifications to YouTube LLC and Google LLC described in ¶¶187 and 321–322. Those notifications specifically identified the posting, asserted Plaintiff's exclusive rights, disputed authorization for the full-length upload, and requested removal or disabling of

access and preservation of the corresponding Film-specific records.

325. The earlier Film-specific agreements, discovery, 2020 litigation, and September 2, 2026 appellate position described in ¶¶166–178 and 320 establish the history of the authorization dispute. Separately, the current full-length posting was made available for actual audiovisual playback through YouTube's platform, as independently documented in California in October 2026. Plaintiff alleges these historical contractual positions and independently documented platform activities as evidence relevant to Defendants' Film-specific knowledge, asserted authorization, technical participation, and responsibility for their respective conduct concerning the identified posting.

326. The particular acts, decisions, and communications concerning the posting identified as M90fFPm3klw include the source and treatment of any asserted Film authorization, the handling of copyright or Content ID claims, interactions with the uploading account, Film-specific rights-management decisions, monetization arrangements, and the response to Plaintiff's October 22, 2026 notifications. Plaintiff alleges that the corresponding records are maintained or controlled by Google LLC, YouTube LLC, or persons acting through their respective platform operations. Those records are material to determining whether either Defendant undertook affirmative, intentional, Film-specific conduct promoting or inducing Doe 1's unauthorized reproduction or dissemination of the Film, the nature and timing of any such conduct, and its causal connection to the identified infringement. Plaintiff seeks appropriately limited discovery of those records and alleges responsibility separately according to each Defendant's own conduct and legally attributable acts.

**B. Vicarious Infringement Pleaded in the Alternative**

327. In the alternative, Plaintiff asserts vicarious copyright infringement against YouTube LLC and Google LLC to the extent established by each Defendant's own legally operative authority, practical control, and direct financial benefit concerning Doe 1's infringement alleged in Claim One. The infringement at issue concerns the specifically identified full-length Film posting, M90fFPm3klw, and the unauthorized reproduction and public dissemination attributable to Doe 1. Plaintiff alleges that vicarious responsibility arises insofar as the particular

Defendant possessed the legal right and practical ability to supervise, restrict, or stop that infringement, received a direct financial benefit causally attributable to it, and failed to exercise the relevant authority to prevent or limit the actionable conduct.

328. YouTube LLC operates the audiovisual platform through which Doe 1's full-length Film posting was published and made available for public playback. YouTube maintains mechanisms for identifying particular videos and uploading accounts, reviewing copyright claims, restricting territorial availability, disabling playback, removing videos, administering monetization, and limiting or terminating account access. The posting at issue was specifically identifiable by its public URL, video identifier, displayed title, and uploading account. Separately, following Plaintiff's January 17, 2022 copyright-removal request concerning another Strength and Honour video, Google represented that the identified trailer had been removed. Plaintiff relies upon those platform functions and the documented earlier Film-specific removal response as evidence of YouTube's legal and practical capacity to identify and restrict particular Film postings, while distinguishing the earlier trailer from the present full-length upload. Google LLC's separate Film-related hosting, processing, contractual, and administrative activities are alleged in ¶¶163–169. Plaintiff alleges responsibility against Google according to any independently established authority and practical ability exercised by Google over the specific posting, rather than solely by virtue of its corporate relationship with YouTube.

329. On September 24, 2026, the identified full-length Film posting displayed approximately 4,100 cumulative views. On October 22, 2026, Plaintiff observed that the same posting had accumulated approximately 4,600 views, reflecting approximately 500 additional views during the intervening period. These figures document continuing audience activity associated with the specific copyrighted work. Plaintiff alleges on information and belief that the unauthorized availability of substantially the complete Film attracted viewers to YouTube's platform and generated Film-specific audience engagement potentially capable of producing economic benefits through advertising, subscription-based viewing, copyright-management arrangements, or other platform monetization mechanisms. The posting-specific advertising impressions, monetization status, YouTube Premium allocations, Content ID claims, revenue

entries, payment recipients, and any distinct economic benefit received or controlled by YouTube LLC or Google LLC are ascertainable from Defendants' Film-specific records. Plaintiff seeks determination of the direct financial benefits, if any, causally attributable to the identified posting and the particular Defendant receiving or administering them.

**C. Present Conduct, Injury, and Relief**

330. This Claim concerns the identified posting, the September–October 2026 observations, and each Defendant's the posting-specific conduct and notifications described in ¶¶185–189 and 258–262, separately from the historical transactional distribution addressed in the earlier proceedings.

331. The secondary infringement alleged herein has contributed to the continued unauthorized availability of substantially the complete Film, impaired Plaintiff's control over the exclusive rights he asserts, placed a freely accessible unauthorized substitute into the market, impaired exclusivity, licensing value, bargaining leverage, and re-release opportunities, and, to the extent established through evidence, caused loss or diminution of Film-related revenue and other commercial opportunities.

332. Plaintiff seeks actual damages and any profits recoverable under 17 U.S.C. §504, or statutory damages to the extent legally available and elected, including enhancement where authorized upon proof of willfulness, together with costs and such other copyright remedies as governing law permits.

333. Plaintiff further seeks preliminary and permanent injunctive relief under 17 U.S.C. §502 upon establishment of the applicable equitable requirements, including relief directed to continued or restored availability of the identified Film posting and substantially identical conduct adjudicated unlawful.

334. Plaintiff seeks appropriately limited discovery and preservation of the posting-specific records identified in ¶190, including actual watch time, retention, geographical views, advertisements served, monetized playbacks, financial allocations, recipients, account terms, removal powers, and notice responses. Those records bear upon the extent of the Film-specific financial benefit and the respective control and participation of Google LLC and YouTube LLC.

The inquiry concerns the particular Film activity alleged in this Claim.

**CLAIM THREE**

**CONVERSION AND SPECIFIC RECOVERY OF TANGIBLE PERSONAL PROPERTY**

**California Common Law; Cal. Civ. Code §§ 3294, 3336; Cal. Civ. Proc. Code §§ 338(c)(1), 667**

**AGAINST MAINSAIL LLC AND SHORELINE ENTERTAINMENT, INC.**

335. Plaintiff incorporates by reference ¶¶1, 4–6, 12, 18–21, 30–34, 37, 41–55, 73–74, 82–83, 90–92, 94–117, 248, 252–253, 263–265, 292–294, 296 and 299, concerning the original tangible screeners, personal ownership and possession, California custody, provenance, demand, prior proceedings, accrual, and injury, insofar as those allegations relate to this Claim.

336. Plaintiff invokes supplemental jurisdiction under 28 U.S.C. §1367 on the overlapping source-material, California handling, and provenance facts alleged in ¶18 and Section VII. Those facts concern the production, custody, identification, and movement of Film copies and their relationship to the federal dissemination claims. The original LipSync screeners and separately identified Shoreline-branded materials remain distinct items in that inquiry.

337. This Claim concerns two specifically identifiable items of tangible personal property: the clean, full-length NTSC DVD-R master screeners produced by LipSync Post Ltd. and dispatched directly to Shoreline Entertainment in California in July 2009. It does not seek through state law rights equivalent to the exclusive copyright rights in the audiovisual work embodied on those physical discs.

338. Plaintiff asserts ownership and an immediate right to possession of the two original screeners based on his personal commissioning and financing, the identified production and delivery records, and their limited-purpose delivery to Shoreline, as alleged in ¶¶94–99. He received no reimbursement for the personal payment and did not sell, assign, give away, or abandon the originals. The right asserted is to the original physical carriers, independently of copyright in their contents.

339. In their November 15, 2023 summary-judgment opposition, Mainsail and Shoreline identified their marketing discs 626 and 627 as manufactured in-house on May 22, 2009. LipSync dispatched the originals on or about July 28, 2009 for delivery on July 30, 2009.

Plaintiff contrasts those representations with the July 2009 LipSync production, original labels, and Pagan evidence alleged in ¶¶97–111. He alleges that the photographs, manufacturing chronology, and barcode records do not establish the subsequent custody or disposition of the separately produced original LipSync screeners.

340. The October 9, 2026 deadline specified in Plaintiff's September 30 written demand expired without a substantive response from Mainsail, Shoreline, or their counsel. As of October 11, 2026, Plaintiff has received no acknowledgment, agreement to return either original screener, identification of its present location or custodian, or accounting explaining its retention, transfer, loss, destruction, or other disposition. Neither original LipSync screener has been returned to Plaintiff.

341. Based upon the documented delivery to Shoreline for limited Film-related purposes, subsequent custody and handling evidence, continued nonreturn, and unanswered September 30, 2026 demand, Plaintiff alleges on information and belief that the original screeners were retained, transferred, disposed of, or otherwise subjected to dominion inconsistent with his ownership and immediate right to possession. Plaintiff seeks to establish the particular wrongful conduct attributable to each Defendant through the custody and disposition records alleged herein.

342. Shoreline was the direct recipient of the original screeners on July 30, 2009. Mainsail's separately alleged copying, handling, shipment activities, and representations through Sam Eigen are set out in ¶¶102 and 106–112. Plaintiff seeks liability for wrongful dominion over the originals according to each Defendant's respective acts, direction, participation, and any legally established basis for attribution between them.

343. Plaintiff alleges direct injury to his ownership and possessory interests in two specifically identifiable tangible items: the original clean LipSync NTSC DVD-R screeners. Those physical-property interests exist separately from the copyright and other intangible rights embodied in the Film. The relief requested under this Claim concerns the original physical carriers themselves, their wrongful deprivation or disposition, and the resulting tangible-property injury.

344. The two original LipSync screeners were professionally prepared Film-specific deliverables containing the completed audiovisual work in the form produced for its original distribution and marketing. They were not interchangeable blank DVD-R media. Their tangible value derives from their original physical form, technical characteristics, identifiable production provenance, archival significance, and the professional preparation and mastering work embodied in those particular finished items. Plaintiff seeks their legally recoverable value based upon competent evidence of those characteristics, the original production and preparation records, the cost of producing reasonably equivalent physical deliverables where relevant to valuation, and any special circumstances supporting an alternative measure of damages under California Civil Code §3336.

345. Plaintiff seeks judgment for possession and the unaltered return of each original clean LipSync screener established to be within the possession, custody, or control of a Defendant responsible for its wrongful detention. Plaintiff further seeks appropriate preservation and inspection of the returned originals sufficient to document their identity, physical condition, labeling, contents, and provenance.

346. If delivery of an original screener cannot be obtained because a liable Defendant wrongfully withheld, transferred, destroyed, disposed of, or otherwise converted it, Plaintiff seeks the legally recoverable value of that specific tangible item under California Code of Civil Procedure §667 and California Civil Code §3336, together with legally recoverable damages for detention, consequential property loss, and reasonable expenses properly incurred in pursuit of the property.

347. Plaintiff relies upon Shoreline's receipt of the original screeners; the different chronology and characteristics attributed to the Shoreline-branded discs; Pagan's evidence; the May 2017 shipment; Eigen's custody representations; the incomplete Laboratory Access materials; and the unanswered demand, as alleged in ¶¶82–83, 94–115 and 339. Plaintiff alleges that these circumstances, considered together, bear upon knowing retention, concealment, transfer, disposition, or other wrongful dominion over the originals and the knowledge and participation attributable to each Defendant.

348. Plaintiff further alleges that, to the extent the Film-material custody, provenance, and disposition evidence establishes that Mainsail LLC or Shoreline Entertainment, Inc. knowingly retained, concealed, transferred, destroyed, or otherwise disposed of the original LipSync screeners in violation of Plaintiff's ownership and immediate possessory rights, or deliberately misrepresented their custody or disposition to prevent Plaintiff's recovery of those originals, such conduct was intentional and undertaken in conscious disregard of his property rights. Plaintiff alleges that any proven deliberate concealment or materially misleading representation intended to deprive him of his original property or prevent its recovery constitutes fraud within the meaning of California Civil Code §3294(c), and that any proven despicable conduct undertaken with willful and conscious disregard of his rights, or intended to cause him injury, constitutes malice or oppression as defined therein. Plaintiff seeks punitive or exemplary damages against each Defendant established to have committed actionable conversion accompanied by the requisite statutory misconduct, upon clear and convincing proof under §3294(a) and satisfaction of the corporate responsibility requirements of §3294(b), including qualifying participation, authorization, or ratification by an officer, director, or managing agent. Plaintiff seeks an award in an amount determined according to the evidence and applicable law.

**CLAIM FOUR**

**DECLARATORY RELIEF REGARDING APPLE INC.'S PRESENT FILM RIGHTS AND AUTHORITY**

**28 U.S.C. §§ 2201 AND 2202**

**AGAINST APPLE INC.**

349. Plaintiff incorporates by reference ¶¶1, 7, 16–20, 27, 29–30, 41–80, 90–93, 118–162, 223–232, 248–251, 272, 287–288 and 296–297, concerning his personal rights, the Apple authorization chain, territorial and temporal limits, redelivery, present adverse positions, injury, jurisdiction, and prior proceedings, insofar as those allegations relate to Apple and this Claim.

350. This Court has original jurisdiction under 28 U.S.C. §§1331 and 1338(a) over the federal copyright claims alleged herein. Plaintiff's present controversy with Apple Inc. concerns the existence, ownership, territorial scope, duration, and continuing authorization of exclusive Film rights protected by 17 U.S.C. §106, including rights of reproduction, distribution, and public

performance. Plaintiff seeks declaratory relief under 28 U.S.C. §§2201 and 2202 determining the parties' presently operative legal relations concerning those rights and any Film-specific authorization Apple claims to possess, recognize, or administer. Plaintiff further invokes supplemental jurisdiction under 28 U.S.C. §1367 over related contractual questions forming part of the same case or controversy.

351. Plaintiff presently asserts ownership of the exclusive Film rights that reverted to him under the September 25, 2006 agreements. Apple has continued to defend the validity of the downstream Mainsail–Entertainment One–Apple authorization chain, notwithstanding Plaintiff's asserted reversion and the subsequent sworn confirmation that the SAA "was not amended." Plaintiff seeks determination of whether Apple presently possesses, recognizes, retains, administers, or may exercise any Film-related license, sublicense, customer-redelivery entitlement, catalogue interest, or other continuing authority derived from that disputed chain, and the legal effect of any such authority upon Plaintiff's asserted exclusive rights.

**A. The Asserted Apple Authorization Chain**

352. Apple has asserted authority concerning *Strength and Honour* through a downstream licensing chain originating with Mainsail and passing through Entertainment One. The written SAA at the beginning of that asserted chain granted Mainsail rights in "the entire world, excluding North America and Ireland," and Plaintiff alleges that no binding amendment expanded that defined Territory.

353. Mainsail subsequently stated in discovery that the SAA "was not amended," and Sam Eigen and Morris Ruskin personally verified the responses containing that statement under oath on March 6 and 7, 2025. Those sworn verifications materially bear upon the scope of the written grant from which Apple's asserted downstream authority ultimately derived.

354. Plaintiff further alleges that the rights previously conveyed by him to Maron Pictures reverted following the September 30, 2015 contractual default, his October 1, 2015 written revocation, and the reversion alleged above. Plaintiff thereafter executed no written conveyance granting Apple any new post-reversion Film right.

**B. Later Apple Film Activity and Present Adversity**

355. The January 7, 2022 customer redelivery, challenged artwork, "Brit flick" description, and "Studio: eOne" attribution are alleged in ¶149. Graham's sworn declaration and screenshots were filed in the prior Apple action on November 14, 2023 at Dkt. No. 149-29. Plaintiff relies upon that transaction as evidence of customer-access and re-download functionality after new retail sales ceased.

356. Apple's July 17, 2026 Answering Brief in Appeal No. 26-2134, DktEntry 11.1, defended the historical Irish licence by reference to the May 2009 communications and defended the prior determination concerning United States infringement. Plaintiff disputes the authorization premises for the reasons alleged in ¶¶144–146 and 150–158, including the SAA's territorial limits and non-amendment evidence and his separately asserted 2015 reversion.

357. Plaintiff asserts that no downstream agreement in the Mainsail–Entertainment One–Apple licensing chain could enlarge the territorial or substantive Film rights lawfully possessed by Mainsail under the operative upstream grant, which expressly excluded North America and Ireland and was subsequently verified under oath as unamended. Independently and in the alternative, without conceding the validity of that licensing chain or the correctness of the prior judgments, Plaintiff relies upon the original Entertainment One Term and post-term framework alleged in ¶¶223–232 and disputes the existence, scope, duration, and legal effect of any purportedly surviving Apple sublicense, customer-redelivery, catalogue, or digital-delivery entitlement. Plaintiff has received no Film-specific instrument establishing the present status, extension, renewal, or replacement of such asserted authority. The actual source, territorial scope, duration, and applicable survival terms remain material to the declaration requested below.

358. Plaintiff challenges Apple's continued scope of the downstream authorization chain, documented customer-redelivery functionality after new sales ceased, and the unresolved status of entitlements under the original Entertainment One Term give rise to a present dispute over rights Apple continues to recognize, administer, or exercise. Plaintiff disputes continuing authority inconsistent with his asserted ownership and the legally operative contractual limits.

359. The existence and scope of any continuing Apple Film right affect Plaintiff's ability to certify chain of title, warrant exclusivity, negotiate territorial and digital distribution,

and pursue restoration, re-release, and further exploitation. Surviving customer-access, digital-delivery, catalogue, and sublicensing entitlements are material to the rights and obligations Plaintiff may represent to prospective licensees.

**C. Declaration Requested**

360. Plaintiff seeks a declaration pursuant to 28 U.S.C. §2201, as between Plaintiff and Apple Inc., determining whether Apple presently possesses, retains, recognizes, administers, asserts, or may exercise any legally operative Film-related licence, sublicense, customer-redelivery entitlement, digital-delivery right, catalogue-administration interest, or other continuing authorization derived from the Mainsail–Entertainment One–Apple chain. To the extent any such entitlement remains legally operative, Plaintiff seeks determination of its contractual or other lawful source, territorial scope, duration, limitations, expiration, and present effect, including whether it permits the continued reproduction, storage, transmission, delivery, or redelivery of the Film to existing customers, the creation of new customer entitlements, or any further commercial exploitation of exclusive rights in the Film.

361. Plaintiff also seeks determination of whether any present Apple authority remains confined to the rights lawfully conveyed through the preceding contractual chain, including the SAA's territorial exclusions and amendment requirements. Plaintiff disputes that downstream instruments, without an independent lawful source, conveyed rights exceeding those available upstream, for the reasons alleged in ¶¶75–80, 118–140 and 144.

**D. Relationship to the Prior Judgment and Pending Appeal**

362. Plaintiff preserves the challenges concerning the prior Apple judgment, disputed declaration, complete SAA materials, and March 2025 verifications through Appeal No. 26-2134 and the proceedings identified in Section IV. This Claim seeks determination of present legal relations and the continuing effect of the original Entertainment One Term, surviving customer or platform entitlements, and the particular adverse rights positions alleged herein.

363. Plaintiff seeks a declaration under 28 U.S.C. §2201 and further relief under §2202 as may lawfully follow. He seeks appropriately limited discovery of the Film-specific records identified in ¶162, including licence-survival and expiration provisions, customer-access and

redelivery entitlements, territorial settings, content identifiers, metadata, and current catalogue and rights-administration instructions, to determine the present authority placed in controversy.

**CLAIM FIVE**
**DECLARATORY RELIEF REGARDING ENTERTAINMENT ONE UK LIMITED'S PRESENT AND POST-TERM FILM RIGHTS AND ADMINISTRATION**
**28 U.S.C. §§ 2201 AND 2202**
**AGAINST ENTERTAINMENT ONE UK LIMITED**

364. Plaintiff incorporates by reference ¶¶1, 8, 13–19, 22–23, 28–30, 41–80, 90–93, 118–140, 197–209, 214–248, 251–254, 266–271, 275, 287–291, 297 and 300, concerning his personal rights, eOne UK's agreements and conduct, territory, term, succession, accounts, post-term duties, jurisdiction, injury, and prior proceedings, insofar as those allegations relate to eOne UK and this Claim.

365. Plaintiff seeks declaratory relief under 28 U.S.C. §§2201 and 2202 concerning eOne UK's asserted continuing Film authority and the post-term contractual obligations specified below. He invokes §§1331 and 1338(a) to the extent the controversy arises under federal copyright law concerning an asserted continuing exercise or grant of exclusive rights protected by 17 U.S.C. §106. He invokes §1367(a) over contractual succession, account administration, and post-term performance where those questions share operative facts with the federal claims. The claim-specific basis for personal jurisdiction is alleged in ¶¶22–23.

**A. eOne UK's Film-Specific Rights and Territorial Scope**

366. The May 16, 2009 agreement, its contracting parties, defined territories, and Guarantee allocation are alleged in ¶¶214–216. The agreement provided specified exclusive distribution and sublicensing rights within its defined Territory. Its original Term commenced upon execution and was defined as fifteen years from the first United Kingdom release, calculated from a release date no later than March 31, 2010, as further addressed in ¶376.

367. Paragraph 21(i) of the May 16, 2009 agreement selects California law. Plaintiff seeks construction of the agreement's scope, duration, succession, assignment, surviving sublicenses, accounts, and post-term duties under that selected law, including the copyright Owner's contractual position under paragraph 18(C).

368. Plaintiff did not sign or execute the May 16, 2009 Mainsail–Entertainment One distribution agreement and was not a named contracting party thereto. Plaintiff's asserted copyright ownership arises under the separate September 25, 2006 agreements and the subsequent contractual revocation and reversion alleged in Section V. Plaintiff relies upon the May 16, 2009 agreement to determine the lawful source, territorial scope, duration, limitations, and continuing legal effect of the Film authority asserted by Entertainment One UK Limited and other Defendants to the extent a Defendant claims rights derived from that agreement.

369. The upstream SAA from which Mainsail claimed its authority separately excluded both North America and Ireland from Mainsail's licensed Territory. Mainsail subsequently stated in discovery that the SAA "was not amended," and its principals verified those responses under oath on March 6 and 7, 2025. Plaintiff asserts that no downstream agreement could enlarge the territorial rights lawfully possessed by Mainsail beyond the scope of the operative upstream grant.

370. Plaintiff's December 2009 termination instructions and January 2010 cessation demands are alleged in ¶¶217–221. He relies upon those contemporaneous objections when disputing eOne UK's claimed unrestricted or continuing authority. The downstream agreement could convey only the rights Mainsail lawfully held and was authorized to grant.

**B. The 2015 Reversion and Paragraph 18(C)**

371. Plaintiff asserts that the Film rights he previously conveyed to Maron Pictures under the September 25, 2006 agreements reverted following the September 30, 2015 contractual default and his October 1, 2015 written Notice of Contract Revocation. Separately, Maron Pictures transmitted its October 7, 2015 notice invoking termination of Mainsail's Sales Agency Agreement. Plaintiff alleges that these distinct contractual events are material to the identity of the copyright owner, the continuing scope of Mainsail's asserted authority, and the succession and assignment provisions contained in paragraph 18(C) of the May 16, 2009 Entertainment One distribution agreement.

372. Paragraph 18(C) of the May 16, 2009 Mainsail–Entertainment One distribution agreement expressly addresses the circumstance in which Mainsail's right, title, and interest in the Film derives from a licence agreement with the copyright Owner. The provision states that the

Distributor's exercise of rights granted under the eOne agreement shall survive termination of the Licensor's upstream agreement and further provides that, upon such termination, the Owner shall take an assignment of the eOne agreement from the Licensor. Plaintiff alleges that these are distinct contractual mechanisms concerning the survival of previously granted rights and the succession to Mainsail's contractual position. Their application depends upon the operative upstream agreement, the legally effective termination event, the identity of the copyright Owner, and the existence and effect of any corresponding assignment.

373. Plaintiff relies upon his October 1, 2015 revocation under the 2006 agreements and Maron Pictures' separate October 7, 2015 SAA notice, as alleged in ¶¶67–72 and 197–198. He has received no executed paragraph 18(C) assignment or Film-specific record identifying the recognized Owner, successor, or person entitled to enforce the resulting obligations. He seeks determination of those instruments' legal effect upon his personally enforceable rights.

374. On November 15, 2023, Mainsail and Shoreline, through their counsel, affirmatively represented in the Northern District of California that the SAA had been terminated on October 7, 2015. *Mahon v. Mainsail LLC et al.*, Case No. 4:20-cv-01523-YGR, Dkt. No. 122, at 21. Counsel further maintained that, following the asserted termination, Defendants had undertaken no affirmative Film-related conduct other than defending the earlier state-court action. Plaintiff relies upon those representations as Defendants' documented position, distinct from his personal revocation under the 2006 agreements; the unproduced paragraph 18(C) assignment is addressed in ¶373.

375. Plaintiff alleges that survival or succession under paragraphs 18(C), 19, and 21(k) cannot itself enlarge the territorial or substantive rights lawfully granted. The conflict between the SAA's exclusions and the eOne agreement's inclusion of Ireland is alleged in ¶¶121–122 and 215–216. Plaintiff disputes any separate authorization inconsistent with those limits, subject to the pending direct challenges to the earlier determinations.

**C. Expiration of the eOne Term and Post-Term Administration**

376. The May 16, 2009 distribution agreement provided for an original exploitation Term ending fifteen years after the first United Kingdom release, calculated from a release date

no later than March 31, 2010. Under that original timetable, the Term reached its scheduled outside expiration date no later than March 31, 2025, absent a legally effective contractual event altering the calculation. Paragraph 16(e) separately prescribed circumstances in which the Distributor could suspend the Term following notice of a qualifying claim and satisfaction of the applicable contractual conditions. Plaintiff has received no Film-specific written notice, suspension record, extension, renewal, or other operative instrument establishing that the original fifteen-year period was lawfully altered or that Entertainment One UK Limited obtained renewed general distribution authority. Plaintiff seeks determination of the legally operative expiration date and disputes any continuing Film-exploitation authority unsupported by an effective contractual basis.

377. Paragraph 12(e) provided a separate six-month sell-off period following the legally operative expiration of the distribution Term, limited to the Distributor's then-existing inventory of physical Videogrammes. Applying the original contractual timetable, that limited period reached its scheduled outside expiration date no later than September 30, 2025, absent a legally operative alteration of the underlying Term. At the conclusion of the applicable sell-off period, the agreement required destruction of remaining inventory and delivery of a customary certificate of destruction to the Licensor. Plaintiff alleges that this limited physical-inventory provision did not itself confer any new or extended general right to license, sublicense, distribute, stream, download, or otherwise exploit the Film through digital platforms beyond the legally operative distribution Term.

378. Plaintiff has received no Film-specific inventory statement, sell-off accounting, stock-disposition record, or certificate of destruction identifying the physical Videogrammes remaining upon expiration of the applicable Term or their subsequent disposition. Paragraph 10(h) separately provided for the return or destruction of remaining Film Materials upon termination of the agreement and receipt of the Licensor's election. Plaintiff has received no Film-specific record establishing any such election, identifying the Materials held or controlled by Entertainment One UK Limited at the relevant time, documenting their return or destruction, or identifying the person or entity recognized as entitled to direct their disposition. Plaintiff alleges

that the operative contractual status of those materials, the corresponding post-term obligations, and the identity of the person entitled to enforce them remain unresolved.

379. The Film-account designation, statements, disputed allocations, and February 16, 2024 hearing explanation are alleged in ¶¶233–241. Plaintiff seeks determination of the account beneficiary, outstanding reporting and reconciliation duties, and post-term account treatment insofar as personally enforceable by him. The supporting invoices, allocations, payment documents, adjustments, recipients, and final disposition remain unprovided as alleged there. The account's "Shoreline Entertainment" designation must be distinguished from Mainsail's contractual role as Licensor for Maron Pictures.

**D. Present Controversy and Declaration Requested**

380. Plaintiff disputes eOne UK's claimed Film authority beyond the territorial and substantive rights lawfully conveyed or beyond their legally operative duration. He alleges a present controversy over surviving Film rights, the Owner or successor under paragraph 18(C), subsequent assignments, and the persons entitled to administer the Film, receive contractual performance, or direct the disposition of remaining Materials and inventory.

381. Plaintiff maintains that Entertainment One UK Limited did not lawfully acquire authority exceeding Mainsail's rights under the governing SAA or the applicable contractual restrictions. Independently and in the alternative, insofar as Defendants rely upon the licensing framework treated as operative in the historical adjudications as the source of presently asserted Film authority, Plaintiff seeks determination of that framework's actual limits and continuing legal consequences. Those questions include the legally operative duration of the distribution Term, the existence and effect of any suspension, extension, renewal, or surviving sublicense, the operation of paragraph 18(C), and any accounting, payment, inventory, or Film-material obligation personally enforceable by Plaintiff. Plaintiff's challenges to the historical ownership and authorization determinations remain preserved through the proceedings identified in Section IV.

382. Plaintiff seeks a declaration pursuant to 28 U.S.C. §2201 determining whether Entertainment One UK Limited presently possesses, retains, recognizes, administers, asserts, or

may exercise any legally operative Film-related licence, sublicense, distribution right, content-provider entitlement, rights-administration interest, or other continuing authority derived from the May 16, 2009 agreement. Plaintiff further seeks determination of the applicable expiration date of the original distribution Term; the existence and legal effect of any valid suspension, extension, renewal, assignment, or surviving sublicense; and the source, territory, scope, duration, and limitations of any Film authority continuing after expiration of the original contractual period. Plaintiff seeks a declaration that any authority to make new Film grants, renew prior distribution arrangements, or authorize further exploitation must arise from a legally effective source of rights and cannot exceed the rights and duration lawfully conveyed under the applicable instruments.

383. Plaintiff further seeks a declaration, as between Plaintiff and Entertainment One UK Limited and within the Court's jurisdiction, concerning the present operation and legal consequences of paragraph 18(C), including the identity and contractual position of the copyright Owner, the effect of Plaintiff's asserted contractual reversion, the legally operative consequences of the relevant upstream termination events, and the identity of any successor or assignee entitled to enforce the Film-specific contractual obligations identified herein. The requested declaration further concerns the person or entity entitled to receive applicable Film-account statements, reconciliation and payment of contractually due amounts, performance of surviving accounting obligations, and legally required disposition of remaining Film Materials and physical inventory. Plaintiff seeks determination of those matters insofar as they affect rights and obligations personally enforceable by him, with any monetary restitution sought separately under Claim Seven.

**E. Prior Proceedings, Preservation of Remedies, and Jurisdiction**

384. eOne UK's July 6, 2026 participation in Appeal No. 26-1092, DktEntry 39.1, and its characterization of the 2015 revocation are alleged in ¶244. Plaintiff disputes that characterization and preserves his direct challenges identified in Section IV. This Claim seeks determination of presently operative rights and obligations arising from the contractual succession, duration, and post-term circumstances alleged herein.

385. Plaintiff alleges personal jurisdiction over Entertainment One UK Limited on the

basis of its own claim-related participation in the Film-specific distribution and digital-platform arrangements alleged above, including the arrangements involving Entertainment One U.S. LP, the subsequent assignment and platform-contracting transactions, and the California-connected administration of Film rights. The original May 16, 2009 agreement also expressly selected California law as its governing law under paragraph 21(i). Plaintiff seeks declaratory relief under 28 U.S.C. §2201 concerning the present legal status of the Film-specific rights and obligations identified herein, together with such further relief under §2202 as may properly follow from that determination.

## CLAIM SIX
## DECLARATORY RELIEF REGARDING GOOGLE LLC'S AND YOUTUBE LLC'S PRESENT FILM RIGHTS
## 28 U.S.C. §§ 2201 AND 2202
## AGAINST GOOGLE LLC AND YOUTUBE LLC

386. Plaintiff incorporates by reference ¶¶1–3, 12–14, 16–20, 24–26, 29–30, 35–36, 38–80, 90–93, 118–140, 163–194, 223–232, 248–262, 274, 285–288 and 296–298, concerning his personal rights, each platform Defendant's roles, the authorization chain, current posting, term, present adversity, jurisdiction, injury, and prior proceedings, insofar as those allegations relate to this Claim.

387. This Court has original jurisdiction under 28 U.S.C. §§1331 and 1338(a) over the federal copyright claims alleged herein, including those concerning the separately identified full-length Film posting discovered in September 2026. Plaintiff seeks declaratory relief pursuant to 28 U.S.C. §§2201 and 2202 concerning the presently operative legal rights and obligations of Google LLC and YouTube LLC insofar as those rights concern the ownership, licensing, reproduction, distribution, public performance, and administration of exclusive rights protected by 17 U.S.C. §106. To the extent determination of those rights requires construction of the related contractual instruments, Plaintiff further invokes supplemental jurisdiction under 28 U.S.C. §1367 over contractual questions forming part of the same Article III case or controversy.

### A. Google's and YouTube's Asserted Authorization Chain

388. Google LLC and YouTube LLC are separate legal entities, as alleged in ¶¶2–3 and

163–164. Their September 2, 2026 joint appellate brief identified YouTube as Google's wholly owned subsidiary. Plaintiff attributes rights, conduct, knowledge, contractual arrangements, and platform functions to each according to its own participation, not merely their corporate relationship.

389. The upstream SAA from which the asserted downstream Film authority ultimately derived granted Mainsail rights in the entire world excluding North America and Ireland. Mainsail subsequently stated in discovery, and its principals verified under oath on March 6 and 7, 2025, that the SAA "was not amended." Plaintiff asserts that no downstream agreement could convey Film rights greater than those lawfully possessed by the purported upstream licensor absent a separate and legally operative source of authority.

390. Plaintiff relies upon the reversion and absence of a new written conveyance alleged in Section V and ¶193, and the original eOne Term and post-term framework in ¶¶223–232. He disputes unrestricted or perpetual platform rights without an independently operative source. The actual duration and scope of any surviving sublicense, content-provider, customer-access, or other entitlement remain to be determined under the governing instruments.

**B. Defendants' Continuing Rights Position and Present Platform Activity**

391. In their September 2, 2026 joint Answering Brief in Appeal No. 26-2299, DktEntry 11.1, Google and YouTube maintained that Entertainment One licensed Google to distribute the Film through YouTube and described historical United Kingdom and Ireland availability during 2011–2019. Plaintiff disputes that authorization for the reasons alleged in ¶¶165–178 and 193. That historical position remains distinct from the later Rt3-Ireland posting and any rights presently administered in connection with it.

392. Google's Film-specific witness Craig Ferguson identified Entertainment One as the content provider that supplied *Strength and Honour* under arrangements permitting Google to display, perform, distribute, and host licensed content through YouTube. Ferguson further stated that Google "relied and continues to rely" upon Entertainment One's representations concerning its authority to license the Film. Plaintiff alleges that this evidence identifies the particular source of authorization upon which Google historically relied and is relevant to determining whether

Google or YouTube presently continues to recognize or administer any Film-related rights derived from that source.

393. The Film-specific hosting and United States processing disclosures are alleged in ¶169. Google also admitted that servers used in connection with YouTube were located in the United States. Plaintiff relies upon those domestic facts as relevant to the scope, administration, and exercise of asserted Film authority, whose legal significance remains disputed.

394. The current posting is the particular audiovisual use documented in ¶36. Plaintiff's challenge to the historical authorization chain and his challenge to Doe 1's upload are distinct. The records identified in ¶¶190–191 will identify any licence or copyright-management entitlement actually invoked in administering that posting and the responsible entity. Plaintiff seeks a declaration concerning an entitlement asserted adversely to his Film rights according to its actual source and implementation.

**C. Present Controversy**

395. Plaintiff disputes the continuing territorial and temporal scope of the Film authorization maintained in Defendants' September 2, 2026 position, including its effect following the original eOne Term alleged in ¶¶223–232. The declaration sought concerns the legal authority for any surviving exercise of exclusive Film rights. The October 2026 posting supplies the separate, specifically identified platform use; its connection to any historically asserted licence is to be established through the posting-specific records, not assumed from the mere existence of the earlier agreements.

396. Any Film-specific authorization, claimant designation, provider entitlement, or rights-management instruction recognized by Google or YouTube adversely to Plaintiff's asserted rights affects his ability to establish ownership, enforce against unauthorized postings, control licensing and monetization, warrant exclusivity, and pursue restoration or re-release. Plaintiff seeks determination of those presently operative interests.

**D. Declaration Requested**

397. Plaintiff seeks a declaration pursuant to 28 U.S.C. §2201, as between Plaintiff and Google LLC, determining whether Google presently possesses, recognizes, retains, administers,

asserts, or may exercise any legally operative Film-related licence, sublicense, content-hosting authority, distribution right, public-performance authorization, content-provider entitlement, monetization right, or other continuing interest derived from Entertainment One or another asserted source. Plaintiff seeks determination of the contractual or other lawful source, territorial scope, duration, expiration, and present legal effect of any such authority, including its relationship to the SAA's express exclusion of North America and Ireland, the March 2025 sworn confirmation that the SAA "was not amended," Plaintiff's asserted 2015 contractual reversion, and the scheduled expiration of the original Entertainment One distribution Term in 2025. Plaintiff further seeks determination of whether any legally operative authority presently held or administered by Google permits continued Film-specific reproduction, storage, transmission, distribution, public performance, rights administration, or monetization within the United States or any other territory implicated by the disputed licensing arrangements.

398. Plaintiff separately seeks a declaration pursuant to 28 U.S.C. §2201, as between Plaintiff and YouTube LLC, determining whether YouTube presently recognizes, administers, implements, asserts, or gives legal effect to any Film-specific licence, sublicense, copyright-claimant designation, Content ID or comparable rights-management interest, content-provider relationship, territorial authorization, monetization instruction, or other continuing entitlement derived from Entertainment One or another asserted source. Plaintiff seeks determination of the legally operative source, scope, duration, expiration, and present effect of any such authority, including whether any Film-related entitlement recognized through YouTube's platform remains effective following the original Entertainment One distribution Term and whether any such entitlement is implemented in connection with the full-length Film posting identified as M90fFPm3kIw. Plaintiff disputes the exercise or administration of any such authority beyond the rights lawfully granted under the applicable agreements or inconsistent with the exclusive Film rights he presently asserts.

**E. Relationship to the Current Infringement Claims and Prior Proceedings**

399. Claim One concerns the independently alleged infringement attributable to the unidentified person or entity responsible for selecting and initiating the current full-length Film

upload. Claim Two concerns any separately established secondary copyright liability attributable to Google or YouTube arising from their own conduct in connection with that identified posting. This Claim concerns the distinct question whether either Defendant presently asserts, recognizes, administers, or implements any legally operative Film-related authorization inconsistent with Plaintiff's asserted exclusive rights. Plaintiff seeks declaratory relief concerning those present legal relations independently of the determination of liability for the particular unauthorized posting.

400. The prior Google/YouTube judgment was affirmed on February 24, 2026. Plaintiff preserves his challenges in Appeal No. 26-2299 and the authorized proceedings identified in Section IV, including the repudiated declaration, incomplete SAA and Laboratory Access materials, and March 2025 verifications. This Claim concerns the present legal relations described above without treating those pending challenges as already successful.

401. Plaintiff seeks the separate declarations specified in ¶¶397–398 under 28 U.S.C. §2201 and further relief under §2202 as may lawfully follow. He seeks appropriately limited discovery under the Federal Rules of the records identified in ¶¶190–191 and 394, including sublicense, termination, renewal, survival, territorial, monetization, and rights-management records, and each Defendant's contractual, administrative, and operational participation concerning M90fFPm3kIw.

**CLAIM SEVEN**
**ALTERNATIVE QUASI-CONTRACTUAL RESTITUTION AND UNJUST ENRICHMENT**
**Improper Film-Account Cost Allocations and Retention of Film-Generated Benefits**
**California Common Law; Federal Rule of Civil Procedure 8(d)**
**AGAINST ENTERTAINMENT ONE UK LIMITED**

**A. Plaintiff's Individual Financial Interests and Basis for Restitution**

402. Plaintiff incorporates by reference ¶¶8, 13–19, 22–23, 56–74, 84–89, 118–140, 149, 172, 214–248, 253–254, 266–271, 275, 278–284, 289–291 and 300, concerning his personal interests, eOne UK's contractual and financial arrangements, disputed charges, notice, commercial presentation, discovery, and injury, insofar as those allegations relate to this Claim.

403. Plaintiff asserts this Claim in the alternative under California common-law principles of quasi-contract and restitution. The Claim concerns the receipt, application, allocation, or retention of identifiable Film-related financial benefits through the distribution account, including the alleged shifting of Defendant-side litigation expenses into charges reducing the amounts otherwise available under that account. Plaintiff seeks restitution of benefits unjustly retained at his personal expense to the extent established under the governing financial and contractual relationships. This Claim does not seek merely to duplicate damages or profits arising from unauthorized reproduction, distribution, or public performance of the Film.

404. Plaintiff's personal financial interests arise from the September 25, 2006 agreements, which promised €300,000 and reserved the 40%, 50%, and 10% interests in the contractually defined distributable surplus identified in ¶¶61–63. He alleges that unauthorized deductions depleted the Film receipts from which that surplus was calculated and thereby impaired amounts personally payable under those terms. He separately claims any entitlement arising from his asserted reversion and the Owner-succession provision in Claim Five. Recovery under this Claim is confined to the particular benefits obtained at the expense of those individual rights.

405. The distribution agreement and financial framework in ¶¶214 and 233 governed receipts, permissible deductions, recoupment, and remittances. Plaintiff alleges that the disputed expense allocations reduced the receipts available under the structure supporting his reserved surplus interests. The enforceable royalty terms, any operative succession, and the actual financial allocations determine the portion recoverable by him personally from eOne UK.

**B. Identifiable Film-Account Transactions and Disputed Cost Allocations**

406. Entertainment One maintained a Film-specific distribution account identifying *Strength & Honour* as title number 504890 and carrying the account designation "Shoreline Entertainment." Its January 29, 2020 statement reported cumulative collections of £354,664.20 (approximately US$461,489.06), distributor fees of £282,851.55 (approximately US$368,046.44), a producer share of £69,916.65 (approximately US$90,975.54), a guarantee of £62,015.51 (approximately US$80,694.58), and a resulting positive Film-account balance of £7,901.14

(approximately US$10,280.96). The U.S. dollar equivalents are calculated using the Federal Reserve's January 29, 2020 exchange rate of US$1.3012 per £1. Plaintiff alleges that the statement establishes identifiable Film-generated receipts, deductions, and an accounting balance whose proper disposition depends upon the governing distribution and financial arrangements.

407. The Film-account statement dated February 7, 2021 reported no new current-period collections but introduced a charge of £155,939.88 (approximately US$213,855.95), designated "Cinema / Other," changing the previously positive Film-account balance of £7,901.14 ($10,280.96) to a reported unrecouped balance of £148,038.74 (approximately US$203,020.33). The subsequent statement dated February 17, 2022 carried forward that charge and introduced a further £270,236.47 (approximately US$368,170.17), designated "Home Video / Other," again without reporting new current-period collections. Consequently, the Film account reflected a closing unrecouped balance of £418,275.21 (approximately US$569,858.15). The two newly introduced "Other" charges totaled £426,176.35, equivalent to approximately US$582,026.12 when separately converted at the applicable historical exchange rates. The U.S. dollar equivalents are calculated using Federal Reserve exchange rates of US$1.3714 per £1 on February 5, 2021 (the preceding business day for the February 7 statement), and US$1.3624 per £1 on February 17, 2022.

408. The February 16, 2024 explanation by Mainsail's attorney Richard L. Charnley is alleged in ¶239. Plaintiff relies upon that recorded explanation concerning litigation-defense expenses and the account reversal. Plaintiff has not received the underlying legal invoices, payment records, accounting journals, allocation schedules, or contractual authorizations establishing the precise nature, recipient, amount, and treatment of the expenses described by counsel.

409. Based on the Film-account statements and the hearing explanation attributed to Mainsail's counsel, Plaintiff alleges on information and belief that eOne UK allocated litigation-defense expenses against Film receipts and balances. He alleges that these unauthorized allocations enabled eOne UK to retain otherwise distributable receipts or reimburse its own expenses from the Film account, reducing amounts available under the financial arrangements

supporting Plaintiff's personal interests. The benefit claimed is the money retained or expense relief actually obtained through that treatment, not the face amount of a ledger debit without a corresponding financial effect.

410. The disputed financial records identify "Shoreline Entertainment" as the Film-account designation, while the executed May 16, 2009 distribution agreement identified Mainsail LLC as Licensor acting for Maron Pictures. Plaintiff alleges that the actual financial arrangements require identification of the entity or entities that incurred the litigation expenses, directed or approved their allocation, received reimbursement or credit, obtained the benefit of an expense reduction, or retained Film-generated receipts affected by the disputed charges. The corresponding records include the underlying distribution agreements, Film-account ledgers, invoices, journal entries, intercompany adjustments, remittance instructions, and payment records. Plaintiff seeks restitution under this Claim from Entertainment One UK Limited to the extent the evidence establishes that it received or retained a legally recoverable benefit at Plaintiff's individual expense, without attributing an identical benefit to another entity merely because of its participation in the distribution chain.

411. The receipt of the statements and the later hearing explanation are described in ¶¶239–240 and addressed for discovery and accrual in ¶420. Plaintiff has received no subsequent complete Film-account statement, closing reconciliation, adjustment ledger, source-level accounting, or Film-specific payment record establishing whether the disputed charges were reversed, reduced, reclassified, transferred, recouped, or otherwise adjusted following the February 2022 statement. Plaintiff alleges that the nature and subsequent treatment of those charges, the identity of any resulting beneficiary, and their effect upon amounts personally payable to him remain material to determining the existence and extent of the restitutionary benefit alleged herein.

**C. Commercial Exploitation, Unauthorized Promotional Presentation, and Film-Generated Benefits**

412. Plaintiff personally developed and established the commercial identity of *Strength and Honour* as an award-winning Irish motion picture, including its distinctive Irish-tricolor

awards cover, authorized theatrical trailer, original Maron Pictures presentation, national identity, cast-credit requirements, and association with Plaintiff as the Film's writer, producer, and director. The Film's awards and nominations described in ¶279, international recognition, and principal cast formed part of the goodwill and commercial value through which the Film was promoted and offered for licensing and distribution. Plaintiff alleges that the authorized artwork, promotional materials, credits, and Irish national identity were integral to the Film's market positioning and to the value of the rights and commercial opportunities arising from its exploitation.

413. The April 2009 SAA negotiations and the contractual restrictions subsequently communicated to Mainsail distinguished permissible distribution-related promotional activity from unauthorized changes to the completed Film and its approved presentation. Plaintiff objected to the disputed Entertainment One distribution arrangements and promotional materials during December 2009 and January 2010, including his January 30 and 31, 2010 demands that the challenged distribution cease and the unauthorized materials be removed. The February 4, 2010 Screen and Advertising Statement of Restrictions expressly required that *Strength and Honour* be identified as an Irish film and prescribed requirements concerning its credits, cast presentation, artwork, and associated promotional identity. Plaintiff alleges that these contemporaneous communications establish the contractual and promotional restrictions communicated through the distribution chain and the notice received concerning departures from the Film's authorized presentation, including the subsequent characterization of the Irish motion picture as a "Brit flick."

414. The Film's principal cast included Michael Madsen, whose performance, professional reputation, and association with *Strength and Honour* contributed materially to its artistic identity and commercial appeal. His recorded appraisal, released on July 4, 2025, is described in ¶280. Plaintiff asserts that the Film's recognized performances, established cast, awards, and original Irish identity were valuable elements of the motion picture's commercial presentation. Plaintiff further alleges that the challenged substitution of unauthorized artwork, altered promotional materials, disputed cast-credit presentation, and "Brit flick" characterization

departed from the commercial identity he developed and authorized, impairing his own professional goodwill and the value of the Film rights and licensing opportunities he personally asserts.

415. The challenged alternative commercial presentation was disseminated through identifiable distribution and platform arrangements. Plaintiff possesses physical DVD packaging bearing the express designation "DVD Packaging © E1 Entertainment 2010," associating the disputed DVD presentation with the Entertainment One-branded distribution chain. On December 29, 2021, Plaintiff documented a Google Play listing displaying disputed Film artwork, promotional material, and the "Brit flick" characterization. On January 7, 2022, an existing Apple iTunes purchaser accessed and downloaded the Film and observed the disputed cover artwork, the "Brit flick" description, and the attribution "Studio: eOne." On September 24, 2026, Plaintiff documented the continued public display of materially altered Film cover artwork through retail listings, including Amazon.co.uk DVD listing ASIN B002UEX15U and Amazon.com Australian-import Blu-ray listing ASIN B00E3PM9C0. Plaintiff alleges that these records establish the distribution history and continued circulation of the disputed promotional presentation through identifiable retail and digital channels, notwithstanding his earlier objections and the restrictions communicated concerning the Film's authorized identity.

416. The promotional, packaging, licensing, and platform records described above are material to identifying the commercial transactions undertaken through the Entertainment One distribution arrangements and tracing the corresponding Film-generated receipts, distribution fees, deductions, remittances, and retained financial benefits. The January 29, 2020 Film-account statement reported cumulative Film collections of £354,664.20 (approximately US$461,489.06) and distributor fees of £282,851.55 (approximately US$368,046.44). The subsequent statements introduced two disputed "Other" charges totaling £426,176.35 (approximately US$582,026.12, using the respective historical exchange rates), as detailed in ¶¶406–407. Plaintiff alleges that the historical commercial exploitation and administration of the Film, including transactions conducted through the challenged promotional presentation, form part of the financial and contractual circumstances in which those receipts were collected and accounted for. Plaintiff

seeks determination of the financial benefits actually retained by Entertainment One UK Limited through the disputed account allocations, including any identifiable amounts or expense reductions obtained at the expense of Plaintiff's personally enforceable financial interests. The relevant benefits, recipients, and contractual treatment are to be established through the Film-specific accounting, licensing, remittance, and transaction records.

**D. Restitutionary Entitlement, Accrual, and Relief**

417. Plaintiff disputes that the May 16, 2009 Entertainment One distribution agreement, the upstream Sales Agency Agreement, or any subsequently identified contractual authorization permitted Entertainment One UK Limited to impose its own litigation-defense expenses upon Film-generated receipts and balances without a legally operative contractual basis. Plaintiff alleges that the disputed allocations, insofar as established to have reduced amounts otherwise payable through the Film account, conferred an economic benefit upon the responsible account beneficiary or expense-bearing entity. Plaintiff seeks restitution from Entertainment One UK Limited to the extent it is established to have received or retained that benefit at Plaintiff's individual expense, including where no enforceable contractual provision authorizes retention of the particular benefit.

418. The economic benefit alleged under this Claim consists of any identifiable Film-generated receipts, account credits, expense reimbursements, reductions in Entertainment One's own financial obligations, or other monetary benefits wrongfully retained through the disputed allocations. Plaintiff alleges that the two "Other" charges recorded in the 2021 and 2022 statements, totaling £426,176.35 (approximately US$582,026.12), are material to determining the extent of those benefits. Plaintiff seeks recovery according to the financial benefit actually obtained or retained, the governing contractual arrangements, and the amounts legally attributable to his personally enforceable rights. The recorded charges are relevant accounting evidence; the amount of restitution shall be established from the actual transactions, their financial effect, and the resulting individual entitlement.

419. Plaintiff pleads quasi-contract in the alternative under Federal Rule of Civil Procedure 8(d), to the extent no enforceable contract governs his individual recovery of the

particular benefit. He alleges that eOne UK retained benefits at his expense through the disputed Film-account allocations without a lawful basis for retention. The distribution agreement's provisions concerning receipts, deductions, expenses, accounting, and remittances are relevant to the parties' competing entitlement positions. Plaintiff seeks restitution at law where available and equitable restitution where an available legal remedy would not afford complete and adequate relief for the particular benefit sought. Plaintiff pleads equitable restitution where the established circumstances demonstrate that an available remedy at law would not afford complete and adequate relief for the particular benefit sought to be restored.

420. Plaintiff received the 2021 and 2022 statements through Mainsail on or about May 12, 2023. They identified substantial “Other” charges but not the underlying expenses, beneficiaries, invoices, or asserted contractual basis. At the February 16, 2024 hearing, Mainsail's counsel described litigation-defense expenses charged against the account and did not identify an authorizing provision when questioned. That explanation supplied additional information concerning the nature of the allocations. Plaintiff pursued Film-account information through the discovery and proceedings described in ¶¶253, 268, and 421; the underlying source records remain unprovided. He relies on those actual events and the applicable discovery and tolling rules in asserting timely relief for the particular allocations and resulting benefits challenged here.

421. Plaintiff pursued relief concerning the disputed Film-account transactions through the proceedings identified in Section IV and continues to challenge the January 29, 2026 dismissal in Appeal No. 26-1092. He relies on 28 U.S.C. §1367(d) for any corresponding supplemental claim that satisfies its requirements, together with any applicable equitable tolling supported by his prior pursuit of relief, notice to the affected Defendant, and procedural circumstances. Timeliness is asserted according to the particular transaction, injury, discovery facts, and qualifying period of tolling.

422. The restitutionary wrong alleged in this Claim arises from the disputed treatment of Film-generated financial receipts and the allocation of expenses to the Film account, including the alleged shifting of Entertainment One UK Limited's litigation-defense costs to an account administered for the Film's contractual beneficiaries. Plaintiff alleges that any unjust enrichment

resulting from such financial treatment concerns a distinct monetary benefit received or retained through the administration of contractual proceeds and expenses, rather than solely the unauthorized reproduction, distribution, public performance, or display of copyrighted material. The historical Film licensing, promotional, and platform records, including the use of materially altered cover artwork and the "Brit flick" characterization, are relevant to identifying the transactions, commercial arrangements, and underlying Film-generated revenues that were subject to the disputed accounting treatment. Plaintiff seeks restitution only for a separately established financial benefit recoverable under California law and does not seek duplicative recovery under the copyright or other Claims pleaded herein.

423. Plaintiff seeks judgment against Entertainment One UK Limited requiring restitution of any identifiable Film-related monetary benefit proved to have been unjustly received or retained at his individual expense through unauthorized expense allocations, improper recoupment, withholding of personally payable amounts, or other independently actionable financial treatment established under this Claim. Plaintiff further seeks an appropriate accounting, ancillary to an established substantive entitlement, concerning the Film-generated receipts, expense allocations, deductions, credits, remittances, and adjustments necessary to determine any balance legally due to him that cannot practicably be ascertained from the available statements and records. Plaintiff seeks prejudgment interest where authorized by law and such additional nonduplicative restitutionary relief as the Court may properly award, according to the actual financial benefit retained by Defendant and the individual rights established by Plaintiff.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Mark Mahon respectfully requests that judgment be entered in his favor and against each Defendant to the extent that Defendant's individual liability, legally cognizable obligations, or adverse rights are established, as follows:

**A. Copyright Infringement — Doe 1**

424. For judgment against Doe 1 for copyright infringement under 17 U.S.C. §§106 and 501, awarding, at Plaintiff's lawful election, either (a) actual damages suffered by Plaintiff and any additional profits of Doe 1 attributable to the infringement and not taken into account in

computing actual damages, pursuant to 17 U.S.C. §504(b), or (b) statutory damages pursuant to §504(c), including enhanced statutory damages upon proof of willful infringement to the extent authorized by §504(c)(2), in amounts established by the evidence and permitted by law;

**B. Contributory and Vicarious Copyright Infringement — Google LLC and YouTube LLC, Claim Two**

425. For judgment against Google LLC and YouTube LLC, respectively, to the extent either Defendant is established to be liable for contributory or vicarious copyright infringement under Claim Two, awarding actual damages and profits recoverable under 17 U.S.C. §504(b), or statutory damages under §504(c) at Plaintiff's lawful election, including enhancement for willfulness where authorized, with each Defendant's responsibility and any applicable joint liability determined according to the actionable conduct and evidence established against that Defendant;

**C. Copyright Injunctive and Related Relief — Claims One and Two**

426. For preliminary and permanent injunctive relief pursuant to 17 U.S.C. §502 and Federal Rule of Civil Procedure 65, preventing or restraining further unauthorized reproduction, distribution, public performance, transmission, or other infringement of the Film by any Defendant found responsible under Claims One or Two, including appropriate relief concerning the full-length YouTube posting identified as video M90fFPm3kIw and further substantially identical unauthorized postings within the scope of the Court's lawful injunctive authority; together with such impoundment, preservation, or disposition of infringing copies and related articles as may be authorized under 17 U.S.C. §503;

**D. Recovery of Plaintiff's Original Tangible Film Materials — Claim Three**

427. For judgment against Mainsail LLC and Shoreline Entertainment, Inc., respectively, upon establishment of that Defendant's liability under Claim Three, recognizing Plaintiff's ownership and superior immediate right to possession of the two original clean NTSC DVD-R master screeners produced by LipSync Post Ltd. and delivered directly to Shoreline Entertainment in California in July 2009, and granting judgment for possession and recovery of those specifically identifiable original physical items under California Code of Civil Procedure

§667 and other applicable law.

428. For an Order directing the unaltered return of each original LipSync screener established to remain within the possession, custody, or control of a Defendant legally responsible for its wrongful detention, together with such orders for identification, preservation, inspection, documentation of physical condition, and verification of original labeling, contents, and provenance as may be authorized and necessary to secure effective recovery of the original property.

**E. Conversion and Tangible-Property Damages — Claim Three**

429. In the alternative, to the extent either original LipSync screener cannot be returned because of actionable conversion, wrongful detention, transfer, destruction, disposal, or other legally established wrongful interference attributable to Mainsail LLC or Shoreline Entertainment, Inc., for judgment awarding the legally recoverable value of the corresponding original tangible item, applicable interest, compensable damages resulting from wrongful detention or disposition, and fair compensation for time and money properly expended in pursuit of the property, pursuant to California Civil Code §3336, California Code of Civil Procedure §667, and other applicable law.

**F. Punitive and Exemplary Damages — Mainsail LLC and Shoreline Entertainment, Inc., Claim Three**

430. For punitive or exemplary damages against Mainsail LLC and Shoreline Entertainment, Inc., separately and according to the actionable conduct established against each Defendant, pursuant to California Civil Code §3294, upon proof by clear and convincing evidence that a Defendant's conversion, wrongful detention, concealment, unauthorized disposition, or other actionable interference with Plaintiff's original LipSync screeners was accompanied by oppression, fraud, or malice. Plaintiff seeks such damages upon proof of intentional conduct in conscious disregard of Plaintiff's ownership and possessory rights, including any established deliberate withholding, concealment, misidentification, transfer, or disposition of the original physical property, and any proven post-demand conduct demonstrating the requisite statutory state of mind. Plaintiff further seeks application of the governing standards

for authorization, ratification, participation, and attribution of misconduct to each organizational Defendant under §3294, in an amount sufficient to punish and deter the misconduct proven and otherwise permitted by law.

**G. Declaratory Relief — Apple Inc., Claim Four**

431. For a declaration pursuant to 28 U.S.C. §2201 determining the existence, legally operative source, territorial scope, duration, expiration, and present effect of any Film-related license, sublicense, customer-redelivery entitlement, catalogue-administration right, or other continuing Film-related authority Apple Inc. presently possesses, claims, recognizes, administers, or exercises under the disputed Mainsail–Entertainment One–Apple authorization chain, including any asserted entitlement concerning continued United States availability, delivery, redelivery, or exploitation of the Film.

432. For a further declaration determining the extent to which any such asserted authority is limited by the governing agreements, the SAA's territorial restrictions and amendment requirements, the contractual rights lawfully conveyed through the distribution chain, the termination or expiration of applicable grants, and Plaintiff's October 1, 2015 contractual revocation and asserted reversion of rights.

**H. Declaratory Relief — Entertainment One UK Limited, Claim Five**

433. For a declaration pursuant to 28 U.S.C. §2201 determining the existence, legally operative source, territorial scope, duration, expiration, and present legal effect of any Film-related license, sublicense, distribution authority, accounting-administration right, collection entitlement, or other continuing right possessed, claimed, administered, or exercised by Entertainment One UK Limited under the May 16, 2009 distribution agreement and the contractual instruments upon which its authority depends.

434. For a further declaration determining the legal effect of paragraph 18(C) of the Mainsail–Entertainment One agreement, including the identification and contractual position of the relevant Owner, the effect of applicable revocation, termination, and expiration events, the operation of any legally effective assignment or succession mechanism, and the identity of the person or entity presently entitled to enforce surviving Film-specific contractual rights and

obligations.

435. For a declaration determining any presently operative Film-accounting, payment, remittance, materials, physical-inventory, or post-term administration obligations owed by Entertainment One UK Limited to Plaintiff personally, to the extent established under the governing instruments and applicable law, together with determination of the legal effect of any continuing assertion or exercise of Film-related authority following the relevant contractual expiration or revocation events.

**I. Declaratory Relief — Google LLC and YouTube LLC, Claim Six**

436. For separate declarations pursuant to 28 U.S.C. §2201 determining whether Google LLC or YouTube LLC presently possesses, claims, recognizes, administers, implements, or exercises any Film-related license, sublicense, content-hosting authority, copyright-claimant designation, Content ID or comparable rights-management interest, monetization entitlement, territorial authorization, or other continuing Film-related right derived from Entertainment One or another asserted source.

437. For a declaration determining the legally operative source, territorial scope, duration, expiration, and present effect of each Defendant's respective asserted Film-related authority, including any presently operative license, claimant designation, rights-management instruction, monetization entitlement, or administrative control concerning the full-length Film posting identified as YouTube video M90fFPm3kIw.

**J. Alternative Restitution and Unjust Enrichment — Entertainment One UK Limited, Claim Seven**

438. For judgment against Entertainment One UK Limited under Claim Seven, pleaded in the alternative, requiring restitution of identifiable Film-generated money or benefits established to have been received, retained, withheld, or applied by Entertainment One UK Limited for its own benefit without a lawful basis for retention, to the extent Plaintiff establishes an individually enforceable legal or equitable entitlement to their recovery. Plaintiff seeks restitution in the amount established by the evidence, together with appropriate ancillary accounting, tracing, interest, or other relief authorized by applicable law, without duplicative

recovery of amounts awarded under any other Claim.

**K. Punitive and Exemplary Damages — Entertainment One UK Limited, Claim Seven**

439. For punitive or exemplary damages against Entertainment One UK Limited pursuant to California Civil Code §3294, upon establishment that the actionable concealment, withholding, or retention of identifiable Film-related funds or benefits alleged in Claim Seven arose from a legal wrong accompanied by oppression, fraud, or malice, and upon satisfaction of the applicable requirements for imposing punitive liability upon a corporate Defendant, in an amount as the evidence and governing law permit.

**L. Further Relief Following Declaratory Judgment**

440. For such further necessary or proper relief under 28 U.S.C. §2202 as may lawfully follow from any declaratory judgment entered by the Court, including enforcement of specifically established rights or obligations arising from the declared legal relationships and, where independently authorized by applicable substantive law, appropriate monetary relief, including damages or restitution, necessary to give effect to such judgment, against the responsible Defendant, upon reasonable notice and hearing, and without duplicative recovery.

**M. Costs and Attorney's Fees**

441. For taxable costs and other recoverable litigation expenses pursuant to Federal Rule of Civil Procedure 54, 17 U.S.C. §505, where applicable, and any other governing statute or legally enforceable provision; together with reasonable attorney's fees to the extent authorized by applicable law and incurred through qualifying legal representation.

**N. Interest**

442. For prejudgment interest upon monetary awards to the extent authorized by the applicable substantive law, and post judgment interest pursuant to 28 U.S.C. §1961.

**O. Other Appropriate Relief**

443. For such other and further legal or equitable relief as the Court deems just and proper to redress the full scope of actionable harm caused by Defendants' actions, including relief necessary to effectuate the judgment entered.

Dated: October 22, 2026

Respectfully submitted,

By:____________________

Mark Mahon
movieman1000@live.com
Mariners Rest, Mariners View Avenue,
Passage West,
Cork,
Ireland
Telephone: + 353 87 742 4444

*Plaintiff Pro Se*

**DEMAND FOR JURY TRIAL**

Plaintiff Mark Mahon hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38 on all issues so triable.

Dated: October 22, 2026

Respectfully submitted,

By:____________________

Mark Mahon
movieman1000@live.com
Mariners Rest,
Mariners View Avenue,
Passage West,
Cork,
Ireland
Telephone: + 353 87 742 4444

*Plaintiff Pro Se*